Page 1

1              IN THE UNITED STATES DISTRICT COURT
2                  FOR THE NORTHERN DISTRICT OF
3                  INDIANA - SOUTH BEND DIVISION
4

ALAN ENGLAND,              :
5      Plaintiff,          :
                           :
6      v.                  : C.A. No. 3:09 CV 408
                           :
7  GAF MATERIALS CORPORATION,:
       Defendant.          :
8
                              - - -
9
                        August 18, 2010
10
                              - - -
11
12              Oral deposition of J. NIGEL ELLIS,
13  Ph.D., P.E., CSP, CPE taken pursuant to notice at the
14  Homewood Suites by Hilton, 350 Rocky Run Parkway,
15  Wilmington, Delaware, commencing at approximately 9:00
16  a.m., before Gloria M. D'Amore, Registered Professional
17  Reporter and Notary Public.
18
19
20                            - - -
21       Corbett Reporting - A Veritext Company
                  230 N. Market Street
22                Wilmington, DE 19801
                   (302) 571-0510
23
24

```
                                                  Page 2

1    APPEARANCES:

2

                   FOLEY & SMALL
3                  BY:  EDMOND W. FOLEY, ESQUIRE
                        (574)-288-7676
4                       efoley@foleyandsmall.com
                        1002 East Jefferson Boulevard
5                       South Bend, Indiana 46617
                   Attorney for Plaintiff

6

7

                   BECKMAN, KELLY & SMITH
8                  BY:  RANDALL J. NYE, ESQUIRE
                        (219)-933-6200
9                       rnye@bkslegal.com
                        5920 Hohman Avenue
10                      Hammond, Indiana 46320-2423
                   Attorney for Defendant

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 3

```
 1                       INDEX

 2

 3   DEPOSITION OF:  J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

 4

 5   EXAMINATION                          PAGE

 6

 7       Examination by Mr. Nye          5,146

 8       Examination by Mr. Foley        136

 9

10

11                  E X H I B I T S

12

13   1.  Packet of documents were premarked    5

14       as Ellis Exhibit No. 1.

15   2.  Curriculum Vitae of J. Nigel Ellis,    5

16       Ph.D., CSP, P.E., CPE was premarked

17       as Ellis Exhibit No. 2.

18   3.  Document entitled Deposition/Trial     5

19       testimony provided by Dr. J. Nigel

20       Ellis was premarked as Ellis

21       Exhibit No. 3.

22   4.  Notes were marked as Ellis Exhibit    19

23       No. 4.

24   5.  Sketch was marked as Ellis Exhibit 5.  21
```

Page 4

1    INDEX CONTINUED:

2

3    6.   Notes were marked as Ellis Exhibit        31

4         No. 6.

5    7.   Notes were marked as Ellis Exhibit        37

6         No. 7.

7    8.   Set of E-mails were marked as Ellis       43

8         Exhibit No. 8.

9    9.   Notes were marked as Ellis Exhibit        47

10        Exhibit No. 9.

11   10.  Sketch was marked as Ellis Exhibit        58

12        No. 10.

13   11.  ANSI/ASSE A1264.1: Background Materials  79

14        was marked as Ellis Exhibit No. 11.

15   12.  Sketch was marked as Ellis Exhibit       105

16        No. 12.

17        (Original notes, Exhibit Nos. 4,

18         6, 7 and 9 were retained by

19         witness, J. Nigel Ellis.)

20

21

22

23

24

Page 5

1                    (Packet of documents were premarked as

2     Ellis Exhibit No. 1 for identification.)

3                    (Curriculum Vitae of J. Nigel Ellis,

4     Ph.D., CSP, P.E., CPE was premarked as Ellis Exhibit No.

5     2 for identification.)

6                    (Document entitled Deposition/Trial

7     testimony provided by Dr. J. Nigel Ellis was premarked as

8     Ellis Exhibit No. 3 for identification.)

9                    J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE,

10    having first been duly sworn according to law, was

11    examined and testified as follows:

12    BY MR. NYE:

13        Q.   Would you state your name, please, for the

14    record?

15        A.   John Nigel Ellis.

16        Q.   Mr. Ellis, we met.  My name is Randall Nye.

17    As you know, I represent the defendant in the case filed

18    by Alan England.  I assume you've had your deposition --

19    well, I know you've had your deposition taken many times

20    before.

21                    So, you're familiar with the procedure?

22        A.   Hopefully.

23        Q.   It's probably unnecessary, but I will ask you

24    to please let me know if any question is unclear, and

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 6

1   I'll be glad to restate it.

2                  Is that fair enough?

3        A.   If it occurs to me to do so.  Sometimes it

4   occurs much later in the process after I read my

5   deposition.  So, I would answer the question by saying,

6   hopefully I would capture it by the time I'm reading my

7   deposition.

8        Q.   Well, again, I'll just ask you if you're

9   unclear about what I'm getting at, would you please tell

10  me, and I'll restate it.

11       A.   If I'm consciously aware.  Yes.

12       Q.   What's your date of birth?

13       A.   1/19/42.

14       Q.   Exhibit No. 2 is a copy of your Curriculum

15  Vitae?

16       A.   True.

17       Q.   Is this up to date?

18       A.   I believe so.

19       Q.   I've looked through your CV.  You have a

20  Ph.D., and that's from Manchester University in 1966.

21                  Correct?

22       A.   Correct.

23       Q.   Your Ph.D. was in what?

24       A.   I think it's stated in my CV.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 7

1     Q.    It says photochemical processes.

2                What does that mean?

3     A.    That's the subject matter.  That's producing

4  highly complex chemicals from the effect of light over a

5  period of time on mixtures of several chemicals, several

6  simple chemicals.

7     Q.    That didn't have anything to do with worker

8  safety, I take it?

9     A.    The Ph.D.?

10     Q.    Yes.

11     A.    Apart from staying out of harm's way with

12  those chemicals.

13     Q.    Right.  What I'm getting at is your education

14  prior to that did not focus on safety engineering or

15  anything like that?

16     A.    That's correct.

17     Q.    And it looks like you were a research chemist

18  for DuPont, 1967 to 1968?

19     A.    Yes.

20     Q.    Looking at your resumé, it looks to me the

21  first reference to something related to safety was -- you

22  indicate you were President of Research & Trading

23  Corporation, 1970 to 1986.

24                What is Research & Trading Corporation?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 8

1    Is that a name of a corporation?

2        A.    Yes.  It started before that.

3        Q.    The years given are '70 to '86?

4        A.    True.  But I'm talking about the work of

5    safety began the first day I joined the DuPont company.

6        Q.    In 1968 -- '67?

7        A.    1967.  Correct.

8        Q.    Research & Trading Corporation, is that the

9    name of the corporation?

10       A.    That's correct.  At the time, yes.

11       Q.    And you were President?

12       A.    Yes.

13       Q.    Were you an owner of that business?

14       A.    Yes.

15       Q.    Were you the sole owner?

16       A.    At times sole owner.  Yes.

17       Q.    And what was the business of that corporation?

18       A.    To develop products that were located overseas

19   and develop them into products that could be sold in the

20   U.S.  That's how I started.  And I ended up picking the

21   safety area for work at height and developing that into

22   products that were geared for America.

23       Q.    Does Research & Trading Corporation still

24   exist?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 9

1      A.   It does.  Yes.  It's part of the division of a

2   company that bought RTC, which is Sellstrom

3   Manufacturing.  S-E-L-L-S-T-R-O-M.

4      Q.   So, you sold that business in its entirety in

5   1986 to Sellstrom Corporation?

6      A.   It was 1996.

7      Q.   Oh, '96.  Okay.

8           Did the business change names to Safety

9   Manufacturing?  No.  I see.  Never mind.  Dumb question.

10     A.   The business expanded.  So, it needed a change

11   of title.

12     Q.   The business was sold in 1996?

13     A.   Correct.

14     Q.   This indicates from 1985 to 2004 you were

15   President of Dynamic Scientific Controls, Inc.?

16     A.   True.

17     Q.   Is that a consulting firm only or what?

18     A.   Yes.

19     Q.   Any other sort of services or products?

20     A.   Within DSC or Dynamic Scientific Controls?

21     Q.   Within Dynamic Scientific Controls.

22     A.   I think consulting for corporations and

23   consulting litigation support are the two parts.

24     Q.   And is it still in existence?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 10

1        A.    What's that?

2        Q.    Dynamic Scientific Controls, Inc.

3        A.    It's a parent of the fall companies.

4        Q.    It's a parent of Ellis Fall Safety Solutions,

5    LLC?

6        A.    Yes.

7        Q.    These are separate corporations?

8        A.    Yes.  I think it's an LLC, Ellis Fall Safety

9    Solutions.  Otherwise, DSC, Dynamic Scientific Controls,

10   is a corporation.

11       Q.    Who were the owners of these corporations?

12       A.    I have been and am the owner of those

13   corporations.

14       Q.    Of both of them?

15       A.    Yes.

16       Q.    Sole owner?

17       A.    At this time, yes.

18       Q.    And how many employees of Dynamic Scientific

19   Controls?

20       A.    Three is the answer, the proper answer to that

21   question.

22       Q.    And how many employees of Ellis Fall Safety

23   Solutions, LLC?

24       A.    Same answer.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 11

1          Q.    Is there overlap between the employees?

2          A.    Yes.

3          Q.    Are we talking about the same three human

4    beings?

5          A.    That's correct.

6          Q.    Who are they?

7          A.    Anna, Andy and me.

8          Q.    Could I ask for last names?

9          A.    P-A-N-C-O-A-S-T.   That's Anna.   And

10   D-U-R-N-E-Y is Andy.

11         Q.    What are their roles?   You're president of

12   both of these corporations, I take it?

13         A.    Yes.   Except, of course, LLCs don't have

14   presidents in them.   I'm the executive member.   So, Anna

15   is assistant to me.   And Andy is the accountant for all

16   of the businesses.

17         Q.    And Ellis Litigation Support, is that again

18   another division of Dynamic Scientific Controls?

19         A.    It's a DBA.   Yes.

20         Q.    DBA.   Okay.

21               So, again, the same people work for...

22         A.    Yes.

23         Q.    Do these three -- well, DBA and two

24   corporations -- two business entities share the same

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 12

1    place of business?

2            A.    Yes.

3            Q.    And where is that?

4            A.    306 Country Club Drive.

5            Q.    Is that your home, as well?

6            A.    It is.  Obviously, not the same space.

7            Q.    When was your first contact with Mr. Foley's

8    firm?

9            A.    The file is on your side of the table.  So,

10   probably, late 2008.  It appears to be during December of

11   2008.  And the first discussion with Ed Foley was the

12   12th of March of 2009 about the case.

13           Q.    If you'll forgive me, I want to back up a

14   little bit to your resumé.

15           A.    Sure.

16           Q.    You indicated you were a developer of safety

17   appliances.  And you're a patent holder.  Let's start

18   with the patent holder.

19                      Do you hold any patents on any devices

20   that are relevant to loading and unloading trucks?

21           A.    Yes.

22           Q.    And what sort of device is that?

23           A.    One that comes to mind is a ladder that is

24   specially designed for access by truckers to the flatbed

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 13

1    surface.

2         Q.   I don't suppose you know the patent number?

3         A.   I don't.  But it's known as the Anderson

4    Ladder.  So you can probably Google it.

5         Q.   Anderson?

6         A.   Mum-hum.

7         Q.   Is that in production?

8         A.   Yes.

9         Q.   Why so modest?  Why name it after Anderson?

10   Why not the Ellis Ladder?

11        A.   Because he was the truck driver who was

12   injured in the fall, who designed this for helping other

13   truck drivers not to be injured falling off of their

14   decks.

15        Q.   If Mr. Anderson designed it, why --

16        A.   We're co-patent holders.  So, I provided the

17   technical expertise.

18        Q.   What does an Anderson Ladder cost?

19        A.   Around $300.

20        Q.   Focusing on this particular case, that of Alan

21   England, would an Anderson Ladder have been useful to

22   him?

23        A.   I think it's useful to every truck driver to

24   get up on their flatbed.  But I believe he was doing

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 14

1    something involving more than simply getting onto his

2    flatbed at the time of his fall.

3          Q.    And these are patents that have something to

4    do with flatbed trucks?

5          A.    It's possible.  But nothing comes to mind

6    right now.

7          Q.    And your resumé says developer of safety

8    appliances.

9                Other than the Anderson Ladder, anything

10   relevant to flatbed truck loading?

11         A.    I thought you just asked me that question.  I

12   said nothing else that comes to mind, other than the

13   ladder for accessing the main deck.

14         Q.    Not every device is patented is what I was

15   getting at?

16         A.    That's true.  That's correct.  Thank you.

17         Q.    Back to this case.

18                I notice in your file, and I apologize,

19   we'll end up passing this back and forth, there are some

20   papers in your file, an E-mail and a CV from a

21   Christopher Gadoury, an attorney in Texas.

22                What does he have to do with this case?

23         A.    Apparently, he was involved in the process of

24   getting from a colleague of mine in Chicago, who was an

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 15

1   expert, to Gadoury to Ed Foley.

2        Q.   So, Mr. Gadoury had something to do with the

3   process of recommending your services?

4        A.   Yeah.  Or evaluating my services.  Yes.

5        Q.   Has he played any role in the formulation of

6   your opinions or gathering information?

7        A.   Neither.

8        Q.   Looking at your file, there is a letter dated

9   the 9th of November of 2008 from you to Chris Gadoury.

10  In your letter you say, Quote, Certain hours may be

11  traded at various stages with Garland Cherry, Esquire,

12  trial attorney in Clermont, New Jersey for strategy

13  sessions, upon agreement and designed to improve the

14  value of my testimony, close quote.

15             Who is Mr. Cherry, and what did he have

16  to do with this case?

17        A.   The last part is nothing.  The answer to the

18  first part is, he's a friend and formerly an attorney in

19  personal injury who has been a colleague of mine for over

20  20 years.

21        Q.   But he had no assistance in this case?

22        A.   No.

23        Q.   Did you ever discuss this case with Mr.

24  Cherry?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 16

1          A.    No.  Not that I recall.

2          Q.    Just to tidy things up, Exhibit No. 1 is a

3    copy of the report you prepared for Mr. Foley?

4          A.    Yes.  The first few pages are the report that

5    I prepared for Mr. Foley.

6          Q.    Who put together the rest?

7          A.    I presume Mr. Foley's office.

8          Q.    Okay.  So, the part you prepared is pages --

9    the seven-page document at the front of it on your

10   letterhead, and the rest was put together by Mr. Foley's

11   office?

12         A.    I'm not sure what "put together" means.

13   Essentially, part of my CV, I guess, trying to provide

14   information about me in a sense.  It's not part of my

15   report, though.  And then there's the article I put into

16   Professional Safety on truck -- trucking and particularly

17   tarping of flatbed trailers.  And nobody put in the web

18   pages that I have on trucking.  I don't see that here.

19   That should be part of it.  Also, some photographs that

20   were taken of the yard, which is used for strapping and

21   tarping.

22         Q.    If I could stop you there just for a second.

23                    In this report, there are four

24   photographs.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

```
                                            Page 17

 1                    Were you provided with any others?

 2                    MR. FOLEY:  I got more than that,

 3     Randall.

 4                    MR. NYE:  What I'm asking is what Mr.

 5     Ellis looked at.

 6                    MR. FOLEY:  I mean, there's five in the

 7     report, I think.

 8                    MR. NYE:  Are there five?  You're right.

 9     My mistake.  My apologies.

10     BY MR. NYE:

11          Q.    There are five photographs here?

12          A.    Yes.

13          Q.    Did you review any others?

14          A.    Don't know.  If I have them, I did.  If I

15     don't have them, I probably didn't.  That's all I recall

16     anyway.  I don't recall anymore.  There was a videotape,

17     also, of the same environment that you're holding open

18     right now.

19          Q.    Right.  So, the video, the five photographs.

20                    Any other photographs or recordings that

21     you saw?

22          A.    Nothing that I have with me.  I don't recall

23     anything in the file box.

24          Q.    And then we have here a diagram.  I take this
```

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 18

 1   to be -- well, actually, seven -- four diagrams.  My

 2   impression is Alan England prepared these and sent those

 3   to you.

 4                       Correct?

 5        A.   Yes.  At my request.

 6        Q.   And the records of the ambulance service, it

 7   looks like?

 8        A.   Yes.

 9        Q.   And, of course, I assume your office prepared

10   the list of deposition testimony?

11        A.   Yes.

12        Q.   Any other materials or information provided to

13   you by Mr. Foley or his office?

14        A.   The depositions.

15        Q.   Right.  You list those in the report, of

16   course?

17        A.   Correct.

18        Q.   My mistake.

19                  Adding onto the depositions, any other

20   materials or information provided by Mr. Foley's office?

21        A.   The agreement with Mr. Foley.  I think that's

22   it.  My CV.

23        Q.   Your report indicates that you provided the

24   OSHA and ANSI standards that you refer to in your report.

Page 19

1   And your report indicates that you had a discussion with

2   Alan England.

3                   Could you, please, tell me about that?

4        A.   I think there were three discussions

5   altogether.  I was trying to get -- if it's possible -- I

6   try and interview the surviving plaintiff or witness just

7   to get my questions answered or a direction and summary

8   to the deposition of that witness.

9        Q.   In person or by telephone?

10       A.   Phone.

11       Q.   And did you record these conversations?

12       A.   No.

13       Q.   Did you take notes?

14       A.   Yes.

15       Q.   Could I see the notes, please?

16       A.   They're on the yellow sticky.  So, if you want

17  to leaf through them, you can do it.  They're on the

18  edge.  So, the bottom one would be the first one, if it

19  has his name on it.

20                  MR. NYE:  Off the record.

21                  (An off-the-record discussion took place

22  at this time.)

23                  MR. NYE:  Back on the record.

24                  (Notes were marked as Ellis Exhibit No.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 20

1   4 for identification.)

2   BY MR. NYE:

3        Q.   Mr. Ellis, I want to refer you to what has

4   been marked as Ellis Exhibit No. 4.  These are a group

5   exhibit consisting of, I don't know, ten or eleven

6   handwritten pages.  This is from your file.

7                   Correct?

8        A.   Yes.

9        Q.   And these are notes you took during your

10  telephone conversation with Mr. England, it looks like,

11  on March 12, 2009?

12       A.   Inclusive of those, yes.

13       Q.   And can you tell from this how long you spent

14  talking to Mr. England?

15       A.   An hour.

16       Q.   Can you read this for me?

17       A.   My example of Soja.

18                   COURT REPORTER:  I'm sorry, Doctor.

19                   THE WITNESS:  Soja.  Capital S-O-J-A.

20  BY MR. NYE:

21       Q.   And what does that mean?

22       A.   Mr. Soja is an attorney in Connecticut.

23       Q.   Why did you write his name down?

24       A.   Because I thought there may be a solution

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 21

1    along the lines that I prepared for him relating to truck

2    accidents and work at height.

3         Q.   What do you mean by "a solution?"

4         A.   For Mr. England and other drivers at the GAF

5    plant in Michigan City.

6         Q.   What is that solution?

7         A.   That's it.  It's a duplicate.

8                   MR. NYE:  Would you mark that, please.

9                   (Sketch was marked as Ellis Exhibit No.

10   5 for identification.)

11   BY MR. NYE:

12        Q.   Exhibit No. 5 is something that you brought

13   with you.

14                   Can you explain what this is?

15        A.   That's the sketch that I did in the Soja case

16   showing how this particular truck in that case could have

17   been accessed for cleaning up the garbage, especially,

18   plastic bags hanging over the side of the very large

19   garbage truck so they could roll the tarp over in

20   preparation for a long drive.

21        Q.   So, this is a device -- did you testify in

22   this Soja case?

23        A.   I think the case was settled the day before

24   trial.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 22

1      Q.   Did you give a deposition?

2      A.   I want to say yes.

3      Q.   Is this case on the list of depositions in

4   your report?

5      A.   If it is, I gave a deposition.  If it isn't, I

6   didn't.  But usually, I prepare this for a deposition or

7   a report.

8      Q.   And is it your opinion that this kind of

9   device should have been installed at the GAF plant?

10      A.   Maybe I should change the word should to

11   could.  It's one of many examples.

12      Q.   And the next word I'm going to point you to --

13      A.   Prohibition of going unload.

14      Q.   What does that mean?

15      A.   Don't know.  Sometimes companies prohibit you

16   from climbing on your load.

17      Q.   Does this refer to a remark by Mr. England?

18      A.   Don't know.  Probably me.

19      Q.   What's this down here?

20      A.   Three straps.  Two for first bundle.  One for

21   next bundle.

22      Q.   Let's try this.

23           With this in front of you, to whatever

24   extent it refreshes your recollection or from your

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 23

1   memory, please tell me what information you got from Mr.

2   England in this conversation on March 12, 2009.

3       A.   Well, he was on the third strap.  He had done

4   pickups at GAF previously.  He was an owner/operator.

5   There were 14 pallets of shingles on the trailer.  The

6   trailer was eight-foot wide.  Two-inch rub rail.  R-U-B,

7   R-A-I-L.  Two words.  48-feet long.  I can't read my own

8   writing to follow.  Essentially, the load was centered.

9   The drip edge around the trailer was four-inches wide,

10  which he later corrects to three and three-quarter inches

11  wide.  Not much of an edge to walk on.  On the ground

12  usually throw straps over the tarp to get on the load.

13  It's not a sentence there.  Throw straps over tarp, get

14  on load.  It sounds like what action he took at the time.

15               A lot of confusion at the time in the

16  plant because the main gate was closed.  Lots of traffic

17  going in both directions.  Throwing the steel buckle over

18  and hit another guy's truck.  Throw up on tarp and

19  climbed and dropped it through.  Then lost memory.  Woke

20  up in the hospital.

21               Softeners.  Edge protection.  Nice day.

22  Must go on the load.  25 miles and stop and check the

23  load.  Every two hours after that.

24       Q.   Would you explain that, please?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 24

1      A.   It is a requirement that you check that the

2  straps are tight on the load within 25 miles beginning of

3  the journey.

4      Q.   Meaning, he told you that he had to stop every

5  25 miles and get up on the load?

6      A.   That's standard that you got to stop your

7  trip, presumably by pulling the truck over and check that

8  your straps are secure.  And then subsequently every two

9  hours after that.  I didn't ask him every different way

10  of doing that, if he had to climb up on the truck.  I

11  don't know if I asked that question.  When on the road

12  over the years, I've seen drivers on the road up on top

13  of their trucks or their trailers.

14             On tarp.  Query.  Pull strap.  Shingles

15  don't move much.  Tarp had bungees.  Loaded with a

16  forklift.  Sent to the tarping and strapping area.

17  Exposed outside.  I can read the words, but I don't

18  understand the context.  Bill of lading is the last thing

19  that picks up.  Must load.  Must be tarped.

20      Q.   Mr. England told you his load had to be

21  tarped?

22      A.   Yes.  Required.

23      Q.   Required by who?

24      A.   Whatever paperwork he had.

Page 25

1    Q.   Have you ever seen the bill of lading in any

2    of the paperwork for this load?

3    A.   I don't think so.  Mr. Foley says that he has

4    it.  So, I'll look at it.  Maybe I just forgot.  But I

5    didn't see it when I was packing up the materials today.

6    Q.   Okay.  Sorry to interrupt you.  Go on, please.

7    A.   Aluminum plants.  Safe area to work.  It's a

8    closed-sided dock, specifically in other plants.  Gives

9    an example of Newburgh, Indiana.  System for two trailers

10   with a wire.  No getting on the load at Alcoa.  It's too

11   dangerous.

12   Q.   Excuse me.  It looks like $100 you wrote down

13   there.

14          What does that mean?

15   A.   Don't know.  Talked about four-foot deck and

16   six-foot coil at an Alcoa plants.  Both had wires

17   overhead.  Rope and harness.

18   Q.   So, Mr. England is describing to you some

19   things he saw at an Alcoa plant in Newburgh, Indiana?

20   A.   Amongst many other Alcoa plants.  Primarily,

21   it looks like he was transporting coil to and from these

22   locations.

23   Q.   Have you, yourself, ever been to any of the

24   Alcoa plants?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 26

1        A.    Many.  I've been the Alcoa fall protection

2   engineering consultant now since 1973.

3        Q.    Go ahead.

4        A.    At this GAF plant, typically, there would be

5   30 truck trailers strapping and tarping.  All loading and

6   storage was outside in the Michigan City plant.  Level

7   area.  Alcoa is the best.

8        Q.    What does that mean?

9        A.    I'm reading into my memory here.  For

10   consistency from plant to plant to having different but

11   yet effective measures for getting fall protection of

12   drivers.

13        Q.    Is this something that Mr. England said, or is

14   it just your opinion, your writing?

15        A.    No.  It's his words that I'm --

16        Q.    That's what I was getting at.

17                   Those were his words?

18        A.    Correct.  Yes.  Right.  But there are also

19   notes that others do it.  And I presume -- I don't know

20   how the ISO 9000 came up.  I don't know whether I

21   mentioned that.  I don't think I would.  But I'm not sure

22   how he would know that, but maybe he does because of his

23   military background.

24        Q.    What is the ISO 9000?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 27

 1        A.   It relates to consistency of production or

 2   operation, such that the consistency leads to a level of

 3   productivity that can be related to production in a

 4   plant.  ISO 9000 is the testing standard to which all

 5   operations are measured if you undergo the services of

 6   that standard.

 7        Q.   Whose standard is this?

 8        A.   ISO is International Standards Operations for

 9   Geneva.  That's the standard for plants to adopt.

10   Manufacturing adopts ISO 5000 series.  And this process

11   might have been the ISO 9000 process.

12        Q.   And Mr. England was familiar with that?

13        A.   He may have been.  I could, certainly,

14   probably say I wasn't familiar enough to actually write

15   down ISO 9000 unless it was mentioned.

16             It says the old, old companies are not

17   doing it.  It says he pulled in and there were -- I'm

18   thinking concrete blocks on one side and nothing on the

19   other side.  Got paperwork.  There was remodeling going

20   on.  Got paperwork from the guard area.  Checked it.

21   Other truckers were doing the same.  Tractor trailers

22   were parked close by for strapping and tarping.  Four

23   feet is too much.  Separation.  Two feet is okay.  There

24   were 25 trucks there, approximately.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 28

 1      Q.   Would you explain that, please, four feet is
 2   too much?  What is that?
 3      A.   I approached this several times in the other
 4   two times I talked with him.  The context changes of
 5   what's too close, what's too far away and what's just
 6   right.  So, this was relating to how close trucks either
 7   are or should be.  And the facility for tossing the
 8   steel, or the buckle on the strap over the truck.
 9      Q.   And what did Mr. England tell you in that
10   regard?
11      A.   In one context he says four feet is too much.
12   Two feet is okay.  So, somewhere in my interpretation of
13   that is between two and four feet is just fine at that
14   time in that discussion.
15      Q.   So, he's referring to how close the semis
16   should be to each other while they're being strapped?
17      A.   Strapped.
18      Q.   And he says two feet is too close, four feet
19   is too far away?
20      A.   In this conversation, two feet is okay.  Four
21   feet is too much.  I'm not sure what the context is.
22   There were other conversations about this to follow that
23   I didn't understand myself.
24                    I think this, also, is dealing with the

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 29

1    view from the street.  So, either had the pictures, or

2    the time, or I had seen the video, and he's recalling

3    that.

4                    The opening times of the plant at

5    Michigan City.  He says there were no signs relating to

6    -- getting in until they, the truck drivers, figured out.

7    Photos were taken from the curb.

8        Q.    If I can interrupt you there.

9                    The photographs that are attached to

10   your report, do you know who took those?

11       A.    Either he did or Mr. Foley did.

12       Q.    Did you have input into what was being

13   photographed?  Did you ask them to photograph anything in

14   particular?

15       A.    No.  This was before I was involved.

16       Q.    And the same sort of question with regard to

17   the videotape.

18                    Did you have any input into what was

19   photographed or from what angle?

20       A.    No.

21       Q.    I'm sorry.  Go ahead.

22       A.    The limitation was the fence, I think.

23                    A load was going to Georgia.  Had to

24   wait for 30 to 45 minutes.  I asked him to draw a bird's

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 30

1    eye sketch, which he subsequently did.  Got the

2    impression that his truck and trailer were trapped while

3    the trucks couldn't really move.  Had the buckle and

4    strap -- he threw the first two over successfully.  He

5    didn't know the other driver.  Didn't see him.

6                      Conversation returns to tarps.

7    140 pounds each.  Four feet.  I don't know what that four

8    feet refers to.  Throw up on the trailer.  Rolled to the

9    roller on -- rolled to roll on.  Tarps and shingles

10   another four feet.  I'm not sure how to make that into a

11   sentence.  One tarp for the whole load.  Rolled down.

12   Very few gaps between the bundles.  No other choice.

13        Q.   No other choice about what?

14        A.   To do what he did, I'm assuming.

15        Q.   Do you recall anything else, any other

16   information that you got from Mr. England in that first

17   conversation on March 12, 2009?

18        A.   No.

19        Q.   Could you locate, if you could, locate your

20   notes for your next conversation with Alan England?

21        A.   I had a conversation on the 9th of June of

22   2010.

23        Q.   With Mr. England?

24        A.   He was on the call.  Yes.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 31

1      Q.    And was Mr. Foley also on the call?

2      A.    Yes.

3                  MR. NYE:  If we could have a moment.

4                  Would you mark this, please, again

5      anyplace.  We don't want to obscure anything that was

6      written.

7                  (Notes were marked as Ellis Exhibit No.

8      6 for identification.)

9      BY MR. NYE:

10     Q.    Mr. Ellis, what has been marked as Exhibit No.

11     6 are your notes of your conversation with Mr. Foley and

12     Mr. England on June 9, 2010?

13     A.    Yes.

14     Q.    Would you do the same thing here?  Go through

15     here, and either from your memory or from whatever --

16     let's put it this way.

17                 What new information did you get in this

18     conversation?

19     A.    I would have to refer to it.  How about if I

20     answer that question by simply going through it and

21     giving you what's new?

22     Q.    Fair enough.

23     A.    So, on that phone call, somewhere in the

24     middle of that phone call with Mr. Foley, Alan England

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 32

1   was reached by phone.

2               He had been in the plant before 30 times

3   over the past six or seven years.  Confirms that his

4   vehicle was trapped.  Confirms that he was feeding web

5   strap through the rub rail gap.

6       Q.   Now, where did he say he was when he was

7   feeding it through the --

8       A.   We haven't got there yet.  We may not get

9   there here.

10      Q.   All right.  Go ahead.

11      A.   Asked about rules for truck drivers.  He said

12  there were none.  Other plants, yes.  Number of trucks

13  there per day, he estimates, 150 per day at which 10 to

14  15 were GAF trucks and trailers.

15              Confirms that the height of the pallets

16  of shingles was four feet.  And the bed was around four

17  feet -- four feet or so.  Pallets are four by four,

18  according to Alan England.  40-inch estimate of one in

19  that position is incorrect.  Full length of his trailer

20  is 48 feet.  If he did walk the edge, he would hold onto

21  the pallet strap for balance.  Confirms there were 14

22  pallets on his trailer, which was centrally and evenly

23  loaded.

24              He got up on the wheel, or with a

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 33

1    stepladder, or at the ICC rail.  There was a two-foot

2    space, approximately.  Truck next to him was loaded with

3    shingles.  One part each side similar to his.

4         Q.   Excuse me.  He was telling you that the truck

5    next to him was how far away?

6         A.   Two-foot space.  Park area was holding 15 to

7    20 trucks at about 9:30 that day.  Estimates the area was

8    50 feet by 300.  On that day, the front gate was closed

9    for construction.  The back gate was the only way in and

10   out this day.  There was traffic going in both

11   directions.  Confirms all loading is always done outside.

12   There were two loading areas using forklifts.  Area one

13   in the front and area two in the back.  Pull around into

14   the tarping tie down area same way.  GAF forklift

15   operator lifted the tarp.  Talk about some loads were

16   10-to 13-feet tall.  Tarp was put up there by the

17   forklift operator.  He unrolled it.

18        Q.   If I can interrupt you, then.

19             Is he describing something happening at

20   GAF?

21        A.   He's talking about general operations over his

22   30 visits.

23        Q.   So, this business about loads 10- to 13-feet

24   tall, that was not something he was describing at GAF?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 34

1          A.    No.  It could have been some loads that they

2    took out of there -- other truckers -- 10- to 13-feet

3    tall.  But that was his -- some of his loads -- not all

4    were 14 pallets.  They were more or less and higher and

5    lower and so.  They varied considerably.

6          Q.    Did he tell you that tarps were loaded or

7    lifted by forklifts at GAF?

8          A.    Yes.  Not all of the time.  But some of the

9    time.  However, he says they were at least helpful;

10   whereas, Alcoa would actively help you.  He's talking

11   about Newburgh, Indiana, Reynolds and Ravenswood, West

12   Virginia.  Leave it at Ravenswood.  Also Alcoa Tennessee

13   plant.  Six or seven loads per week.  3,500 miles per

14   week.  Typically, he dropped the shingles and then

15   returned with an Alcoa load, including Alcoa boxside

16   plant and Texarkana.

17         Q.    Let me ask you what this means.  It looks like

18   you wrote 50/50 chance.

19                     What does that refer to?

20         A.    I'm trying to interpret that.  That he would

21   be on top of the load, including occasions when the load

22   was twisted.  That may be generally, not specifically,

23   with regard to the GAF plant the loading.

24         Q.    In what context is this 50/50 chance he would

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 35

1   be up on the load?  In what context?  At what time?  Or

2   doing what?

3       A.   Well, certainly, for all tarping, he would be

4   on top of a load.  But I don't know what this 50/50

5   chance refers to in terms of traveling from Plant A to

6   Plant B.  But I think it relates to the fact he was

7   frequently on top of his load for whatever reason.  And

8   he gives other reasons for that in the conversation.

9               Points out again the forklift operators

10  were not really social at the GAF plant.

11              Regarding the strapping that day, three

12  trucks were right against the concrete barriers.  And

13  there was a central track in the 300 feet by 50 feet area

14  where all trucks went back and forth.  This particular

15  sketch is going one direction, but the previous sketch

16  goes both directions.

17              There was some heightened risk.  Hazard

18  of moving trucks.  We talked about turning radius.  I

19  think that's where I've done the sketch of that.

20              The other driver pulled next to Alan.

21  The note I made here is that the controlling employer was

22  GAF.  And in that work area, there were no rules.  There

23  were security in and security out.  Paperwork shufflers.

24  Steel mills in the south were worse.  At GAF, it took

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 36

1    30 minutes to load.  And one to five hours, whatever that

2    means, to go through the plant.

3                    Talks about his company, Builders

4    Transport and Spectrum Transportation, who dispatched

5    him.  There was no rule books for drivers at GAF.

6                    I did not understand the next question,

7    which relates to no shingles moved in bracket except the

8    ice underneath -- if ice got underneath.  That's the end

9    of the conversation.

10        Q.   It looks like you've written down Rick

11   Williams of Schilli Transportation and a Cell phone

12   number.

13                    Who gave you that information?

14        A.   Most probably, Mr. Foley.

15        Q.   Do you remember anything else about this

16   conversation with Mr. England and Mr. Foley?

17        A.   No.

18        Q.   Did you say you had a third conversation with

19   Alan England?

20        A.   Mum-hum.

21        Q.   Could you locate that?

22        A.   I believe so, from memory.  It's on the 11th

23   of June of 2010.

24                    MR. NYE:  And if you don't mind, could

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

                                                        Page 37

1    we have this marked as Exhibit 7.

2                      And if you would like to take a quick

3    break.

4                      THE WITNESS:  Yes.

5                      (Notes were marked as Ellis Exhibit No.

6    7 for identification.)

7                      (Break was taken at, approximately,

8    10:30 a.m.)

9                      (Back on the record at, approximately,

10   10:40 a.m.)

11                     MR. NYE:  Back on the record.

12   BY MR. NYE:

13       Q.   These are your notes talking to Mr. England

14   on, it looks like, on June 11, 2010.

15                     Am I right so far?

16       A.   Yes.

17       Q.   And was Mr. Foley in on that call, as well?

18       A.   It does not look like it.

19       Q.   From your memory or your notes or both, would

20   you, please, tell me what information or any new

21   information you got at the time from Mr. England?

22       A.   Talked about the congestion of trucks, which

23   are a mixture of flatbeds and panel trucks.  80/20,

24   percentage wise, which we use for shipping out of the

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 38

1    plant.

2                     This part doesn't look like it should be

3    part of a discussion with Alan England.  It talks about

4    premises law.  So, I think Mr. Foley may have been on

5    that call.

6                     Is this the one we already did?

7         Q.   I believe Exhibit 7 was just marked not too

8    long ago.

9         A.   Okay.  And this part of the conversation, I

10   believe, Mr. Foley must have been on the call.

11        Q.   And he provided you with some opinions from

12   him on Indiana premises liability law?

13        A.   Yes.

14        Q.   Do you personally think that you are an expert

15   on premises liability law in the State of Indiana?

16        A.   I'm not an expert.  But I've been acquainted

17   with what the law is.  So, therefore, if I were in

18   Indiana, I should be guided by the language of reasonable

19   care toward business invitees, which is similar in most

20   states anyway.  And I do come up against it in every case

21   I do.

22                     Essentially, my expertise is based on

23   whatever the premises law in that state is.

24        Q.   But you're aware we have 50 states?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 39

1          A.    And I've been hired in every one of them as an

2     expert in fall cases.

3          Q.    Other than speaking with Mr. Foley, what have

4     you done to investigate the law in Indiana on premises

5     liability?

6          A.    Nothing.

7          Q.    Have you consulted any statutes or legal

8     authorities regarding Indiana law?

9          A.    Yes.  I do have, somewhere on the table here,

10    I do have a summary of Indiana law in this area.

11         Q.    Well, we'll get to that, then.  Go ahead.

12         A.    Keep on going?

13         Q.    Yes.

14         A.    I'm leaving out other aspects of Michigan,

15    sorry, Michigan City, but Indiana premises law,

16    concerning business invitees.  There are other items

17    there.

18                    How far should trucks be apart is one

19    question.  And his opinion this day is four feet.  They

20    talk about at what distance you have to move sideways

21    between two trucks.  That appears to be two feet.  Can't

22    walk straight.  You have to go sideways.

23         Q.    So, whose opinion is it that it should be four

24    feet?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 40

1        A.   His opinion.

2        Q.   Do you have an opinion on that?

3        A.   I don't have an opinion at this time on

4   whether it should be four feet.  I think it should be as

5   much as possible so you can accomplish a work process of

6   strapping from the ground which is conveniently and

7   capably tossing a strap from one side of your truck over

8   the top of the load to the other side without endangering

9   yourself or another person, including another driver.

10        Q.   Let's talk about that.

11             So, it's possible to, feasible, to strap

12   the load from the ground without getting up on the

13   trailer, the strapping itself.

14             Do you agree with that?

15        A.   If there is special distances involved both

16   after headroom and also beyond the other side of your

17   truck so the arc can continue.  Because as it touches

18   down, the strap is going to arc further to its pivot

19   point.  You don't want it to be hung up on the side of

20   your truck so you have to climb up the truck to get it.

21   So, there's going to be headroom issues, which I don't

22   know if there's anything -- the question of here is

23   sufficient headroom.  What's the question is the

24   inability for Mr. England to toss this strap and buckle

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 41

1   over the truck, such that it doesn't come into contact

2   with another truck, which happened to be parked close to

3   him that day.

4        Q.   And what did he tell you was the distance

5   between his truck and the truck next to him?

6        A.   I'm not sure whether already discussed that or

7   not.  But it appeared to be -- I don't recall

8   specifically, but I believe it was less than two feet.

9        Q.   And Mr. England told you that he thought he

10  needed four feet to be able to strap from ground level

11  without getting up on the trailer?

12       A.   That was what he said, from what I understood

13  from what he said.  That would be the minimum distance

14  apart.  I got a sketch of this somewhere in my notes

15  anyway.

16       Q.   We'll look at the sketch in a minute then.

17            Would you go ahead, then, with what you

18  can tell us about the conversation on June 11, 2010?

19       A.   We're discussing the likelihood of walking rub

20  rail, as opposed to climbing the load.  He has no

21  specific memory of which.  But he's familiar at previous

22  times with doing both, depending on the circumstances.

23  He said he would walk on the load he climbed, if

24  necessary.  If it was eight feet off the ground, more

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 42

1   likely to walk on top than to have three inches of rub

2   rail to walk on which might be slippery.

3        Q.   So, if I understand you correctly, he didn't

4   recall whether he, at the time of his fall, was on top of

5   the pallets, or was on the rub rail?

6        A.   That's correct.  But thinks it's more likely

7   he was on top.

8        Q.   I'm sorry.  Go ahead.

9        A.   Would regard himself as skilled throwing over

10  the truck, meaning the buckle.

11       Q.   Is that another way of saying he's pretty

12  confident that if he had enough room, he could strap the

13  load without leaving the ground?

14       A.   Yes.  Talks about 80 percent of the time the

15  straps are below the tarps.  The tarp goes on top of the

16  strapped load.  The reason is to avoid tearing the tarp.

17       Q.   Now, this is something I wanted to ask you

18  about.

19                  Did he tell you that it was his

20  intention to tarp the load on the date of this fall?

21       A.   I'm reasonably confident I can say the answer

22  is yes to that.

23       Q.   Why only reasonably confident?

24       A.   Because I don't see a statement yet that says

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 43

1    he was going to do it, actually do it.  But it seems the

2    forms and the paperwork were such that he had to do it.

3         Q.   But you haven't seen the forms and the

4    paperwork?

5         A.   Not that I recall.  I may have.  But I don't

6    recall right now.  I would have to look in the file.

7         Q.   Well, here's your file.  I don't see any other

8    paperwork relating to his load on the day of the

9    accident.

10        A.   You checked this.  I'm looking at some notes

11   here from Mr. Gadoury, which relate to a conversation he

12   has had with Mr. England, Alan England.  Describes the

13   loading of the pallets on the truck -- on the trailer.

14   When I say truck, I really mean trailer.

15        Q.   Right.  I understand.  I do the same thing.

16             MR. NYE:  Since you're referring to

17   that, let's mark that Ellis 8.

18             (Set of E-mails were marked as Ellis

19   Exhibit No. 8 for identification.)

20   BY MR. NYE:

21        Q.   Mr. Ellis, Exhibit 8 is a set of E-mails

22   between Chris Gadoury and yourself regarding Mr.

23   England's case?

24        A.   Yes.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 44

1          Q.    I'm a little confused.

2                  My impression from you earlier was Mr.

3     Gadoury's only input in this matter was to recommend your

4     services?

5          A.    That's what I thought, too.

6          Q.    Did he also speak to Mr. England and then

7     provide some information to you?

8          A.    Apparently so, at the tail end of 2008.

9          Q.    With that addition, Exhibit 8, did Mr. Gadoury

10    have any other input in the matter?

11         A.    It looks like there were one or two calls.

12    That's about it.

13         Q.    Did Mr. Gadoury represent Mr. England?

14         A.    I don't know.  I don't think so.  I don't know

15    whether he's another expert or whether he's an attorney.

16    I just don't know.  Maybe it's somewhere in the files

17    here.  I've had no constructive discussion, other than

18    that one E-mail that you just saw with Mr. Gadoury.  But

19    a summary of the discussion is I believe that Mr. England

20    was preparing to tarp that truck that day, at least the

21    trailer portion of the truck.

22         Q.    Would it be more accurate to say you believed

23    he was intending to tarp it?

24         A.    Isn't that what I just said?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

                                                    Page 45

1        Q.    You said was preparing to.

2                My understanding from this deposition

3   is, whatever his intentions, he didn't get beyond -- he

4   didn't even complete strapping.

5                Do you agree with that?

6        A.    Yes.  I do agree.  But intending is a better

7   word.

8        Q.    You were explaining, or you were going through

9   your Exhibit 7, your notes of the conversation of

10  June 11, 2010?

11       A.    Yes.  It looks like another reason to get

12  higher up the load is edge protection is important when

13  strapping down shingles, pallets of shingles.  It's very

14  easy to cut the shingles.

15       Q.    But didn't Mr. England testify in his

16  deposition that he was able to put his edge protectors on

17  from the ground with a device that he purchased.

18                Isn't that true?

19       A.    I think for the lower height loads, that's

20  true.  But for the higher loads, which we weren't dealing

21  with this day, I think you have to get up there somehow

22  to do that.

23       Q.    But the load he had on the day of his fall,

24  according to his testimony, he could put the edge

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 46

1    protectors in from the ground?

2         A.   I concluded the same thing.  We talked for a

3    while about coil loading, which is really an Alcoa type

4    of operation.  We talked, again, about GAF loading of

5    shingles.  Talked about pulling the tarp off the load so

6    he don't have to go up on the load when you're untarping.

7         Q.   That would be at the point of delivery then?

8         A.   Yes.  I can't read the other portions of my

9    notes.

10        Q.   Fair enough.  Okay.  I think we talked about

11   three telephone conversations with Alan England.

12              My impression is, those are the only

13   occasions that you have spoken with him.

14              Am I right?

15        A.   Yes.

16        Q.   Okay.  I got the idea from your report that

17   you had also spoken to Mr. Rick Williams?

18        A.   Yes.

19        Q.   Are there notes of that conversation?

20        A.   Yes.

21        Q.   Could you find those, please?

22        A.   May I put these in here.

23        Q.   You're the best judge of where they go.

24        A.   Dated the 10th of June of this year.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 47

1                    MR. NYE:  Before we get started, if you

2      don't mind, we'll mark that as Ellis 9.

3                    (Notes were marked as Ellis Exhibit No.

4      9 for identification.)

5      BY MR. NYE:

6          Q.   Exhibit 9 are your notes from your

7      conversation with Rick Williams on June 10, 2010?

8          A.   I think so.

9          Q.   Was Mr. Foley in on that conversation?  I see

10     his name there.

11         A.   Well, the name on the left merely means it's

12     going to go in this file.

13         Q.   Does that mean he was not a part of the

14     conversation?

15         A.   It doesn't say he was.  It doesn't say he

16     wasn't.

17         Q.   What is your recollection?  What can you tell

18     us?

19         A.   My recollection is that at this moment Mr.

20     Foley was not on this call.  It may have been a call from

21     him.  But, I think, I had his phone number so I could

22     have made the call myself, or he could have called me, or

23     Mr. Foley could have made the call.

24         Q.   Fair enough.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

                                                    Page 48

1          A.    Whatever happened, I asked the questions.

2          Q.    Fair enough.

3                        And what information did Rick Williams

4     give you on June 10, 2010?

5          A.    Right.  Has been trucking, transporting

6     shingles for 20 years.  You need a distance between the

7     trucks of four to six feet.  Truck meanings trailers.  If

8     you're an old man, you need to use a side kit.  Two

9     words.

10         Q.    Two questions.

11                        What is a side kit?

12         A.    A side kit is a bunch of two by fours and thin

13    plywood, which is slotted together to form a barrier

14    which can stay in place or be removed, depending on the

15    needs of getting the load off the truck.  And it's a very

16    popular way of providing a side to the load for certain

17    types of goods.  It does take up space.  It does take up

18    part of the weight.

19         Q.    The other question would be, we all have

20    different points of view, but in the context here of this

21    conversation, what's an old man?

22         A.    I didn't dare ask.  I didn't ask for a

23    detailed explanation of what an old man is.

24         Q.    You wrote 48 years.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 49

1          Is that how old Mr. Williams is?

2     A.   47 years is how old he was at the time.  Yes.

3     Q.   From the context of the conversation, did Mr.

4  Williams seem to classify himself as an old man?

5     A.   No.

6     Q.   Did he use a side kit?

7     A.   No.

8     Q.   Mr. England is about ten years older.  He was

9  59 when he had his accident.

10          Is he an old man for these purposes?

11     A.   I did not go into that discussion.  But I

12  might have concluded that he was thinking that an older

13  person should have a different system.

14     Q.   Why?

15     A.   I didn't make that conclusion.  But I thought

16  he was trying to make that conclusion.

17     Q.   Meaning, Mr. Williams thought of Mr. England

18  as in the old-man category?

19          MR. FOLEY:  Let me just object.  I think

20  you're asking him to speculate, aren't you, Randy, what's

21  in someone else's mind?

22          MR. NYE:  I'm asking about the context

23  of the conversation.

24          MR. FOLEY:  Speculative.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 50

1    BY MR. NYE:

2        Q.   Let's put it this way.  You've had more

3    experience with the trucking industry than I.

4                  Fifty-nine is well beyond the median age

5    of truck drivers?

6        A.   Well, somewhere in this conversation, in fact,

7    down here bottom of that page, he's saying he knows

8    people who drive flatbeds who are 80-years-old.  So, I

9    guess, if you have trucking in your blood, you're going

10   to do it as long as you can physically move around.

11       Q.   But generally speaking, 59 is older than

12   average?

13       A.   I didn't make any conclusions at all with

14   regard to the situation at hand and the fact he says he

15   knows 80-year-old drivers who use side kits.  And to

16   never take them off is a way to work longer from his

17   experience.

18       Q.   Let's go ahead and talk about this

19   conversation.

20                  Again, what information did Rick

21   Williams give you on June 10, 2010?

22       A.   Flatbeds are typically a young man's job.

23   Backing into a dock.  And drive the forklift down onto

24   the flatbed is a way of working side kits.  Talks about

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 51

1  turning his truck and trailer around.  150 flatbeds every

2  day.  20 trucks there at the time, estimate.  Takes one

3  hour to get through and takes 15 minutes for him to tie

4  down.  "They," meaning the forklift operators, will put

5  up your tarp.  He had a 150-pound tarp.  Although, he is

6  saying his preference was for small tarps, 25 to

7  30 pounds each.

8       Q.   Is he telling you that GAF operators, forklift

9  operators will put the tarps up on the load for you?

10       A.   Yes.  Yes.  Upon request.  And I assume he was

11  talking about the GAF plant.  It is common practice

12  nationwide to ask the forklift operators to do that for

13  you.

14            Heard him fall as he hit the ground.  He

15  ran around and saw him.  Went and got security.  He

16  usually climbed on top of the load, not walked around.

17       Q.   To do what?

18       A.   Sometimes to put edge protectors.  He gets to

19  load now and again, but not in this case.  His trailer

20  was 102-inches wide.  Alan's was 96-inches wide.  Maybe

21  three-inch rub rail beyond that.

22       Q.   If I could go back, if you don't mind.

23            I understand Mr. Williams told you he

24  gets on his load now and again, but not, what's that, not

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 52

1    in this case?

2          A.    Not in this case.  Talking about himself.

3    There was no stacking of pallets.  Each pallet was

4    four-feet tall.  If you have two pallets one on top of

5    each other, you would be 12 feet, plus the height from

6    the ground.  Eight plus four is just over 12.  Got

7    maximum of 13-and-a-half feet with maximum height of your

8    truck, trailer.

9          Q.    But what Williams is telling you, on this

10   occasion, this place, there's only one --

11         A.    He's talking about his own truck.  He didn't

12   get on the load in this case.

13         Q.    Meaning, GAF that day, his truck with the

14   single roll of a layer of pallets, he would not get on

15   top?

16               MR. FOLEY:  When he said he did not do

17   it in this case, in this instance, he didn't get on his

18   own truck in this instance.

19               THE WITNESS:  Right.  He got on top of

20   it now and then, but not in the case.

21   BY MR. NYE:

22         Q.    "He" meaning Williams?

23         A.    "He" meaning Williams.  He said he got there

24   first, but then he changed that to he may be wrong.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 53

1    There were lots of concrete barricades around.  He

2    recollects that he pulled in first after another truck

3    pulled out.  He was intending to go park, then strap then

4    tarp.

5              Now, the process is to go in one way and

6    come out another way.  Then that day he had to circle and

7    go back in the same area.  They were, apparently,

8    building a new security building.  Alan's truck had four

9    feet on top of the trailer; in other words, it was about

10   eight-feet tall.

11        Q.   Meaning a single layer of four-foot pallets?

12        A.   Yes.  Were there any rules, not at GAF,

13   affecting the drivers.  That was the end of the

14   conversation with Mr. Williams.

15        Q.   So, Mr. Williams told you that he heard Mr.

16   England fall?

17        A.   Yes.

18        Q.   Had he seen Mr. England before then?

19        A.   Did not ask that question.

20        Q.   Had he spoken with him before that?

21        A.   The answer is, I don't think so.

22        Q.   Had Rick Williams begun strapping his load at

23   the time that Mr. England fell?

24        A.   Yes.  He says that he was either strapping or

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 54

1   tarping.  I can't remember which he said.  I don't think

2   I have any note of that.  But he was working on his

3   truck.

4          Q.   Can you read that for me, please?

5          A.   It appears to say taller loads elsewhere, for

6   example, drywall.

7          Q.   Discussing loads somewhere other than GAF?

8          A.   Yes.

9          Q.   Could you read that for me, please?

10         A.   Back in dock.  Drive on end with forklift.

11         Q.   It looks to me, if I can read your

12  handwritten, it looks like move truck, question mark.

13              Am I reading that correctly?

14         A.   Yes.

15         Q.   What did you mean by that?

16         A.   I don't know.

17         Q.   And what is the line below that?

18         A.   I seem to be trying to investigate whether or

19  not Mr. England's truck was trapped in traffic, part of

20  traffic.  And I don't think I got an answer.

21              And the next line, which is not related

22  to the line previously on the truck, moving the truck.

23  There's nobody in front of his truck.  I don't know why.

24  It must have come up in the conversation.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 55

1    Q.   Does nobody mean no truck was parked in front

2  of it or no people were there or what?

3    A.   I don't know.

4    Q.   It looks to me if I read this correctly,

5  quote, Got up in front and walked around, close quote?

6    A.   Yes.

7    Q.   What do you mean by that?  Who got up and

8  walked around?

9    A.   I don't know.  He certainly didn't see Mr.

10  England until he heard the fall, impact, and then went

11  around and saw his legs.

12    Q.   I noticed you wrote GAF Mt. Vernon there.

13          Did Mr. Williams talk about the GAF

14  plant at Mt. Vernon, or what?

15    A.   It came up.  I don't know what comment he made

16  about Mt. Vernon.

17    Q.   I see the word Kevin here.

18          Who is Kevin?

19    A.   I don't know.

20    Q.   It says, Kevin, am I reading this correctly,

21  Kevin, landlord owes a duty of care?

22    A.   Yes.

23    Q.   No idea who Kevin is?

24    A.   No.  Not at this moment.  No.  Kevin's

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 56

1   research is pointed to the next line.  I guess, maybe,

2   that's Mr. Foley's assistant.

3                    MR. NYE:  Is it right, Ed?

4                    MR. FOLEY:  I have an associate named

5   Kevin.  He has done some research for me.  But I don't

6   remember him ever talking to you.

7                    THE WITNESS:  He may not have.

8                    MR. FOLEY:  Okay.

9                    MR. NYE:  Okay.  Thank you.

10                    MR. FOLEY:  May I look at those real

11   quick, too, Randy.  Thanks.  This writing is worse than a

12   doctors.

13                    MR. NYE:  That's harsh.

14                    THE WITNESS:  My father was a doctor.

15   Maybe I have his genes.

16                    MR. FOLEY:  Well, you're a doctor.  I

17   guess it fits in.

18                    MR. NYE:  Architects have excellent

19   handwriting.  They print.  So, it's legible.

20                    THE WITNESS:  No sense of safety.

21                    MR. FOLEY:  A friend of mine I mentioned

22   is an architect.

23   BY MR. NYE:

24        Q.   So, that's the only conversation you had with

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

                                                    Page 57

1    Rick Williams?

2         A.    True.

3         Q.    Have we discussed every conversation that

4    you've had with either Alan England or Rick Williams?

5         A.    Yes.

6         Q.    Have you had any other sources of information

7    that we haven't discussed here?

8         A.    Not that I'm aware of.

9         Q.    And Exhibit 3 is a list of cases in which you

10   have given depositions or court testimony?

11        A.    Yes.

12        Q.    Is this complete?  Are there any other cases?

13        A.    I'm reliant on my assistant.

14        Q.    As far as you know, is it complete?

15        A.    I don't know the answer to that question.  I'm

16   hoping it's accurate.

17        Q.    Was your assistant directed to prepare a

18   completed list?

19        A.    She keeps the list.

20        Q.    I've read different things in your report.

21   Here 20 inches.  Other things.

22              Did you come to any conclusion as to the

23   distance between Rick Williams' truck and Alan England's

24   truck?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 58

1          A.    In what way, physically, you mean, or because

2     of...

3          Q.    Yes.   Somebody wrote 20 inches.   I've seen two

4     feet.

5                    What is your conclusion in that regard?

6          A.    Well, it wasn't enough to toss a buckle on a

7     strap over conveniently for Mr. England.

8          Q.    But how far?

9          A.    I have an interesting sketch some place, which

10    maybe we should find, which would help.  Answer my

11    approach to that area.  It's a variable approach.  It's

12    in here somewhere.

13                    Here is the sketch.  (Indicating.)

14                    MR. NYE:  Could you mark that, please.

15                    (Sketch was marked as Ellis Exhibit No.

16    10 for identification.)

17    BY MR. NYE:

18         Q.    It's kind of implicit in the conversations

19    that we've had that you've never been to the Michigan

20    City plant of GAF?

21         A.    True.

22         Q.    Is Exhibit 10 the diagram or your sketch that

23    you were just referring to?

24         A.    Yes.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 59

1      Q.    Would you explain this, please?

2      A.    Taken or drawn from the position of being at

3  the back, the rear of the truck, maybe even the front,

4  not discounting the truck itself, shows an individual

5  lobbing an object over the top of the loaded truck.  In

6  this case, it would be shingles packed over a four-foot

7  wide pallet.  It shows you the alternative ways of how it

8  might be thrown.  I haven't actually reconstructed that

9  to check how good Mr. England was.  But his opinion was

10  that it was not satisfactory to throw it into a gap he

11  had available, whatever that was.

12      Q.    Do you have an opinion on what that gap was

13  between the truck?

14      A.    Not specifically, no.  It was insufficient.  I

15  think both Rick Williams and Alan England would agree

16  with that.

17      Q.    Have you watched truck drivers throw straps

18  over loads of shingles?

19      A.    Yes.

20      Q.    When Alan England was throwing his strap over,

21  was it just a strap?  Was there a metal buckle attached

22  to the end that was being thrown or not?

23      A.    Well, I regarded it was a standard practice.

24  The webbing strap could be two- or three-inches wide or

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 60

1    30-thick webbing.  And the buckle would be to attach to

2    the load binder there on the other side.

3         Q.   So, you would expect there to be a buckle on

4    the end of the strap, the end that is being thrown over?

5         A.   Yes.

6         Q.   Could we look at your report, Page 4.  Under

7    the subheading The Hazard, Item No. 1.

8         A.   The Hazard - background?

9         Q.   Yes.  The Hazard - background, that

10   subheading.

11        A.   Yes.

12        Q.   Item No. 1.  You give some statistics there

13   for fatalities from falls?

14        A.   I do.

15        Q.   You refer to the construction industry?

16        A.   Yes.  And then I refer to all occupational

17   deaths.

18        Q.   What are you saying, that 33 percent of

19   fatalities in the construction industry are from falls?

20   Is that what you're saying?

21        A.   A third of the deaths at work in construction

22   are from falls.  That's correct.  That's one statement.

23        Q.   But Mr. England was not working in the

24   construction industry; was he?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 61

1        A.    That's true.

2        Q.    You say that industry deaths represent

3   14 percent of all occupational deaths?

4        A.    Yes.  Which would include Mr. England's type

5   of work.

6        Q.    But it would include all occupations?

7        A.    That's correct.

8        Q.    Which is more and less hazardous than

9   strapping a truck?

10        A.    A person could have been strapping a truck and

11   been killed once.  But if it existed, it would be in that

12   statistics.

13        Q.    All occupations, roofers, whatever?

14        A.    HVAC.  Everything.

15        Q.    Did you look at, or are you aware of any

16   statistics or data with regard to deaths from occasion in

17   the course of strapping trucks?

18        A.    No.  But I broaden that to say flatbeds.

19   Okay.  Flatbeds, in general, would take into account

20   strapping.

21        Q.    And what data is there?

22        A.    It is very low.  But it is low for one reason.

23   After discussion with BLS, loads, quite conceivable, the

24   very person that should be reporting such deaths of

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 62

1    falling off of a flatbed truck are people who have been

2    killed.  There is such an amenity of owner/operators in

3    this country, sole employees, they don't get around to

4    reporting their own death.

5         Q.   So, you're saying the deaths from --

6         A.    In the trucking industry.

7         Q.   Don't get reported?

8         A.    Sixty deaths are unreported each year based on

9    my rough calculations.

10         Q.   Are reported or are unreported?

11         A.    Unreported.

12         Q.   Are you speaking of deaths resulting from,

13   what, a fall from a flatbed truck?

14         A.    Falls from the load or the surface of flatbed

15   truck, flatbed trailer.

16         Q.   Can you break that down between strapping and

17   tarping?

18         A.    No.

19         Q.   Would it include both strapping and tarping?

20         A.    It would include any operation involving

21   height and a flatbed trailer.

22         Q.   You say these deaths are unreported.

23              Where does the number come from?

24         A.    I did a calculation.  The injuries are well

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 63

1    reported, and they're consistent with other industries.

2    But trucker death involving flatbeds are very low because

3    they're underreported because the death of the

4    owner/operator, who is the owner of his own one or two

5    flatbeds, is unable to report his own death.

6                  So, I did it based on comparison of

7    statistics injuries to death.  The typical number of 300

8    to 1 injuries to death in industry, from industry to

9    industry.

10        Q.   On these calculations, could you provide Mr.

11   Foley with a copy of it?

12        A.   I would possibly have to re-research that, but

13   I could do that.  Yes.

14        Q.   When did you do this?

15        A.   In the last two years.

16        Q.   Was it published?

17        A.   I have published it.  And I have reported it

18   in presentations to the National Safety Council and/or

19   the American Society of Safety Engineers.

20        Q.   Well, if you published it, isn't it already in

21   written form?

22        A.   In Powerpoint form.  It will be on my website.

23        Q.   Which is more dangerous, tarping or strapping?

24        A.   Tarping is definitely more dangerous and

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 64

1   hurtful to your body than strapping overall.

2         Q.    Can you quantify that?

3         A.    No.   There are so many different scenarios

4   that arise.  A low ceiling.  Trucks parked close to each

5   other.  A wall.  Strapping which is normally done by

6   tossing a buckle on the end of the piece of webbing over

7   top of a truck trailer is -- sometimes you have to

8   improvise.  So, it's a well-recognized issue that falls

9   within the tarping area, which is consistently almost

10  every truck, and you treat it from a policy point of

11  view, as any work done at height by a truck operator must

12  follow certain rules.  So, you apply that to your own

13  truckers, and you apply it to independent truckers.

14        Q.    Strapping, it can be done from the ground?

15        A.    Normally.

16        Q.    And as long as it is done from the ground,

17  there's not going to be any fall?

18        A.    That's correct.  Not enough to account for,

19  unless it's icy or has other slippery conditions.  The

20  owner should keep the lot where you're expecting work to

21  be done by his own drivers or by independent drivers,

22  should keep it free of hazards.

23        Q.    The Alan England case, any hazards on the

24  surface?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 65

1      A.    There did not appear to be.  It was a dry day.

2 So, what could have been the case one day was not the

3 case that day.

4      Q.    In your report of the same page, Page 4, The

5 Hazard - found here, that subheading?

6      A.    Mum-hum.

7      Q.    You make a reference to premises law calls for

8 protection of invitees.

9            Would you agree that Indiana law -- they

10 govern this issue?

11      A.    Yes.

12      Q.    I'll state what's obvious, you haven't been to

13 law school?

14      A.    I have.  Just up the road.

15      Q.    What law school did you attend?

16      A.    I attended for one semester at Widener Law

17 School.

18      Q.    Is this on your resumé, or did I miss it?

19      A.    It may be.  But I'm not sure.  It may be.

20      Q.    What is the name of the law school again?

21      A.    Widener.  Abbreviated it could be called The

22 Delaware Law School.  W-I-D-E-N-E-R.

23      Q.    And when was this?

24      A.    Probably five- or six-years-ago.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 66

1          Q.    Was it your intention to get a law degree?

2          A.    It was to be admitted to law school for

3     evening classes.

4          Q.    How many classes did you take?

5          A.    Three.

6          Q.    And what were they?

7          A.    Agency, remedies and writing, I believe.

8          Q.    Writing?

9          A.    Yes.  Agency, remedies and writing.

10         Q.    Referring to that version of the intellect of

11    legal writing?

12         A.    Correct.

13         Q.    Those are the only law courses you've ever

14    taken?

15         A.    Yes.

16         Q.    None of those courses, from the sounds of

17    things, would have anything to do with premises liability

18    law?

19         A.    Why not?  Remedies applies.  Agency applies

20    here.  But in terms of its applicability to this case,

21    obviously, I've been involved with thousands of fall

22    cases of every description.  And I'm not applying law,

23    but I'm reasonably familiar with concepts of laws as the

24    attorneys that I'm working for bring them to my

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

                                                    Page 67

1     attention.

2          Q.   Do you have an opinion on whether Mr. England

3     was an invitee or licensee under Indiana law?

4          A.   I don't know the answer to that question

5     technically.  I believe certainly he was an invitee.  He

6     had been many times.  Okay.  He wasn't thrown out of the

7     plant.

8          Q.   What do you mean you don't know the answer

9     technically?

10         A.   Well, because I know he was an invitee.  They

11    may be one in the same thing, as far as I know.  The

12    invitee, he certainly was.

13         Q.   Can you define the difference between an

14    invitee and a licensee under Indiana law?

15         A.   No.

16         Q.   Can you define the duty of a landlord -- I'm

17    sorry -- the owner or occupier of land in Indiana to an

18    invitee?

19         A.   I believe the risk -- the presumption of a

20    duty that an owner of a property has to invitees who may

21    not recognize hazards.  And if they did, they may not do

22    anything about them on the property.

23         Q.   What is that duty?

24         A.   The duty is to provide a safe place to visit.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 68

1   Reasonable care.

2        Q.   Have you consulted any or looked at any

3   Indiana case or any Indiana statute that relates to

4   premises liability law?

5        A.   I have.  There is a document somewhere in the

6   proceedings here which I saw last night which relates to

7   that.

8        Q.   So, what did you look at?

9        A.   Let me see if I have it.

10                 MR. FOLEY:  I need to check out.  It's

11   almost noon.

12                 MR. NYE:  Let's take five minutes or so.

13                 (Off the record at, approximately, 11:45

14   a.m.)

15                 MR. NYE:  Back on the record.

16                 (Back on the record at, approximately,

17   12:00 p.m.)

18                 THE WITNESS:  So, the answer to your

19   question is that the document must be still on my office

20   table, which relates the summary of Indiana premises law

21   at home.

22   BY MR. NYE:

23        Q.   Weren't you asked to bring your complete file

24   here?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 69

1      A.    I intended to bring everything.

2      Q.    Who prepared this summary of Indiana premises

3  liability law?

4      A.    I don't know.

5      Q.    Did you prepare it?

6      A.    No.

7      Q.    Anything else you did not bring with you that

8  relates to this case?

9      A.    Not that I'm aware.

10     Q.    On the same page, Page 4, you make the

11  statement that OSHA Section 5(a)(2) requires the

12  controlling employer, in this case GAF, to provide

13  protection to its invitees.

14            My understanding is 5(a)(2) directs

15  entities to comply with regulations?

16     A.    True.

17     Q.    You refer to two specific regulations there.

18  OSHA 1910 and 1926.

19            Are there any other specific OSHA

20  regulations that you believe apply to Mr. England's

21  truck?

22     A.    I've used the consensus standards, ANSI

23  Z359.1.

24     Q.    ANSI, that's not a government regulation.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 70

1              Correct?

2        A.    That's true.

3        Q.    We'll get to that.  But I would like to talk

4   about one thing at a time.

5        A.    But under general duty, you have to use a

6   recognize standard in the industry to support the

7   5(a)(1).

8        Q.    Let's put it this way.

9              You reference here two ANSI standards

10  and two OSHA standards.

11             Are there any other --

12       A.    They are bodies of standards, really.  1910 is

13  a body of general industry standards, which, if it exist,

14  it would follow this kind of case, if OSHA chose to

15  prepare a citation against the owner.  And 1926 also is a

16  body of knowledge, which could be applied.

17       Q.    Are there any others that you believe are

18  applicable here?

19       A.    No.  This covers pretty much.  There may be

20  some other ANSI standards that I have not included, but I

21  think these two are the most important.

22       Q.    Let's focus on OSHA for a while, then we'll

23  get to ANSI.

24       A.    You're focusing on ANSI, which is a

Page 71

1    recommended set of standards.  They could be cited as

2    part of general duty.  OSHA citation.

3         Q.   Well, I'm just talking about one thing at a

4    time, if you don't mind.

5         A.   Go ahead.

6         Q.   My understanding is that OSHA Section 1926 is

7    a set of rules for construction industry.

8              Am I right?

9         A.   That's typically the way it's used.

10        Q.   But Alan England was not working in

11   construction?

12        A.   That is absolutely true.

13        Q.   And 1926, therefore, does not apply, or

14   doesn't require anything of GAF, in this instance?

15        A.   It's a body of knowledge that GAF and any

16   other reasonable employer would use to formulate its own

17   rules on site affecting not only its own employees, but

18   also employees who are invitees, which could be

19   owner/operators like Mr. Alan England.

20        Q.   Are you saying that 1926 required anything of

21   GAF?

22        A.   No.  It's a body of knowledge that a wise

23   employer, somebody who has been in business for many

24   years, and is interested in providing a set of rules or

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 72

1    policies for independent drivers and its own drivers as

2    employees could have pulled from that body of knowledge

3    to create a set of rules for safety, if they had chosen

4    to do so.

5         Q.   I understand what you're saying.

6              But OSHA would not cite GAF for not

7    following 1926 with regard to --

8         A.   Probably not.  Unless there were some

9    extenuating circumstances involving construction in an

10   area, or a truck had come through an area in the front of

11   the building, which was being reconstructed at the time.

12   But there was no such evidence for this particular case.

13        Q.   Not on this day, this truck?

14        A.   That's correct.

15        Q.   Okay.  I want to ask you the same with regard

16   to Section 1910.

17              Is there anything specific in there that

18   applies to loading and unloading trucks?

19        A.    Not that I have seen.  But the overall

20   standards would apply to edges and falls that occur at

21   several locations within the 1910 section.

22        Q.   Here again, it's simply a set of standards

23   that could be followed by a landowner or employer?

24        A.    It is.  It's a place which is law in its own

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 73

1    right and has been in existence for many years.  It's not

2    like it came yesterday, or the day before this incident.

3    And it could have been years to create a set of policies

4    that would apply to what invitees would do in this plant,

5    whether they should wear hardhats, whether they should

6    wear gloves, whether they should be mindful of fall

7    hazards, what they should do if a fall hazard, such as

8    tarping, or such as climbing on the truck or the load for

9    any reason, what they should do for safety, which most

10   plants in this country of any size do have currently and

11   have had for many years.

12        Q.   But for Alan England's truck on the day and

13   place where he was hurt, there's nothing specific that

14   would required any particular fall standard?

15        A.   That's true.  GAF never created the rules for

16   visitors to its plant that could include Mr. Alan

17   England.

18        Q.   So, it's a set of rules, or a body of concepts

19   that could be used to create rules, but not binding on

20   GAF legally?

21        A.   I think very definitely binding on GAF legally

22   when it comes to premises law.  These rules were not with

23   one company.  They were with hundreds of companies

24   nationwide.  We've already seen Alcoa have these rules in

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 74

1    effect.  You wouldn't be handed these rules when you came

2    in the gate through security.  Do this, don't do that.

3    When you're at height, use the tarping station.  Don't

4    climb on the truck unnecessarily.  Don't go to any

5    lengths to expose yourself to a height over four feet,

6    which is the general industry rule out of the 1910

7    regulations, which have been generally accepted by plants

8    nationwide.

9                     So, there very definitely would be some

10   rules that should have been set up and policies that

11   should have been set up for drivers like Mr. Alan England

12   to guide him on safety on the premises.

13        Q.   But 1910, there's nothing in there that could

14   be the basis for an OSHA citation against GAF?

15        A.   We're not talking about employees.  We're

16   talking about simply a set of rules that would apply to

17   invitees under premises law in Indiana on the day of Mr.

18   Alan England's visit on the site where he was injured.

19        Q.   My question was, anything in 1910 that could

20   serve as the basis for an OSHA citation against GAF with

21   regard to Mr. England's strapping, his strapping, what he

22   was doing with his truck, loading of his truck on the

23   date of the accident?

24        A.   There could have been.  I don't think there

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 75

1    was.  There wasn't an OSHA violation.  But they could

2    have applied 5(a)(2) to his situation if they had so

3    chosen.  If he had been killed, there may have been a

4    better chance of a citation which we're talking about.

5         Q.   1910 has a lot of stuff in it.

6              Right?

7         A.   Yes.

8         Q.   Can you tell me anything in there specifically

9    that relates to loading and unloading of trucks?

10        A.   No.  Loading and unloading trucks is one form

11   of exposure.  Not even the loading process.  We're

12   talking about the tarping process or the strapping

13   process here of what gives rise to a height hazard.

14   Certainly, Mr. England, without dispute, is over four

15   feet above the ground, which does invoke some aspects of

16   the general industry rules.  It is four feet in general

17   industry and six feet in construction, generally.

18              So, we could have taken that four-foot

19   rule out of general industry and applied it to a set of

20   policies that would be applicable to Mr. England when he

21   was doing the work of any kind over four feet.

22        Q.   I don't think you're answering my question,

23   which is, is there anything in 1910 that specifically

24   relates to loading and unloading trucks?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 76

1          A.    Not that I've seen.

2          Q.    Let's look back to 1926.  I read from part of

3     your record, and you state in there 1926.500 exempts

4     vehicles or trailers from the requirement of fall

5     protection and the trigger height is six feet.

6                    Is that still true?

7          A.    Yes.  As it applies to employers and

8     employees.

9          Q.    With regard to the ANSI standards there that

10    you refer to in your report, you refer to Z359.1.

11                    My understanding is that standard

12    provides guidance on how to provide fall protection, if

13    one wants to do it, needs to do it.

14                    Is that a fair statement?

15         A.    Yes.

16         Q.    Is there anything in that standard that

17    specifically relates to truck loading, unloading,

18    strapping?

19         A.    There's no reference to any application of

20    products or systems.  It really relates to, if you want

21    to create a fall protection system because you know you

22    have a fall hazard of any kind whatsoever, then here is a

23    place to find how to build that system and what standards

24    that it should meet.  Once you decide that there is a

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 77

```
1    hazard of tarping, for example, then that is the place to
2    go to provide a fall protection system criteria for that
3    system that you choose to apply.
4         Q.   But no reference to loading and unloading
5    trucks?
6               MR. FOLEY:  I think the standard would
7    speak for itself, wouldn't it, Randy?  Aren't you just
8    asking him to relate to you what the standard states?
9    Doesn't that speak for itself?
10              MR. NYE:  Well, he's discussing his
11   report.  I think I'm entitled to ask about it.
12   BY MR. NYE:
13        Q.   My question is, does ANSI Z359.1 have any
14   reference to loading or unloading trucks or strapping
15   trucks or tarping trucks?
16              MR. FOLEY:  Same objection.
17              THE WITNESS:  There's no reference to
18   any application of fall protection in any of the ANSI
19   Z359 standards.
20   BY MR. NYE:
21        Q.   So, the answer is, no, it doesn't make any
22   reference?
23        A.   That's correct.
24        Q.   You also referred there to the ANSI standard
```

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 78

1  No. A1264-1?

2          A.    Dot 1.

3          Q.    Dot 1.  Pardon me.  A1264.1.

4                  I've looked at that, and as I read it,

5  it says in the scope, when describing its scope, that it

6  expressly excludes loading and unloading of trucks.

7                  Do you agree?

8          A.   If you read that there, then I certainly would

9  agree with that, as it specifically states at that

10 particular scope and point in the standard.

11                 But the other points of the standard,

12 relative from a protection point of view, such as pulling

13 up catwalks and railing heights, and other types of

14 structure, which a truck would back into, and you would

15 then be able to do your strapping, tarping from the safe

16 area of a catwalk, at a height of, let's say, eight feet

17 or four feet, as the case may be, you would very

18 definitely pull from that standard how to build a catwalk

19 for such protection that you may deem as effective in

20 your operation.

21         Q.   I have it here somewhere.

22                 Do you agree that the written standard

23 expressly states in describing its scope that it does not

24 apply to loading and unloading trucks?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 79

1        A.   If you want to quote from it, I will stipulate

2    to that, if that's what the standard says.  But my

3    previous answer stands.  If you want to build a catwalk

4    to do operations around trucks, then you get your

5    guidance from A1264.1.

6        Q.   Well, do you agree or disagree, I can find it

7    for you, if you want, and you referred to it in your

8    report --

9        A.   You should.  You should.  We're dealing at

10   cross purposes here with that question.

11               MR. FOLEY:  Do you want to mark that,

12   Randy?

13               MR. NYE:  Well, he agrees with it.

14   Maybe we might as well.

15               Can you mark that.

16               (ANSI/ASSE A1264.1: Background Materials

17   was marked as Ellis Exhibit No. 11 for identification.)

18               MR. FOLEY:  Could you identify, Randy,

19   what is Exhibit 11?

20               MR. NYE:  Something I printed out from

21   the website, American Society of Safety Engineers.  ANSI

22   A1264.1.  I'll show it to you.

23               MR. FOLEY:  Is it the actual standard,

24   or is it a summary from the website?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 80

1              MR. NYE:  Summary.

2              MR. FOLEY:  It's not the actual

3    standard.

4              MR. NYE:  It's what I printed out from

5    the website.

6              THE WITNESS:  I can have a copy of the

7    standard faxed to you.

8    BY MR. NYE:

9       Q.   Anyway, I read this to say, excluded from the

10   standard are, among other things, the loading and

11   unloading of trucks, railroad and marine docks,

12   self-propelled, motorized equipment and some other

13   things.

14             Do you agree?

15             MR. FOLEY:  Let me just, for the record,

16   object.  This, apparently, is not the specific ANSI

17   standard.  This, apparently, is an interpretation from a

18   website that Randy took from some source.

19             So, to the extent you're asking him

20   whether or not that document, Exhibit 11, says what

21   you're indicating it says, I have no objection.  But to

22   the extent you're asking him to relate that to the ANSI

23   1264.1, specific standard, my objection would be that the

24   standard speaks for itself.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 81

1                    THE WITNESS:  Yes.  I think in your

2      statement you were correct.  But you did not add the last

3      part of the sentence, which is what the purpose is aimed

4      at, which is for the purpose of providing walk access to

5      a product off of construction work areas.  And certainly,

6      I agree with that.  We're not providing actual walking

7      access using the A1264.1 to the bed of a flatbed trailer.

8                    However, that does not conflict with my

9      assertion that the standard can be used to build a

10     catwalk out to the edge of the truck for the purpose of

11     providing an access as appropriate over the railing of

12     the catwalk attempting to walk for purpose of tarping,

13     strapping, other such means in the normal course of

14     preparing a truck for the highway.

15     BY MR. NYE:

16          Q.   Of course one can do anything.  One can follow

17     anything.  I'm asking about the standard.

18                    Do you agree that the scope of the

19     standard does not apply to trucks, to, what's the term

20     used, loading and unloading areas of trucks?

21                    MR. FOLEY:  Same objection.

22                    THE WITNESS:  But you got to finish the

23     sentence.  Unloading and loading of trucks for the

24     purpose of providing walk access to a product.  I'm

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 82

1   saying I'm not disagreeing with that.  But what I am

2   saying is, if you want to build a catwalk goes up to, but

3   doesn't allow you on the vehicle, then the standard would

4   apply.

5   BY MR. NYE:

6        Q.    Is it your opinion --

7        A.    A finger dock is used in the terms of this

8   standard.  Building a finger dock, you would absolutely

9   go to this standard.  But you're not providing access

10  onto the bed of a truck, which is what that statement

11  says.  So, I agree.

12       Q.    Is it your position that this standard A1264.1

13  applies to loading and unloading of areas of trucks?  Yes

14  or no?

15       A.    No, the way that you've expressed your

16  question.  You're not addressing the issue of finger

17  docks.  Finger docks is how you would go -- is a go-to

18  standard for preparing a finger dock.

19       Q.    In this case, there was no finger dock?

20       A.    There was no finger dock.  Could have been a

21  finger dock.  It could have been a great idea.

22       Q.    Are you saying this A1264.1 would apply to a

23  finger dock?

24       A.    Yes.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 83

1        Q.    Okay.  At the GAF plant in Michigan City,

2   there was no finger dock?

3        A.    That's correct.

4        Q.    Something we can all agree on?

5        A.    Unfortunately, that's the truth of the matter.

6   There was no protection, fall protection of any kind at

7   the GAF plant in this case.

8        Q.    If we can focus on my question, which is,

9   given that there was no finger dock, does ANSI A1264.1

10  apply to the Michigan City facility?

11       A.    Absolutely.  It applies to, probably, dozens

12  of locations in the GAF facility in Michigan City.  And,

13  in particular, if GAF had chosen to provide protection of

14  any kind for workers, and they chose the finger docks,

15  which are at other GAF plants, notably in the Baltimore

16  plant are finger docks, that they could have pulled the

17  standard how to built a catwalk to go around the area

18  that a truck would back into, or drive through, then,

19  that would have been the standard to go to.

20       Q.    So, it's a standard for catwalks?

21       A.    Yes.  Catwalks and walk areas that are

22  self-contained.

23       Q.    If one --

24       A.    Builds a catwalk in that scope.  Yes.  That's

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 84

1    what it's for.

2         Q.   So, this is simply a source one can use for

3    guidance in preparing a catwalk?

4         A.   Catwalk and finger dock.  Correct.  We would

5    not be stepping from the catwalk onto the flatbed truck

6    by this standard.  That's correct.

7                   MR. FOLEY:  Can I see that, Randy?

8                   MR. NYE:  Yes.

9    BY MR. NYE:

10        Q.   We discussed the scope of this regulation?

11        A.   Of the standard.

12        Q.   Standard.  You're right.  It's not a

13   regulation.

14                   ANSI is an acronym for American Society

15   of Safety Engineers?

16        A.   No.  ANSI is the American National Standards

17   Institute.  And the organization that host this

18   particular standard is the American Society of Safety

19   Engineers.

20        Q.   These are private organizations.  They're not

21   governmental bodies?

22        A.   The American National Standards Institute is a

23   recognized standards body that provides the American

24   government representation to the International Standards

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 85

1    Organization out of Geneva.  So, it has quasi

2    governmental status.  The U.S. Government is delegating

3    its membership to the American National Standards

4    Institute.  There are tens of thousands of ANSI

5    standards.  Most of them are recommendary standards.

6    Occasionally they are picked up into law as was the ANSI

7    A117 Disabilities Standard before it became law.

8         Q.   The ANSI standards that you've referred to,

9    they have not been made into law?

10        A.   The ones I have been referring to have not

11   been made into law by the Federal Government.

12        Q.   Are you saying they were made into law by the

13   government of the State of Indiana?

14        A.   I don't know the answer to that question.  I

15   don't think so.  I think Indiana is maybe a federal state

16   referring to OSHA matters.  At one time, Michigan adopted

17   an ANSI standard for fall protection, but not currently.

18   And that may be so from other standards or other states,

19   too.

20        Q.   But not the Federal Government and not

21   Indiana?

22        A.   I believe that's true.

23        Q.   We talked about the scope.

24                  Are there any specific standards within

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 86

1    A1264.1 that discussed loading and unloading trucks?

2          A.    At this time throughout ANSI, including the

3    Z15 trucking standards, there's no mention of loading or

4    unloading at this time, specifically.

5          Q.    Continuing on, Page 4 of your report, the next

6    item under the subheading The Hazard - found here, Item 3

7    you say, quote, The danger of falling is not appreciated

8    by truckers and they do not have the capacity to protect

9    themselves, close quote.

10                What's the basis for this statement that

11   the danger of falling is not appreciated by truckers?

12         A.    What I'm saying here is that safety is not

13   intuitive.  Safety must come from a set of rules, which

14   are then applied.  So, you have to have enforcement.  If

15   someone does not follow your rules, does not use your

16   finger dock, or your fall protection system, then you

17   have the right to exclude them from the plant or notify

18   the direct employer of the violation of your rules.

19         Q.    Well, what you're saying is in this sentence

20   is that the danger of falling is not appreciated by

21   truckers.

22                What do you mean by that, that they

23   don't understand they can fall?

24         A.    It's really not so much they don't understand

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 87

1    that they can't, they can or can't fall.  But they don't

2    understand the consequences of falling in their every day

3    conduct of their work on your property.

4         Q.   Are you saying that Alan England didn't

5    appreciate the danger of falling?

6         A.   He did not appreciate the danger of falling

7    such that would end up with the type of injuries that he

8    presently has or worse.  This is the greatest hazard

9    faced in construction.  It's very severe in other

10   industry.

11        Q.   What's your basis for saying that Alan England

12   did not appreciate the risk of being injured by a fall?

13        A.   I go back to the word consequences.  Most

14   people think they can catch themselves if they're

15   falling.  Very few people, including lawyers and experts,

16   hold onto stair railing, which are meant as a fall

17   protection device.  They may appreciate that they can

18   fall.  But they don't appreciate the consequences of

19   falling and the fact that several million people go to

20   the emergency room from falling on their home stairs or

21   office stairs every single year.

22                  So, they don't understand the

23   consequences and the cost to society of it and the cost

24   to the host employer.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

                                                        Page 88

 1        Q.   So, you're not saying that Alan England did

 2   not realize that he could fall and could hurt himself

 3   while falling?

 4        A.   I'm not saying that, per se.  I'm saying that

 5   the consequences are not understood by anybody in

 6   America.

 7        Q.   Did Alan England tell you that he was unaware

 8   of the risk of falling and hurting himself?

 9        A.   No.  I never asked that question to him.  I

10   would suspect he would say that he was aware.  But he

11   wasn't aware of the consequences of how much the costs

12   would be to himself or others.  And it's the duty of the

13   premises owner to know that anybody coming on their

14   property would not understand the hazard and would not

15   take any matter themselves or any solution to remediate

16   that exposure.

17        Q.   Are you aware that Mr. England was an

18   independent contractor?

19        A.   Yes.

20        Q.   What does that mean?

21        A.   Compared to what?  Independent contractor as

22   far as GAF is concerned?

23        Q.   Yes.

24        A.   Whoever hired him or found the work for him to

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 89

1    do.

2        Q.   He owned his truck and his trailer?

3        A.   Right.

4        Q.   He was in business for himself?

5        A.   Yes.

6        Q.   He was not an employee of GAF?

7        A.   That's right.

8        Q.   What is the distinction between being an

9    independent contractor and being an employer under

10   Indiana law?

11              MR. FOLEY:  In what context, Randy?  I

12   think there's a lot of distinction.  I don't think that's

13   an appropriate question.

14   BY MR. NYE:

15       Q.   You can answer.

16       A.   Could you clarify?

17              MR. FOLEY:  Let me object.  I think the

18   question is ambiguous.  I would object to the form of the

19   question.

20              THE WITNESS:  Can you restate it in a

21   different words?

22   BY MR. NYE:

23       Q.   What is your understanding of the distinction

24   between an independent contract and an employee under

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 90

1   Indiana law?

2                   MR. FOLEY:  Same objection.

3                   THE WITNESS:  An employer usually pays a

4   salary to an employee in this type of work.  GAF, in

5   fact, did have its own employee drivers on this site.

6                   When an employee might fall, for

7   example, he would fall under the worker's compensation

8   statute in Indiana being an employee of, actually, a

9   fee-paying employer.

10                  If an independent contractor is driving

11  the truck, he is not covered by the Indiana worker's

12  compensation statute and would have to look to his own

13  worker's comp contracts, if he has one.

14  BY MR. NYE:

15      Q.   Do you have an opinion on whether GAF had a

16  duty to provide a safe place to work to independent

17  contractors like Alan England under Indiana law?

18      A.   Yes.  I believe that falls under premises law.

19      Q.   Alan England, as an independent contractor, he

20  was his own employer.

21                  Correct?

22      A.   I believe so.

23      Q.   And did he have responsibilities under OSHA as

24  an employer?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 91

1        A.   That question is whether OSHA applies it to a

2   sole employer/employee.  I'm not sure it did under the

3   OSHA act applicable at the time of his accident.  But if

4   he had two or three employees, then certainly he would

5   fall under that.

6                  I think as one employee, also, you may

7   not be entitled to worker's compensation as an

8   owner/operator, not having read the statute for Indiana.

9                  But if he had chosen to apply OSHA

10   regulations to his own conduct, then I think you would

11   like to ask that question.

12        Q.   No.  I'm asking whether he was obliged to any

13   obligations under OSHA, not what he might have liked to

14   do, but did he have any duties under OSHA?

15        A.   I think strictly speaking the answer would be

16   no.  Would it be a best practice?  Yes.  Those that he

17   could follow.  There are some he could not follow.

18        Q.   What OSHA standards or concepts do you believe

19   he should have followed?

20        A.   If he was aware of a hardhat requirement in

21   the plant, if there were dangers of things falling on his

22   head, then, if he was notified of that, then he should

23   wear a hardhat on his own recognizance, not even with

24   regard to the employer, the controlling employer's

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 92

1    requirements.  He should wear something that was

2    appropriate to fend off whatever might be falling,

3    falling on top of his head.

4                    If there was a cutting hazard, or an

5    abrasion that was unacceptable, then if he appreciated

6    the hazard, then he should apply hand protection, gloves,

7    solvents for your hand.  If there was something that

8    would dry the oils on your hands, for example, and cause

9    lesions and other discomforts.

10                   And if there was a height hazard, then,

11   you would look to the host employer's rules, possibly the

12   rules that apply to their own employees and look to see

13   how you would apply those rules.  There was fall

14   protection equipment that the host employer, GAF, had,

15   according to one of the components, at least one of the

16   components, being exposed to.  And a diligent person

17   might seek to see how to apply that, where would the

18   anchorage point be for lanyards and harnesses, where

19   would that be around the truck.  There was certainly

20   nothing around the truck, if it's your own truck, to

21   attach to.

22                   So, there would have to be an

23   understanding that the host employer would provide some

24   of the protection and you might provide some of your own

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 93

1  protection, such as a harness.

2              But when the argument finally has

3  settled, there was never any discussion going back into

4  history, according to the depositions, that any of the

5  deponents could recall regarding providing protection,

6  looking out for invitees, like independent truck drivers,

7  like Mr. England.  And, therefore, there was no basis to

8  provide any protection.  There was no basis to expose him

9  to actually what hazards were recognized by the GAF

10 management.

11             And, therefore, it now boils down to who

12 is most responsible for the hazard that Mr. England

13 faced.  And in the case of the hazard, in the course of

14 his normal duties or exception duties, to take a load of

15 shingles from this GAF plant, being required to tarp,

16 being exposed to fall hazards, that Mr. England would

17 reasonably be provided the shelter of some same rules

18 that GAF would provide for the protection of its invitee.

19      Q.   I understand what you're saying.  GAF should

20 have provided rules.

21             In the absence of rules, do you believe

22 he had any duty to exercise reasonable care for his own

23 safety?

24      A.   Absolutely, yes.  What he understood to be

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 94

1    areas of where he could be injured, that he was aware of.

2                    But I don't think he is expected by any

3    person to provide his own finger dock and to provide a

4    station for tarping, which might cost tens of thousands

5    of dollars.

6          Q.    Do you believe he could have provided a

7    stepladder?

8          A.    Get on and off the vehicle, off the flatbed,

9    that's one way of doing it.  Some truckers do that.  They

10   keep on using it as long as it does not get stolen.

11         Q.    What about an Anderson Ladder?  Would you have

12   recommended he have one of those with him?

13         A.    Yes, I would.  It has only recently come on

14   the market.  I would recommend that all flatbed drivers

15   that I'm familiar with should invest in one.

16         Q.    Would it be your recommendation he use a

17   stepladder?

18         A.    Well, a stepladder has a problem how do you

19   face onto the structure and how big is the stepladder to

20   begin with.  And you should only really walk off a

21   stepladder -- stepping off a stepladder isn't recommended

22   by any safety organization or any manufacturer.

23         Q.    You would recommend the Anderson Ladder.  And

24   you said they cost about $300?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 95

1        A.    Yes.  I think so.

2        Q.    Speaking of things he could have done for his

3    own safety, any reason he could not have asked Mr.

4    Williams to move his truck?

5        A.    There is no reason why he could not have found

6    the driver.  I don't believe he thought there was a

7    driver there, and he was just locked in.  There was no

8    place for him to go.  I get the feeling that there was no

9    place, unless he had all of the trucks moved, he was

10   simply trapped in the place besides the concrete blocks,

11   concrete barriers.

12       Q.    Mr. Williams was right there, close enough to

13   hear the impact when he fell?

14       A.    Apparently so.

15       Q.    Don't you think he would have been well

16   advised to go over and ask Mr. Williams to move his

17   truck?

18       A.    His statement in his deposition was that he

19   wasn't aware there was another driver in the vicinity.

20       Q.    If he walked over, and there was Mr. Williams

21   to talk to?

22             MR. FOLEY:  Well, let me just object,

23   Randy.  I think you're being argumentative at this point.

24   He has answered the question.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 96

1              MR. NYE:  I don't believe he has.

2      BY MR. NYE:

3          Q.   Mr. Ellis, was there anything to prevent Mr.

4      England from going over and asking Mr. Williams to move

5      his truck?

6              MR. FOLEY:  Same objection.

7              THE WITNESS:  If he was aware of Mr.

8      Williams, there's no reason he couldn't have done that.

9      BY MR. NYE:

10         Q.   Wouldn't you have advised him to look for the

11     driver and have him move the truck?

12         A.   I would certainly have counted that as one of

13     things I would have done.  I have special knowledge in

14     this area, too.  There are a lot of things I would have

15     done that he maybe was not aware of.  Again, it's not

16     expected that a person on your site will actually take

17     prevention measures.  You have to assume that they will

18     not do that.  That's why you must provide protection for

19     them as a controlling employer.

20         Q.   Well, what I want to ask you about is whether

21     there are things Mr. England could have done to avoid the

22     accident?

23         A.   I'm saying from my place that there are a

24     number of things he could have done.  But I'm not saying

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 97

 1    he would have known that.

 2                    Here is a driver going from Point A to

 3    Point B, and maybe even several times Point A to Point B,

 4    but also to C, D, E, F, G, and there are a variety of

 5    safety practices that these locations have, some that

 6    provide fall protection and some that do not.  I think

 7    for him to come up with own protection, I think, is not

 8    reasonable.

 9         Q.   Was Mr. England aware that it would be safer

10    for him to strap his truck from the ground as opposed to

11    climbing up on the truck?

12         A.   I think you'll have to ask Mr. England that

13    question.  I don't think he has been asked that question.

14    I would expect him to say it was safer to strap it from

15    the ground.

16         Q.   That's common sense?

17         A.   I don't use the word common sense or the term

18    common sense.  I would think that anything you do from

19    the ground I would encourage as a trainer.

20         Q.   Is there any reason to think Mr. Williams

21    would not have cooperated and moved his truck if he had

22    been asked?

23         A.   I can't answer that question.  I don't know.

24    The circumstances were such that neither knew of each

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

                                                    Page 98

 1    other's presence.

 2         Q.   How far apart were they?

 3         A.   Fairly close.  I guess there is noise in the

 4    background.  Things going on.  Forklift trucks moving

 5    around.  I'm not sure we got a clear picture of the

 6    working conditions.

 7                   At this point, could I take a quick

 8    break?

 9                   MR. NYE:  Sure.

10                   (Off the record at, approximately, 12:45

11    p.m.)

12                   (Back on the record at, approximately,

13    12:55 p.m.)

14                   MR. NYE:  Back on the record.

15    BY MR. NYE:

16         Q.   Do you have any opinion as to why Mr. England

17    fell on the date of the accident?

18                   MR. FOLEY:  Randy, when you say that,

19    let me just make a point of clarification.

20                   Do you mean whether he slipped or

21    whether he lost his balance?  Is that what you're

22    referring to?  Or did he fall because there was no fall

23    protection?  Are you asking how the accident happened,

24    what made him fall?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 99

1              MR. NYE:  I thought why was simple

2     enough.  Let me restate it.

3     BY MR. NYE:

4        Q.   Mr. England had a lot of years of driving a

5     flatbed truck, presumably, strapping all of them, tarping

6     many of them.  He had never fallen before.

7              Do you agree so far?

8        A.   I believe that's true.

9        Q.   Do you have any opinion as to why he fell on

10    June 13, 2008?

11       A.   At this time, I don't have an opinion, except

12    to say any exposure to height over four feet is

13    dangerous, and there should be fall protection provided

14    by the host employer.  And he should be trained.  And he

15    should be observed from time to time.

16       Q.   Do you know how old he was on the date of the

17    accident?

18       A.   Around 60.

19       Q.   Have you considered the possibility his age

20    may have contributed to his fall?

21       A.   I'm 68.  So, how do I answer that for myself?

22    I think he seems to be reasonably capable, from having

23    read his deposition a couple times, of being a truck

24    driver.  One is more cautious.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 100

1      Q.   Do you know whether he had any chronic medical
2   conditions on the date of the accident?
3      A.   I do not know that.
4      Q.   Do you know whether he was on any medication
5   on the date of the accident?
6      A.   I don't know that.  I believe he was not.  But
7   I don't know that for sure.
8      Q.   Were you aware of his weight on the date of
9   the accident?
10      A.   I thought I had notes on that.  But I'm not
11   aware of that right now.
12      Q.   If I told you according to the medical records
13   he weighed over 340 pounds, do you agree that his weight
14   may have had a contributing factor to his fall?
15           MR. FOLEY:  Well, Randy, that is
16   speculative.  Let me object.  That question is pure
17   speculation.
18           MR. NYE:  Pure speculation as to his
19   weight?
20           MR. FOLEY:  Pure speculation as to what,
21   if anything, caused him to fall.  And that's why they
22   needed fall protection.  You're just asking him to
23   speculate, I think.  That's not a proper question.
24   BY MR. NYE:

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 101

1      Q.    You can answer the question.

2      A.    The question, to me, comes through as saying

3   the heavier you are, the more likely you are to fall.  I

4   don't think there's any connection in my 40 years in this

5   business of connecting weight, certainly, around that

6   area, maybe up to 400 or so, with the tendency to fall

7   just like a person who is 100 pounds would fall less than

8   a person who is 250 or 350 pounds.

9            I'm a keen collector of statistics and

10  updating those statistics.  I have never seen any records

11  of statistics with regards to the likelihood of a

12  340-pound person would fall more likely than a 200-pound

13  person or 100-pound person.  I know there are concerns

14  about the equipment in recent years.  But most of the

15  leading manufacturers now have their equipment and would

16  fit onto one of the pictures that I brought with me today

17  in another case where the maximum intended load of a

18  person would be over 400 pounds, 440 pounds.  So, that

19  would certainly take into account, and in this same time

20  period, Mr. England's weight.  Previously used to be on

21  the order of 300 pounds.  In recognition, men gain weight

22  of two pounds a year once they hit 50.  Manufacturers are

23  taking note of that and building their systems to greater

24  tolerance of heavier weights.  Talking about at the time

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 102

1    of this incident.

2    BY MR. NYE:

3         Q.    So, you think short of 400 pounds, weight

4    would not affect his likelihood of falling?

5         A.    Well, I don't think I answered it that way.

6    Obviously, the question is, if a person falls, the

7    heavier you are, you're going to have more injuries.  I

8    think there may be certain kinds of falls.  You can get

9    very lucky on fall, if you hit the right thing, or if you

10   hit a softer object.

11              Certainly, the ankle is not built any

12   better, if you turn your ankle at 400 pounds versus

13   200 pounds, you're probably going to receive more

14   injuries.  And the same goes for other structural parts

15   of the body, too.  But I'm not a doctor.  And this

16   question probably should be answered by someone with -- a

17   physician with orthopedic qualification.

18        Q.    Have you made an assessment of Alan England's

19   credibility?

20        A.    One of the reasons I received his video

21   deposition was to look at the type of person we're

22   dealing with here as a plaintiff.  I believe he has

23   excellent credibility.

24        Q.    Would you agree that is an issue for the jury

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 103

1    to decide?

2         A.   Certainly.

3         Q.   You have never been to, I believe, tell me if

4    I got this wrong, you have never been to the Michigan

5    City GAF plant.

6                   Correct?

7         A.   True.

8         Q.   Have you been to any of the GAF plants?

9         A.   I'm not sure.  I seem to remember to have been

10   to a GAF plant in North New Jersey, but I can't say for

11   certain.

12                   MR. FOLEY:  Is there one, Randy?

13                   MR. NYE:  I don't know.

14   BY MR. NYE:

15        Q.   Maybe this is sufficient for follow up.

16                   Do you remember, an awkward question,

17   since you're not even sure you were there, do you have

18   any recollection of anything you might have seen, if you

19   were there at a GAF plant in New Jersey?

20        A.   No.  Nothing comes to mind right now.  The

21   reason I would be visiting any plant would be to look at

22   a fall exposure that the management would be aware of,

23   such as walking on the roof, or top of overhead cranes,

24   or pits, or on some of the equipment that they have.  But

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 104

1    I don't recall.

2         Q.   I know you've seen them, loads on flatbed

3    trailers being strapped before.

4              Have you seen, specifically seen loads

5    of pallets on shingles being strapped before?

6         A.   I don't recall that.

7         Q.   You've done consulting work for Alcoa.  You've

8    visited their plants.

9              Did I get that right?

10        A.   Many.  Right.

11        Q.   How many Alcoa plants have you been to?

12        A.   I haven't tried to count them.  It's --

13        Q.   Ballpark.

14        A.   Fifteen.

15        Q.   When you have been to the Alcoa plants, my

16   understanding is that there are fall protection systems

17   for loading trucks at these plants?

18        A.   And even unloading trucks, too.

19        Q.   Just in general trucks terms, would you

20   describe what those devices are like?

21        A.   Yes.  In the Phoenix plant in Arizona, I

22   designed a horizon lifeline system for loading, strapping

23   and tarping.  And that informal sketch that I provided

24   them was brought into existence by connecting two

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 105

1   buildings and roofing it.

2              And the interesting thing about it was,

3   not only did the truckers have fall protection being

4   trained by video, this was a cable system, and there were

5   several rows of them so the trucks could have throughput

6   at a reasonable rate.  They were instructed to wear

7   hardhats, of course, in that area.  And this became the

8   area, also, that the loading was done.  It was intended

9   only for visiting truckers to tarp there, but with

10  protection from the sun and to protect them from falling,

11  it became a fact that the whole plant was changed around

12  to use that system, which was, essentially, connection

13  between two of the existing buildings.

14             We have done similar cable systems for

15  the largest producer of aluminum cans in the country.

16  That's in Kentucky.  And we have been involved in the

17  design of rail facilities for loading, which I have a

18  sketch of with me here today an as example.

19             I'm handing you the document.

20             MR. NYE:  Could you mark that, please.

21             (Sketch was marked as Ellis Exhibit No.

22  12 for identification.)

23  BY MR. NYE:

24      Q.   So, Exhibit 12 is the device.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 106

1              Is this something --

2         A.   It's an example.

3         Q.   Is it an example of a specific system that is

4    actually in use or an idea?

5         A.   No.  We've installed systems like that, but

6    not that particular case.  That was a case I was doing.

7         Q.   So, this was prepared for litigation?

8         A.   That is correct.  That particular one.  But it

9    followed, and we used the same engineer to design it who

10   had done installations elsewhere.

11        Q.   You spoke in terms of we have provided.  I

12   assume you're referring to your company, your companies?

13        A.   Ellis Fall Safety Solutions is the company

14   that actually would conduct this work and provide the

15   labor to do it and the training to follow.

16              And the one you're looking at is the

17   shipper of pipes for creating roadside signs, a vertical

18   component thereof.

19        Q.   Does your company actually build these

20   systems?

21        A.   Yes.

22        Q.   As well as design them?

23        A.   Yes.

24        Q.   And what would the fee for your company be to

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 107

1    design and build systems like that shown in Exhibit 12 or

2    Exhibit No. 5?

3         A.   I don't know for sure.  I would have to go

4    back and look at some records.  My thought is, a cable

5    system, several thousand dollars.  And for a rail system,

6    like the one shown, about the same price.  Sometimes the

7    rail systems are a little more expenses depending upon

8    the post systems to hold them up.  In this case, working

9    on the bar joist in the ceiling.

10        Q.   You're referring to Exhibit 12?

11        A.   Correct.

12        Q.   Both roughly the same fee?

13        A.   In the cases where we're looking at the

14   sketches of such systems, cable and rail systems,

15   normally rails have elevated posts to support them are

16   going to be more expensive.

17             For example, if we did a railroad yard

18   for the maintenance work, the guys who worked on

19   unloading railroad cars, we would probably do a rail

20   system.  That rail system would have to have posts to get

21   it up in the air.

22        Q.   At Alcoa, if we could get back to that --

23        A.   I haven't finished.

24        Q.   Oh, I'm sorry.  Go ahead.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 108

1          A.    But with regard to Alcoa, the type of systems

2     that are presently used in the Midwest, the Tennessee

3     plant, two or three plants in Central Northeast

4     Pennsylvania, they're all either fixed or moveable

5     catwalks with the driver himself.  He drives into a

6     two-sided dock.  And then he pushed mechanically a

7     100-long foot section of catwalk up against the exposed

8     side of the truck or trailer.

9                     Other ones involve putting in post

10    systems.  A slot into the rub rail.  Some people have

11    made their own systems slotted, and then it creates part

12    of a rating system, a piece that was slotted into the rub

13    rail gaps, in the back of it, would be the one side, and

14    then that leaves you exposure for two sides.  And then

15    you have an observer to keep people away from the near

16    side.  And there's a barrier put in for the end of the

17    trucker, too.

18                    The other types of systems, which are in

19    the article, and in the follow-up website on our Fall

20    Safety dot com website, on trucking solutions.  You click

21    on each one of those.  And you'll see net systems.

22    You'll see rail systems.  You'll see railing systems.

23    You'll see 12, 15 or 20 systems.

24                    I always go back to the system which we

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 109

1    described earlier of putting in two by fours and plywood

2    to provide a barrier between you and the fall hazard,

3    which many trucks do use when they're out on the road.

4    I'm sure on your way back to the airport, you'll probably

5    see two or three of those.

6           Q.    At Alcoa, what is being lowered on the trucks?

7           A.    Mostly, aluminum coil.  Different thicknesses.

8           Q.    Given where I live, I see steel go by on

9    trucks all of the time.  I don't have a picture in my

10   mind of aluminum coils.

11               How big are they?

12          A.    Some are huge.  Some weigh 30,000 or

13   40,000 pounds.

14          Q.    We're talking a coil in the conventional

15   sense?

16          A.    Eight feet in diameter, approximately.  Four

17   or five feet up to eight feet.

18          Q.    When these things are loaded, are they

19   loaded --

20          A.    Coils?

21          Q.    Yes.  How are they loaded?

22          A.    Hopefully safely.

23          Q.    I mean, are they --

24          A.    The safest way is the donut hole to be facing

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 110

1    up and down.

2         Q.   Is that what happens, or is the donut hole

3    horizontal?

4         A.   It depends on the practice of the plant and

5    what material handling is like.  If you load by crane,

6    the donut hole is going to be side to side, which is the

7    most dangerous position.  If you load by forklift, they

8    can be laid flat.

9         Q.   What does Alcoa do?  How do they do it?

10        A.   I think they have both.  They have good

11   chains, so they don't fall under the cab.

12        Q.   Are you aware of any shingle manufacturers

13   that provide fall protection devices the kind we're

14   discussing?

15        A.   Not at this moment.

16        Q.   Through your article, as well as what Mr.

17   England testifying to, and just driving on the highway,

18   my impression is an awful lot of stuff gets moved on

19   flatbed trailers?

20        A.   Yes.

21        Q.   Would you be able to quantify that?

22        A.   In terms of the number of...

23        Q.   Truckloads a year?

24        A.   No.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 111

```
 1       Q.   Or whatever statistics you might know?

 2       A.   The number of flatbeds on the road?

 3       Q.   Yes.

 4       A.   Over a million.  Maybe several million.

 5       Q.   Now, do you mean million or several million

 6  trucks?

 7       A.   Yes.

 8       Q.   Flatbed trucks?

 9       A.   Flatbed trailers.  There are more trailers

10  than there are trucks.

11       Q.   I'm doing the same thing you are.

12                 And they move all different kinds of

13  merchandise and products and that's kind of the point of

14  it.

15                 Right?

16       A.   If you're an independent operator, you're

17  going to haul anything from chicken to coil of steel.

18  Wherever you get a load going and a load coming back,

19  that's the trick.  You better be good on the Internet,

20  too, to find out where those loads are so you can track

21  to it once you made your initial delivery.

22       Q.   For this million plus flatbed trucks that are

23  on the road every day, what proportion of them will be

24  loaded and unloaded or unloaded at a place with fall
```

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 112

1    protection devices of the kind that you've discussed here

2    today?

3         A.    Well, another way of asking that question is,

4    what percentage of plants that ship would have fall

5    protection for their independent contractors.  I think

6    that's the flip side of your question.

7         Q.    Yeah.

8         A.    More.  More and more.  I can't put a figure to

9    it.  I know every single Alcoa plant has protective

10   measures.  And that is a specific area that corporate

11   Alcoa requires for the last eight to ten years is that

12   every Alcoa shipping location and receiving location has

13   fall protection for trucks that are expected.

14        Q.    Can you give me any sort of sense of -- I

15   supposed thousands of places from which they're loading

16   flatbed trucks on a given day, what percentage have fall

17   protection devices?

18        A.    Yes.  I'm going to talk about shipping now,

19   not receiving.  Shipping is the main thing.  Receiving, I

20   think, you can remove, by just taking the bungee off the

21   tarp, and you can pull the tarp off.

22             But in terms of shipping, I think that

23   the laws in each state and the realization that you're

24   responsible to keep safe your employees, but also your

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 113

1   invitees is -- the message is out there.  While it's not

2   -- I want to say half, but I'm not sure it's half -- but

3   I'm saying we're approaching half of the shippers in the

4   country as a whole have some means of fall protection

5   that would be helpful in controlling fall hazards at

6   their shipping location.

7          Q.   What is the basis for you saying it is

8   approaching half?

9          A.   Just the fact it comes up in discussion.

10  Since I got the article and have the website put

11  together, many, many people have contacted me about

12  consulting and also the shippers themselves.  And it's

13  going to be more in some industries than other

14  industries.  Some are going to have nothing.  Some are

15  going to be more.  And it depends on if they're willing

16  to do the throughput calculations to determine just how

17  many facilities it's going to take in a given area where

18  you do your strapping, your tarping and how many trucks

19  and trailers you can put through there.

20               The one that we designed and got built

21  in Kentucky had eight lanes for trucks to go through.

22  And two of those lanes were for independent truckers who

23  had a type of tarp that is automatically deployed, and

24  you can actually concertina, c-o-n-c-e-r-t-i-n-a,

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 114

1  something like that, concertina it up to one end, load

2  with a crane or forklift, and then pull it by hand.  And

3  I've done this in Newark, Delaware where there's a

4  manufacturer there.  It takes three days to put these

5  things on.  You can push it by hand.

6        Q.   I'm not asking you about specific examples or

7  antidotal evidence.  I'm asking for any source of actual

8  statistics, actual numbers of what percentages of trucks

9  daily are loaded with fall protection.

10              Are you aware of any reliable

11  statistical source?

12        A.   No.  I'm not.  It varies by industry.  So,

13  certainly, if you had a previous accident, that plant is

14  much more likely to have taken the hint and put

15  protection, availability at the top of their list for

16  safety investment in that plant.

17              So, if you've had a previous incident,

18  that usually triggers whether you put skylight screens on

19  the roof, or whether you put tarping stations on there,

20  probably, for your shipped goods to go through and have

21  people working at height to be protected.

22        Q.   But you are not aware of any statistical

23  evidence or quantitative analysis of percentages of

24  actual use of fall protection devices for loading trucks?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 115

1   Can you point me to anything?

2        A.   No.  But based on me -- I'm a good person to

3   talk about this subject, if it's carefully asked, the

4   question, because I believe that half of all of the

5   facilities that have experienced an incident in their

6   past, within two or three years, at least half of them,

7   or if not a good majority of them have got fall

8   protection in place of some sort right now.

9        Q.   And what is your source for that?

10       A.   I've been around the fall protection business

11  now since 1970.  I've visited thousands of plants.  I

12  continue to visit plants almost every week.  Probably am

13  contacted on half of all of the skylight fall throughs in

14  this country for the last several years.  What I --

15       Q.   Well, this case has nothing to do with falling

16  through a skylight.

17       A.   But you have wait until I finish my sentence.

18  Okay.

19            What I find there is that even though

20  skylights are left exposed, I mean, dome skylights fall

21  under roof skylights in metal buildings, that almost all

22  of them are protected after the event.  So able to

23  approach a skylight.  And the only reason the protection

24  of a screen on top has been put on there is because of

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 116

1   the fact that the owner has recognized that they have a

2   problem of independent contractors falling through their

3   building skylights, 30 feet to the ground, and most of

4   them are killed.

5                    In this case, I would think the same

6   logic would apply, especially if the injury is

7   significant, or if the court find significant fault of

8   the controlling employer.

9        Q.   Speaking of flatbed loads generally, they

10  almost universally have to be strapped, correct, or maybe

11  I should say universally they are all always strapped?

12       A.   No.  They're all set up to bolt onto the

13  flatbed itself.  Sometimes pieces of wood are attached to

14  it so you don't have to strap.  And, of course, coils we

15  already talked about chaining in several directions.

16  There are several different techniques to hold the load

17  stable.  But they have to be checked and checked within

18  25 miles of shifting.

19       Q.   So, they all have to be strapped or chained or

20  somehow affixed to the flatbed trailer every load?

21       A.   Yes.

22       Q.   Of all of these millions of flatbed loads,

23  what proportion are tarped?  Obviously, it depends on the

24  type of product.  I'm just speaking generally.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 117

1      A.    Close to half.   You got some sort of tarping

2   arrangement no matter what the product is.   The U.S.

3   Government, pretty much all agencies, now ship with

4   tarps.   There's no need for keeping rain off the

5   structure.   And it's growing.   It's being pushed by

6   insurance companies in another area.

7                  And there are requirements for trucks

8   that carry produce and stones.   Each state has its own

9   requirement.   It's under littering laws in Delaware, such

10  that you have to have a tarp over the goods, so they

11  don't whip out of there as they're traveling down the

12  idea.

13                 Unfortunately, the problem is with those

14  types of trucks, some of which have automatic arms that

15  pull the tarp down, that they are destroyed over the

16  years of use.   And my estimate of them is half of them

17  are not working.   That's a 100 percent requirement the

18  State has.   The tarping of aggregate and vegetable

19  produce and garbage.

20     Q.    When systems like that, such as in Exhibit 5

21  and 12 are installed or overhead systems that you talked

22  about, who provides the harness?

23     A.    Not the at-risk worker.   In other words, if

24  you expect you're an independent trucker to bring in a

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 118

```
1    harness, it's not going to happen.  If you're the

2    controlling employer, you provide the harness system, if

3    you're going to use a harness system.  Some people don't

4    use harness systems.

5         Q.   What does a harness cost?

6         A.   Seventy dollars.

7         Q.   And you think that would be unrealistic and

8    reasonable to expect an independent operator to provide

9    his own?

10        A.   It's not the provision of the product, it's

11   the compatibility of other equipment that's on site.  You

12   have to hook it up somehow.  Who's going to verify the

13   compatibility on that day at that time.  They go by

14   brand.

15        Q.   What is the weight capability of these

16   systems?

17        A.   Whatever they are designed to be.  We design

18   it for 400 pounds after discussion with the owner.

19                  And for two people, and we'll do up to

20   five on a continuous run in certain circumstances, if

21   it's five people working on the side of a building, we'll

22   design for that.

23        Q.   Are there risks associated with having people

24   in these harnesses?
```

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

                                                    Page 119

 1        A.    Are there risk associated with any harness

 2    system?  Yes.

 3        Q.    What are they?

 4        A.    Well, the fact every harness system is going

 5    to wear out at some point.  What that means, it could

 6    just be taken, stolen, put some other place, removed.

 7    There's no product to wear.  There's no follow up.

 8    There's no endorsement by the plant to expect the drivers

 9    to just do something themselves.  There has to be a

10    training program, some video.  Or you do what Mobil did

11    before they combined with Exxon, which is, you don't let

12    them do the work at all.  You let your own employees do

13    it while the driver drinks coffee.

14                    The refinery that was across the river a

15    few years ago, that's the direction they took.  We're

16    doing it, we're doing it ourselves for loading of

17    lubricants into oil tankers into tank trucks, for

18    example.

19                    There are fitting problems with

20    harnesses.  There are chemical problems with harnesses,

21    what they have chosen.  The oversight by the host

22    employer is something that must be accounted for when

23    you're counting your expenses that you got to keep your

24    systems up and working.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 120

1              That's why some companies prefer to use

2      the catwalks because it's less maintenance.  On the other

3      hand, if there is more maintenance, truck drivers can't

4      drive straight, especially going backwards.  And the

5      rails can keep them contained within catwalk, three-sided

6      catwalk structure, as they back up to it, there are

7      typically half-inch rubber on the rails because the

8      drivers are not able to drive a straight line.  And after

9      a while, of course, two or three years, you drive into

10      the structure and destroy it.  It's not able to be used

11      for a few weeks.  So, that covers both the non-harness

12      area and the harness area.

13          Q.   Your work in litigation consulting, how is it

14      divided between work for plaintiff attorneys versus

15      defense attorneys?

16          A.   Typically, the last year or so, 80 percent

17      plaintiff.

18          Q.   Eighty percent for plaintiff?

19          A.   Right.  But when I do defense, I usually

20      represent about five companies.

21          Q.   Exhibit No. 3 is the list of cases in which

22      you have given deposition or trial testimony.

23              Of these 22 cases, how many of those did

24      you represent the plaintiff?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 121

1      A.    Is it not on there?  There's a P and a D.

2      Q.    I don't see it.

3      A.    I don't see it myself.  Do you want me to pick

4    out defense cases here, or what do you want me to do?

5      Q.    If there are any, tell me about them, or just

6    mark them, if that's easier.

7      A.    Let me see if I can.

8      Q.    Or whichever you would like, or tell me.

9      A.    I got you.  Let me see.  It may take me a

10   little while to get myself oriented.  I'll keep on

11   looking.  There are several of them.  This is a defense

12   case.  (Indicating.)

13     Q.    Number 11?

14     A.    Mum-hum.  That's all I'm spotting right now at

15   the deposition and trial level.  There may be one or two

16   on here.  And the reason I may be having difficulty

17   picking them out is because my testimony is the same no

18   matter whose side I'm on.

19     Q.    That's commendable.

20            So, you're saying of the cases listed on

21   Exhibit No. 3, only No. 11, the James Offord case is one

22   in which you assisted in the defense?

23     A.    That I recognize.  Yes.

24     Q.    Your report, I think, has a copy of your

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 122

1    agreement with Mr. Foley regarding compensation for your

2    services?

3         A.   Right.

4         Q.   Is that still in effect?

5         A.   Yes.

6         Q.   Those fees?

7         A.   Yes.

8         Q.   Your fee for being here for the deposition is

9    $2,250.

10                   Correct?

11        A.   Yes.

12        Q.   In addition to that, what have your billings

13   to date been to Mr. Foley?

14        A.   I saw an amount today, but here it is, right

15   here.  That's the total billed.

16        Q.   $48,406?

17        A.   Correct.  Yes.

18        Q.   My impression is, you have not done work with

19   Mr. Foley's firm before.

20                   Is that correct?

21        A.   I don't think I have.

22        Q.   Have you had any sources of information or

23   anything you considered with regard to the opinions in

24   Alan England's case that we have not already talked

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 123

1    about?

2         A.   Are you asking me?

3         Q.   If it's in your report, I've seen it.  That's

4    either not reflected in your report or that we have not

5    discussed today.

6         A.   No.  They're all here at this time.

7         Q.   Are you planning any other work in this case

8    other than, I suppose, testifying at trial, if it gets

9    there?

10        A.   Correct.  I don't think I discussed anything

11   else to do at this time.

12        Q.   Have you recommended or offered any additional

13   services or analysis to Mr. Foley?

14        A.   No.  I think Mr. Curry, who is the safety

15   director, who was remote from the Michigan location, who

16   was deposed, I haven't seen his deposition yet.  I would

17   want to see that before trial.  And any other nonmedical

18   depositions.

19        Q.   Anything else?

20        A.   Other discovery concerning whether GAF has any

21   fall protection systems anywhere in the country or what

22   has been recommended.  More details about previous falls

23   as they provided the notice that most companies need to

24   act.  And some aspects of law around that.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 124

1          Q.   You say in your report that Mr. England's

2     trailer was loaded with 14 pallets.

3                    What is that based on?  Is that based on

4     what he told you?

5          A.   I think so.  The documents that he was

6     provided with, which I can't remember exactly seeing it

7     or not, or whether it was represented to me, indicated 14

8     pallets, seven down one side and seven down the other

9     side.

10          Q.   What, if anything, do you know about any

11     previous falls involved in loading trucks at the Michigan

12     City GAF plant?

13          A.   I believe there was at least one.  But I don't

14     know the details of that other case or cases.

15          Q.   You don't know anything about why that

16     gentleman fell?

17          A.   Not that I recall.  I think there is some

18     explanation or something offered in testimony.  But I do

19     not recall that, as we sit here today.

20          Q.   There has been some discussion in Mr.

21     England's deposition of one of the finger docks.

22                    Are there delays associated with using

23     finger docks?

24          A.   You mean interruption in the throughput of the

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 125

1    shipping operation?

2           Q.    That's one possibility.  Yes.

3           A.    Something has been said that there are

4    techniques.  I've just been doing a course at Auburn

5    University in their Master's program how you calculate

6    these sort of things.  Something that needs to be done.

7                         For example, time spent to push a

8    railing on rollers and the space involved, being

9    outdoors, or on the inside, I would think that the simple

10   netting system, netting hangs vertically, and then you

11   simply take it on each rub rail location and just hook it

12   in and forms a nice little place to fall into.  That's,

13   probably, the simplest of all in terms of costs,

14   construction.  It would need some maintenance over the

15   years.  I think it takes up the least space, as well.

16                         So, I'd be looking for all of these

17   combination and whether or not we can rely on the 500 by

18   300, or whatever the size is, I think it was 50 feet by

19   300, I think that was the size that has been gathered

20   was, the area for the strapping and tarping of this

21   plant, and whether it's common practice for trucks to be

22   going in both directions because of other types of

23   construction.  I think where you would put these tarping

24   stations with regard to typical usage at the plant.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 126

1              So, it would be a project to sit down

2     and work out, but it can be done.  There are ways of

3     doing it.

4              Obviously, I want to see no disruption

5     in the operation.  In fact, maybe even more production

6     because the worker now feel safer no matter what age they

7     are or what weight they are.  They're going to get on the

8     road, which is what all of them want to do, as quickly as

9     possible.

10        Q.   We talked about this, but it is a little

11    unclear in my mind where it came out.

12              According to what he told you, Mr.

13    England, did he really recall whether he was trying to

14    walk along the rub rail or on top of the pallets of

15    shingles when he fell?

16        A.   He recalled that previously he had done both

17    in different times, different locations.  But that day,

18    he could not remember.  But if he had to make a guess, he

19    would be on top of the load.  So, he would be able to

20    feed the webbing down vertically through the opening,

21    rather than holding onto a strap and reach down.  It is

22    more ergonomically acceptable when he thought it through.

23    He does not remember the day.

24        Q.   He had done it both ways?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 127

1          A.    Previously.  Right.  He had done it holding

2     the straps for his balance and walking along in some

3     circumstances.  And he had been over the top of the

4     material previously.  But he felt he was over the tarp

5     this time feeding down, standing down, and feeding down

6     the webbing through the rub rail opening, but couldn't

7     say which.  That's what comes out.

8          Q.    Now, the paramedics in their report indicate

9     that he had fallen five feet.

10               Is that your recollection, as well?

11         A.    No.  But I'll take your word for it.

12         Q.    It is in your report, if you want to look at

13    it.

14         A.    Okay.  Right.

15         Q.    Any reason to think they were wrong?

16         A.    Yes.  Sure.  They were going to say he fell

17    off his truck.  How tall is his truck, four or five feet,

18    four or five feet off the flatbed.  There's, obviously,

19    no frozen imagine in the sky of him standing on top of

20    the shingles.

21               But so, unless they got a witness to say

22    where he feel from, they would be guessing.  Apparently,

23    ten feet of open flatbed each side at each end of the

24    trailer.  But it doesn't tie into the work he was doing

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 128

1    or about to do, which was to drop a piece of webbing with

2    a metal buckle on the end of it and feed it through the

3    rail on the side of the trailer.

4              I read lots of these types of reports.

5    First impressions, they don't tend to take pictures like

6    they did in the past.  He either fell from the flatbed

7    itself, which is four or five feet, or he fell from the

8    tarp.  So, did they convince themselves he was walking on

9    the side of the rub rail, which would be four or

10   five feet, or did they convince themselves he was on top

11   of the shingles.

12        Q.    Did they talk to him?

13        A.    I don't know what his condition was.

14        Q.    You can't believe the possibility they talked

15   to him?

16        A.    No.  I don't know whether they state they do.

17   But why would he remember them any better than he would

18   remember right now.  Either way, it's above four feet,

19   which is the general industry rule that applies to plants

20   that you have fall protection.  Because four feet is the

21   height where if you fall off naturally almost

22   semi-consciously is the first time your head impacts

23   directly to the ground.  That's the why reason it was

24   chosen.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 129

1        Q.    Should he have been wearing a hardhat?

2        A.    If it was the practice in the plant to wear a

3    hardhat, yes, he should have been.  However, there's only

4    one hardhat that is recommended at this time for use on

5    flatbeds.  And that is a Bullard Type II, and there's a

6    specific part number, which has an extension to support

7    the neck and also has a triple suspension under the chip.

8    And that Type II, the ANSI standards for hardhats is what

9    is recommended up to, I believe, 50 feet eye height.  And

10   I published I think the article in Professional Safety.

11   That's their recommendation.

12       Q.    "They" being ANSI?

13       A.    The Professional Safety Magazine published by

14   American Safety Engineers.  In my article there, that you

15   have a copy of, did mention that was recommended.  I

16   think regular hardhat, be careful, that's meant for

17   deflection of bolts and nuts coming from the top.  But if

18   you hit the ground with your neck, you'll have problems.

19   You can have paralysis issues.  You'll bend the neck.

20            So, a regular hardhat would not be

21   appropriate.  If the plant provided hardhats that were of

22   the Type II and provided by the Bullard instructions for

23   use on flatbeds only and not for planning the load, and

24   Alcoa had made that rule, then I would recommend the use

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 130

1   of such a hardhat, specifically tested for this type of

2   incident.

3           Q.   So, you would only recommend him wearing that

4   if the plant required it?

5           A.   I think it is an additional precaution.  It is

6   not required by law.  All hardhats right now are only

7   recommended to deflect objects falling from above.  And

8   falling on your head is not things falling on you from

9   above.  It's a good idea.  It makes sense.  There have

10  been a number of success stories in the stair erection

11  area where people have fallen on their hardhat and have

12  successfully survived.  It's not a general rule.  It's

13  not a substitute for fall protection.

14          Q.   Mr. England, you've seen his deposition.  He

15  had a contract, a hauling contract with Builders

16  Transportation Company?

17          A.   Yes.

18          Q.   Does Builders Transportation Company have any

19  responsibility for his safety?

20          A.   Am I right in thinking that Builders

21  Transportation had a contract with GAF?  Because there I

22  think we put the requirements in there for what their

23  duties were, if any.

24          Q.   Well, I'm asking about the relationship

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 131

1   between -- the role of Builders Transportation.

2          A.   Yes.   I'm trying to find it in the exhibits.

3          Q.   It's Exhibit 10.

4          A.   Okay.   I found it in my copy.

5          Q.   Exhibit 10.   Here you go.

6          A.   Good.   Thank you.   Let me read it.

7                   MR. FOLEY:   Let me just object.   I think

8   the document speaks for itself.

9                   You're asking him whether that document

10  creates a duty.

11                  MR. NYE:   He's giving all kinds of

12  opinions on responsibilities.   I don't know what's

13  different about this end.

14                  MR. FOLEY:   Well, I object.   I think the

15  question you're asking him is a question that can be

16  ascertained by looking at the document.   So, it speaks

17  for itself.

18                  THE WITNESS:   I want to clarify the

19  question relating to this agreement contract, hauling

20  agreement between Builders Transportation Company and Mr.

21  Alan England, the contractor.   I'm not sure I recognize

22  that there is a claim against Builders Transportation,

23  which this would relate to.

24                  So, could you clarify the question?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 132

1    BY MR. NYE:

2        Q.   Well, you have given opinions what about what

3    GAF's responsibilities are under the law of the State of

4    Indiana and OSHA.

5              And I'm asking you if Builders

6    Transportation Company, in your opinion, had any

7    responsibility with regard to the safety of Mr. England?

8        A.   I have not seen the agreement between Builders

9    Transportation Company and GAF, if it exist.  If there is

10   one, now is a good time to know that.  Because I don't

11   think that Builders Transportation is a defendant in this

12   case.  So, therefore, I have not been asked to look at

13   this.

14       Q.   So, you have no opinion?

15       A.   Not at this time.

16       Q.   The company that dispatched Mr. England, do

17   they have any responsibility under OSHA or under any

18   Indiana law?

19       A.   And who is that?  Do I have a contract with

20   them, or is there a contract between --

21       Q.   I don't know if you've seen it or not.

22       A.   Don't know.  Throw me a name so I can see if I

23   heard of it.

24       Q.   Maybe we should move on.  Just haven't thought

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 133

1   about that.

2               I would like to ask you a few more

3   questions about something that has already been marked.

4   If you'll excuse me, I'll come over here so we can look

5   at it at the same time.

6       A.   Sure.

7               How long are we going today?

8               MR. FOLEY:  Well, I assume you're

9   getting close, aren't you, Randy?

10              MR. NYE:  Closer.

11              MR. FOLEY:  Okay.  It's two o'clock.

12              THE WITNESS:  One thing I want to do is,

13  I want to bolt this down before I get a headache.  Maybe

14  we can work a few more minutes.  But we can go through

15  this right now.

16  BY MR. NYE:

17      Q.   Referring to what has already been marked as

18  Exhibit No. 6, your notes, at the top it looks to me

19  like, as I read this, he was strapping his trailer,

20  noticed -- could you read that for me?

21      A.   Noticed our guy on trailer, right, is the way

22  he expressed himself.  This is Mr. Williams.

23      Q.   This is Mr. Williams' statement that he

24  noticed -- our guy would be Alan England?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 134

1        A.    Right.

2        Q.    So, he noticed Alan England on his trailer

3   prior to the fall?

4        A.    Yes.

5        Q.    So, this makes it sound like Alan England and

6   Rick Williams are strapping their trailers at the same

7   time?

8        A.    On the trailer, does that mean he's strapping?

9   I don't know.  Maybe yes.  Maybe no.  I don't know.

10        Q.    Well, if Alan England had not yet gotten to

11   it, any tarping, so if he's on his trailer, he was

12   engaged in strapping.  Would you agree?

13        A.    There's so many operations that a trucker

14   does, I don't want to jump to the conclusion that he's

15   strapping his own truck.  This guy was strapping, it

16   seems.

17        Q.    "This guy" meaning?

18        A.    Williams.

19        Q.    Williams was strapping his trailer?

20        A.    Yes.  He noticed our guy on the trailer.  Then

21   he tarped.  So, then he tarped.  So, there's some time

22   aspect involved here.  And then, I guess, as he was

23   tarping, heard Alan fall, the effects of Alan's fall.

24        Q.    So, you take this to mean that Rick Williams

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 135

1   was tarping his truck at the time that Alan England fell?

2          A.   Well, it's a complex thing.   I got down here.

3   These are flashes of conversation that are happening.   I

4   didn't see anything in writing from Mr. Williams.   "He"

5   being Mr. Williams was strapping his trailer -- noticed

6   our guy, Mr. England, on presumably his trailer.   Then,

7   "he," meaning Williams, tarped and then heard him fall.

8   So, we're talking about different activities.

9          Q.   Okay.

10          A.   At the time he was strapping his trailer, Mr.

11   Williams, he noticed Alan on the trailer.   He didn't say

12   which part of the trailer.   And then some time later when

13   he finished strapping, then Mr. Williams tarped, and that

14   is when he heard the fall.   I don't know what the time

15   period is.   I don't know if it takes 15 or 20 minutes.   I

16   don't know whether it's the beginning of the time period

17   or the end of the time period, whether then he goes to

18   tarp, gets the tarp up.   I don't know.   You could be

19   talking another 15 or 20 minutes.

20          Q.   But Williams told you that "he," Williams was

21   strapping his trailer.   And at that time, he saw Alan

22   England up on top of England's truck?

23          A.   Yes.   At that moment in time.   But at a later

24   time, when he was tarping his trailer, he heard Alan

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 136

1   fall.  I haven't quantified that yet in terms of time.

2                   MR. NYE:  That's all I have.

3   BY MR. FOLEY:

4       Q.   I have just a few questions, Nigel, if I can.

5                   Based upon your investigation in this

6   case and your experience in dealing with companies and

7   these issues of fall protection, in your opinion, was it

8   foreseeable for GAF and its representatives that Mr.

9   England and other truck drivers would get up onto their

10  flatbeds to either do tarping or strapping?

11      A.   Yes.

12      Q.   So, the fact that he was not in the process of

13  specifically tarping is of no moment.  In your opinion,

14  it was still foreseeable that these drivers could and did

15  get up on their flatbeds for various reasons, whether it

16  is tarping, or strapping, or to catch a -- to thread a

17  strap that had gotten caught or other reasons?

18                  MR. NYE:  Object to the form of the

19  question.

20                  THE WITNESS:  I think it's in all of the

21  depositions that the observations were made that drivers

22  were either on the top of their flatbeds or on the loads

23  doing tarping work.  And whatever kind of work is

24  involved that should have been anticipated.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 137

1    BY MR. FOLEY:

2         Q.    And based upon your experience and the

3    investigation that you've done in this and other cases,

4    is it your opinion that GAF should have had fall

5    protection for these truck drivers?

6         A.    Absolutely, yes.

7                   MR. FOLEY:  And if I could look at

8    Exhibit No. 11 there, Randy, which was the ANSI thing

9    that you read.

10                  MR. NYE:  Yes.

11   BY MR. FOLEY:

12        Q.    You were asked some questions about ANSI and

13   OSHA standards.  And Exhibit 11 was marked, and there was

14   some discussion on it.  You were asked about whether or

15   not Exhibit 11 specifically applied to loading and

16   unloading trucks, flatbeds, et cetera.

17                  Is it also correct that Exhibit 11, Dr.

18   Ellis, under scope states, This standard sets forth

19   safety requirements in industrial and workplace

20   situations for protecting persons, areas/places where

21   danger exists of persons or objects falling through floor

22   or wall openings or from platform ramps?  Is that what

23   that scope refers to?

24        A.    I'm finishing the sentence.  Also, in normal

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 138

1    temporary and emergency conditions.  The answer is yes.

2         Q.    And is it your opinion that ANSI 1910 and 1926

3    should have been used by GAF to create a set of policies

4    in the exercise of reasonable care to provide some type

5    of fall protection for business invitees on the property?

6         A.    Yes.  With the addition of one thing.

7         Q.    And what is that?

8         A.    They also should have read my book for

9    guidance.

10        Q.    So, you were asked a lot of questions about

11   whether 1910 and 1926 specifically applied to loading and

12   unloading flatbeds, I believe.  And on Page 4 you explain

13   the OSHA sections and the ANSI sections that you

14   reference in your report.

15             Can you just explain for us what you're

16   referring to there?  How do these sections apply in our

17   case, the OSHA 582 and then the ANSI standards that

18   you're referencing on Page 4.

19        A.    In 1972, DOT, and the Department of Labor,

20   OSHA, met to discuss a working relationship around the

21   application of rules for trucking, especially when trucks

22   were stationary and people were working on trucks.  They

23   agreed to stay in close contact, both agencies.  However,

24   as of the present day, there has been no meeting in the

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 139

1    last 38 years that would have fulfilled their commitment

2    in this area.

3              As a result, OSHA has cherrypicked

4    through its general duty clause, especially workers on

5    concrete trucks, and certain other vehicles, such as

6    aerial lifts to provide enforcement in the area of trucks

7    and trucking and other wheeled vehicles.

8              Since nothing addresses flatbed trucks

9    or panel trucks, where a known danger of falling occurs

10   in the normal operation of loading of trucks, then a

11   responsible employer, who is in a controlling position,

12   either under OSHA multi-employer work rules or directly

13   as a result of premises duty to provide a safe workplace

14   for invitees, Mr. England was an invitee on a continued

15   basis of many months and years, that a set of rules

16   should be formulated.  And, perhaps, they only had to go

17   next door to the next company to ask to borrow their

18   rules because the rules that I've seen are set up very

19   similarly to recognize the hazards on the job, to

20   recognize where workers can go for bathroom facilities

21   and for safe walking in the area.  Whether or not in what

22   areas to wear hardhats, what kind of hardhat.  And other

23   safety rules that the drivers must comply with at the

24   time of entry to the plant.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 140

1              Therefore, it would make sense to me if

2      knowing that GAF is applying fall protection rules,

3      apparently, with regard to harnesses and lanyards within

4      its own plant, according to the testimony in this case,

5      that they would also look to apply what they could out of

6      the OSHA regulations and rules for providing a safe

7      workplace to invitees.  And then formulate that into a

8      serious maybe ten statements that could be easily

9      understood in large print, on one side of the piece of

10     paper, and present that to the drivers and have people

11     involved with drivers understand what their rules, or

12     what roles are to enforce that policy, and to write up

13     drivers that did not comply with fall protection when

14     leaving the ground.

15          Q.   So, you were asked questions about whether or

16     not GAF could have been cited by OSHA for some

17     violations.

18              Am I right correct that even though

19     there may or may not have been an OSHA citation, is it

20     your opinion that GAF in the exercise of reasonable care

21     should have employed the OSHA and the ANSI standards to

22     which you refer in order to do what they could to provide

23     protection for those business invitees and independent

24     truckers coming onto their premises?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 141

1        A.    That's the starting draft.  But then you got

2   to develop it to include features, which are particularly

3   applicable to drivers.  And you got to incorporate

4   general workplace rules, their conduct, where they should

5   go, where they shouldn't go, which is typical for any

6   plant.  So, those would be common.  Apply the OSHA rules

7   for personal protective equipment, breathing apparatus,

8   if necessary, head protection, eye protection, face

9   protection, shoe protection, all those rules should be

10  incorporated here.  And then have the specialty items,

11  which is putting up structures, they'd have to train

12  because those are not mentioned in any standard at this

13  time.  Post systems, how far down in the ground would you

14  go.  What sort of concrete block?  What sort of forces

15  should you take on the top?  There you would go to the

16  ANSI standards, and to, perhaps, items in my book.  I

17  give an engineering treatise on how to go about creating

18  average points, which may be 25 feet in the area, which

19  would be needed for this kind of application.

20            So, certain areas you would have to go

21  beyond.  But being in compliance of 5(a)(1) in applying

22  that to all people allowed on site, you would work

23  towards a document and provision of safety facilities

24  that would provide the necessary overhead protection,

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 142

1    which no driver could afford to bring with him and would

2    be possible to bring with him, and you provide it and

3    then enforce the use of it.

4        Q.   So, in your opinion, could these OSHA and ANSI

5    standards and regulations have been employed by GAF to,

6    in the exercise of reasonable care, do what it could have

7    done to have prevented an accident like the one we're

8    investigating in this case?

9        A.   Yes.   If Mr. England had been trained, if the

10   facilities were there, if the facilities covered the

11   hazard that he was exposed to, a fall over four feet,

12   and, therefore, providing protection from that particular

13   hazard, that should be provided.

14       Q.   Do you believe it was negligent on the part of

15   GAF to fail to provide this fall protection that you've

16   referenced?

17                  MR. NYE:   Objection.   Calls for a legal

18   conclusion.

19                  THE WITNESS:   Yes, I do.   Most

20   definitely.

21   BY MR. FOLEY:

22       Q.   Did we mark all of the diagrams that you

23   bought?

24                  MR. NYE:   I think so.

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 143

1    BY MR. FOLEY:

2         Q.   You brought some diagrams that show different

3    -- like Exhibit 5 is a method of fall protection that

4    you've designed in the past.

5                    Is that correct?

6         A.   Yes.

7         Q.   And then the other exhibit is Exhibit 12.

8                    That's another method of fall protection

9    that you've designed?

10        A.   Yes.

11        Q.   You mentioned these nets, safety nets, and I'm

12   just wondering, Doctor, do you believe that there was

13   fall protection that could have been employed on the GAF

14   property in Michigan City that would have both prevented

15   this accident and would have been feasible for GAF to

16   have provided?

17        A.   All the methods I have talked about in my

18   report and also this deposition are feasible and cost

19   efficient.  Namely, that they are far less cost than the

20   cost of one case of a person falling, which any one of

21   these protections would reasonably afford a reduction of

22   injury, if not the elimination of injury.

23        Q.   And just some of the protections you've

24   mentioned I think would be the T-bars where there would

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 144

1    be a cable extending from one to the other?

2          A.   Upside-down L's, which are one direction.

3    T-bars, which are shown in Exhibit 5 is another method of

4    holding cables.  Rail systems.  All of these are possible

5    and easily so for outdoor application because you don't

6    have to build it into the existing structure.  There's no

7    overhead obstruction that we're aware of, based on the

8    pictures that were taken outside of the fence -- part of

9    the exhibits.

10                    And now we have to make sure that the

11   equipment location, in a site location for installation,

12   or several locations for the number of trucks coming

13   through that location, we may have to have ten of these

14   workstations, and then somebody to do the calculation to

15   make sure they can get in and out with the same speed

16   that they would be able to do so without protection, but

17   yet, far safer an operation.

18                    And probably, I believe, if the

19   protection was well engineered, that the drivers welcome

20   it, and they work faster to get out of there and get on

21   the road.

22          Q.   And would the netting, also, work at this

23   site, do you know?

24          A.   The netting I've seen so far has been used

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 145

1   internally.  But I think it's so simple that after long

2   thought about all of these methods, having a vertical net

3   hanging on both sides of a truck, 48 or so feet long, a

4   driver simply goes and hooks it up, it takes him about

5   two minutes to do both sides -- how we deal with the end

6   is another issue -- I believe that's the quickest of any

7   kind of protection to put up, as long as it's not left

8   out there forever, depending on what the environment is,

9   maybe changing it out every three or five years, I

10  believe that is the simplest of all methods.

11              And it is being used by Alcoa and also

12  by a steel company in New Zealand and Australia, Blue

13  Steel (phonetic) -- B-L-U-E -- I'm still working on my

14  answer.  I can't remember the second name of the company.

15  First name is Blue something Steel Company.  It's in my

16  book.

17      Q.   Were you finished with your answer?

18      A.   Yes.

19      Q.   Doctor, then, is the report that you have

20  identified, and I don't know if we've marked -- we've

21  marked his report as Exhibit No. 1 -- is that a true and

22  accurate copy of your report that includes the opinions

23  that you have in this case, in addition to any other

24  opinions that you have referred to in your deposition?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 146

1      A.   Yes.

2      Q.   You were asked about hardhats.

3            To your knowledge, did GAF have any

4  rules for truckers coming onto the property to wear

5  hardhats?

6      A.   I believe there were no rules for truckers

7  based on the testing of each other person in this case

8  that I read.

9      Q.   And, in your opinion, could GAF foresee the

10 fact that truckers were not wearing hardhats on their

11 premises?

12     A.   Of course, yes.

13     Q.   And then, you were asked about other work that

14 you may or may not do.

15           If this case goes to trial in South

16 Bend, which is roughly half an hour from Michigan City,

17 would you plan on going to visit the site prior to trial?

18     A.   If requested, yes.

19           MR. FOLEY:  I think that's all I have.

20 Thank you.

21 BY MR. NYE:

22     Q.   You testified that GAF should have read your

23 book.

24           How much does a copy cost?

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 147

1        A.    $125.  Unless you're a member of the American

2    Society of Safety Engineers.

3        Q.    $125?

4        A.    Yes.

5                    MR. NYE:  That's all I have.  Thank you.

6                    MR. FOLEY:  I have no further questions.

7                    Off the record.

8                    (An off-the-record discussion took place

9    at this time.)

10                    MR. FOLEY:  Back on.

11                    We'll waive signature.

12                    (The deposition was concluded at,

13    approximately, 2:30 p.m.)

14                    (Presentation, reading and signing of

15    the deposition were waived.)

16

17

18

19

20

21

22

23

24

J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE

Page 148

1                    C E R T I F I C A T E

2    STATE OF DELAWARE:

                              :

3    NEW CASTLE COUNTY:

4              I, Gloria M. D'Amore, a Registered

5    Professional Reporter, within and for the County and

6    State aforesaid, do hereby certify that the foregoing

7    deposition of J. NIGEL ELLIS, Ph.D., P.E., CSP, CPE, was

8    taken before me, pursuant to notice, at the time and

9    place indicated; that said deponent was by me duly sworn

10   to tell the truth, the whole truth, and nothing but the

11   truth; that the testimony of said deponent was correctly

12   recorded in machine shorthand by me and thereafter

13   transcribed under my supervision with computer-aided

14   transcription; that the deposition is a true record of

15   the testimony given by the witness; and that I am neither

16   of counsel nor kin to any party in said action, nor

17   interested in the outcome thereof.

18              WITNESS my hand and official seal this

19   31st day of August A.D. 2010.

20

21

         _____

22       GLORIA M. D'AMORE

         REGISTERED PROFESSIONAL REPORTER

23       CERTIFICATION NO. 119-PS

24

[& - 86]                                                                  Page 149

**&**

**&**  2:2,7 7:22,24 8:8
  8:23

**1**

**1**  3:13,14 5:2 16:2
  60:7,12 63:8 70:7
  78:2,3 141:21
  145:21
**1/19/42**  6:13
**10**  4:11,12 32:13
  33:16,23 34:2 47:7
  48:4 50:21 58:16,22
  131:3,5
**100**  25:12 101:7,13
  108:7 117:17
**1002**  2:4
**102**  51:20
**105**  4:15
**10:30**  37:8
**10:40**  37:10
**10th**  46:24
**11**  4:13,14 37:14
  41:18 45:10 79:17
  79:19 80:20 121:13
  121:21 137:8,13,15
  137:17
**119**  148:23
**11th**  36:22
**12**  4:15,16 20:11
  23:2 30:17 52:5,6
  105:22,24 107:1,10
  108:23 117:21
  143:7
**125**  147:1,3
**1264.1**  80:23
**12:00**  68:17
**12:55**  98:13
**12th**  12:12
**13**  33:16,23 34:2
  52:7 99:10
**136**  3:8
**14**  23:5 32:21 34:4
  61:3 124:2,7

**140**  30:7
**15**  32:14 33:6 51:3
  108:23 135:15,19
**150**  32:13 51:1,5
**18**  1:9
**19**  3:22
**1910**  69:18 70:12
  72:16,21 74:6,13,19
  75:5,23 138:2,11
**1926**  69:18 70:15
  71:6,13,20 72:7
  76:2 138:2,11
**1926.500**  76:3
**1966**  6:20
**1967**  7:18 8:7
**1968**  7:18 8:6
**1970**  7:23 115:11
**1972**  138:19
**1973**  26:2
**19801**  1:22
**1985**  9:14
**1986**  7:23 9:5
**1996**  9:6,12

**2**

**2**  3:15,17 5:5 6:14
  69:11,14 75:2
**2,250**  122:9
**20**  15:20 33:7 48:6
  51:2 57:21 58:3
  108:23 135:15,19
**200**  101:12 102:13
**2004**  9:14
**2008**  12:10,11 15:9
  44:8 99:10
**2009**  12:12 20:11
  23:2 30:17
**2010**  1:9 30:22
  31:12 36:23 37:14
  41:18 45:10 47:7
  48:4 50:21 148:19
**21**  3:24
**219**  2:8
**22**  120:23

**230**  1:21
**25**  23:22 24:2,5
  27:24 51:6 116:18
  141:18
**250**  101:8
**288-7676**  2:3
**2:30**  147:13

**3**

**3**  3:18,21 5:8 57:9
  86:6 120:21 121:21
**3,500**  34:13
**30**  26:5 29:24 32:2
  33:22 36:1 51:7
  60:1 116:3
**30,000**  109:12
**300**  13:19 33:8
  35:13 63:7 94:24
  101:21 125:18,19
**302**  1:22
**306**  12:4
**31**  4:3
**31st**  148:19
**33**  60:18
**340**  100:13 101:12
**350**  1:14 101:8
**37**  4:5
**38**  139:1
**3:09**  1:6

**4**

**4**  3:22,23 4:17 20:1
  20:4 60:6 65:4
  69:10 86:5 138:12
  138:18
**40**  32:18 101:4
**40,000**  109:13
**400**  101:6,18 102:3
  102:12 118:18
**408**  1:6
**43**  4:7
**440**  101:18
**45**  29:24
**46320-2423**  2:10
**46617**  2:5

**47**  4:9 49:2
**48**  23:7 32:20 48:24
  145:3
**48,406**  122:16

**5**

**5**  3:13,15,18,24,24
  21:10,12 69:11,14
  70:7 75:2 107:2
  117:20 141:21
  143:3 144:3
**5,146**  3:7
**50**  33:8 35:13 38:24
  101:22 125:18
  129:9
**50/50**  34:18,24 35:4
**500**  125:17
**5000**  27:10
**571-0510**  1:22
**574**  2:3
**58**  4:11
**582**  138:17
**59**  49:9 50:11
**5920**  2:9

**6**

**6**  4:3,4,18 31:8,11
  133:18
**60**  99:18
**67**  8:6
**68**  99:21

**7**

**7**  4:5,6,18 37:1,6
  38:7 45:9
**70**  8:3
**79**  4:13

**8**

**8**  4:7,8 43:17,19,21
  44:9
**80**  42:14 50:8,15
  120:16
**80/20**  37:23
**86**  8:3

[9 - anyway]                                                                    Page 150

**9**

**9**  4:9,10,18 31:12
  47:2,4,6
**9000**  26:20,24 27:4
  27:11,15
**933-6200**  2:8
**96**  9:7 51:20
**9:30**  33:7
**9th**  15:9 30:21

**a**

**a.d.**  148:19
**a.m.**  1:16 37:8,10
  68:14
**a117**  85:7
**a1264-1**  78:1
**a1264.1**  4:13 79:16
  81:7 82:12,22 83:9
  86:1
**a1264.1.**  78:3 79:5
  79:22
**abbreviated**  65:21
**able**  41:10 45:16
  78:15 110:21
  115:22 120:8,10
  126:19 144:16
**abrasion**  92:5
**absence**  93:21
**absolutely**  71:12
  82:8 83:11 93:24
  137:6
**acceptable**  126:22
**accepted**  74:7
**access**  12:24 81:4,7
  81:11,24 82:9
**accessed**  21:17
**accessing**  14:13
**accident**  43:9 49:9
  74:23 91:3 96:22
  98:17,23 99:17
  100:2,5,9 114:13
  142:7 143:15
**accidents**  21:2
**accomplish**  40:5

**account**  61:19 64:18
  101:19
**accountant**  11:15
**accounted**  119:22
**accurate**  44:22
  57:16 145:22
**acquainted**  38:16
**acronym**  84:14
**act**  91:3 123:24
**action**  23:14 148:16
**actively**  34:10
**activities**  135:8
**actual**  79:23 80:2
  81:6 114:7,8,24
**add**  81:2
**adding**  18:19
**addition**  44:9
  122:12 138:6
  145:23
**additional**  123:12
  130:5
**addresses**  139:8
**addressing**  82:16
**admitted**  66:2
**adopt**  27:9
**adopted**  85:16
**adopts**  27:10
**advised**  95:16 96:10
**aerial**  139:6
**affect**  102:4
**affixed**  116:20
**afford**  142:1 143:21
**aforesaid**  148:6
**age**  50:4 99:19 126:6
**agencies**  117:3
  138:23
**agency**  66:7,9,19
**aggregate**  117:18
**ago**  38:8 65:24
  119:15
**agree**  40:14 45:5,6
  59:15 65:9 78:7,9
  78:22 79:6 80:14
  81:6,18 82:11 83:4
  99:7 100:13 102:24

134:12
**agreed**  138:23
**agreement**  15:13
  18:21 122:1 131:19
  131:20 132:8
**agrees**  79:13
**ahead**  26:3 29:21
  32:10 39:11 41:17
  42:8 50:18 71:5
  107:24
**aided**  148:13
**aimed**  81:3
**air**  107:21
**airport**  109:4
**alan**  1:4 5:18 13:20
  18:2 19:2 30:20
  31:24 32:18 35:20
  36:19 38:3 43:12
  46:11 57:4,23 59:15
  59:20 64:23 71:10
  71:19 73:12,16
  74:11,18 87:4,11
  88:1,7 90:17,19
  102:18 122:24
  131:21 133:24
  134:2,5,10,23 135:1
  135:11,21,24
**alan's**  51:20 53:8
  134:23
**alcoa**  25:10,16,19,20
  25:24 26:1,7 34:10
  34:12,15,15 46:3
  73:24 104:7,11,15
  107:22 108:1 109:6
  110:9 112:9,11,12
  129:24 145:11
**allow**  82:3
**allowed**  141:22
**alternative**  59:7
**altogether**  19:5
**aluminum**  25:7
  105:15 109:7,10
**ambiguous**  89:18
**ambulance**  18:6

**amenity**  62:2
**america**  8:22 88:6
**american**  63:19
  79:21 84:14,16,18
  84:22,23 85:3
  129:14 147:1
**amount**  122:14
**analysis**  114:23
  123:13
**anchorage**  92:18
**anderson**  13:3,5,9
  13:15,18,21 14:9
  94:11,23
**andy**  11:7,10,15
**angle**  29:19
**ankle**  102:11,12
**anna**  11:7,9,14
**ansi**  4:13 18:24
  69:22,24 70:9,20,23
  70:24 76:9 77:13,18
  77:24 79:16,21
  80:16,22 83:9 84:14
  84:16 85:4,6,8,17
  86:2 129:8,12 137:8
  137:12 138:2,13,17
  140:21 141:16
  142:4
**answer**  6:5 10:20,20
  10:24 15:17 31:20
  42:21 53:21 54:20
  57:15 58:10 67:4,8
  68:18 77:21 79:3
  85:14 89:15 91:15
  97:23 99:21 101:1
  138:1 145:14,17
**answered**  19:7
  95:24 102:5,16
**answering**  75:22
**anticipated**  136:24
**antidotal**  114:7
**anybody**  88:5,13
**anymore**  17:16
**anyplace**  31:5
**anyway**  17:16 38:20
  41:15 80:9

**apart** 7:11 39:18 41:14 98:2
**apologies** 17:9
**apologize** 14:18
**apparatus** 141:7
**apparently** 14:23 44:8 53:7 80:16,17 95:14 127:22 140:3
**appear** 65:1
**appearances** 2:1
**appeared** 41:7
**appears** 12:10 39:21 54:5
**appliances** 12:17 14:8
**applicability** 66:20
**applicable** 70:18 75:20 91:3 141:3
**application** 76:19 77:18 138:21 141:19 144:5
**applied** 70:16 75:2 75:19 86:14 137:15 138:11
**applies** 66:19,19 72:18 76:7 82:13 83:11 91:1 128:19
**apply** 64:12,13 69:20 71:13 72:20 73:4 74:16 77:3 78:24 81:19 82:4,22 83:10 91:9 92:6,12 92:13,17 116:6 138:16 140:5 141:6
**applying** 66:22 140:2 141:21
**appreciate** 87:5,6,12 87:17,18
**appreciated** 86:7,11 86:20 92:5
**approach** 58:11,11 115:23
**approached** 28:3
**approaching** 113:3 113:8

**appropriate** 81:11 89:13 92:2 129:21
**approximately** 1:15 27:24 33:2 37:7,9 68:13,16 98:10,12 109:16 147:13
**arc** 40:17,18
**architect** 56:22
**architects** 56:18
**area** 8:21 24:16 25:7 26:7 27:20 33:6,7 33:12,13,14 35:13 35:22 39:10 53:7 58:11 64:9 72:10,10 78:16 83:17 96:14 101:6 105:7,8 112:10 113:17 117:6 120:12,12 125:20 130:11 139:2,6,21 141:18
**areas** 33:12 81:5,20 82:13 83:21 94:1 137:20 139:22 141:20
**argument** 93:2
**argumentative** 95:23
**arizona** 104:21
**arms** 117:14
**arrangement** 117:2
**article** 16:15 108:19 110:16 113:10 129:10,14
**ascertained** 131:16
**asked** 14:11 24:11 29:24 32:11 48:1 68:23 88:9 95:3 97:13,22 115:3 132:12 137:12,14 138:10 140:15 146:2,13
**asking** 17:4 49:20 49:22 77:8 80:19,22 81:17 91:12 96:4 98:23 100:22 112:3

114:6,7 123:2 130:24 131:9,15 132:5
**aspect** 134:22
**aspects** 39:14 75:15 123:24
**asse** 4:13 79:16
**assertion** 81:9
**assessment** 102:18
**assistance** 15:21
**assistant** 11:15 56:2 57:13,17
**assisted** 121:22
**associate** 56:4
**associated** 118:23 119:1 124:22
**assume** 5:18 18:9 51:10 96:17 106:12 133:8
**assuming** 30:14
**attach** 60:1 92:21
**attached** 29:9 59:21 116:13
**attempting** 81:12
**attend** 65:15
**attended** 65:16
**attention** 67:1
**attorney** 2:5,10 14:21 15:12,18 20:22 44:15
**attorneys** 66:24 120:14,15
**auburn** 125:4
**august** 1:9 148:19
**australia** 145:12
**authorities** 39:8
**automatic** 117:14
**automatically** 113:23
**availability** 114:15
**available** 59:11
**avenue** 2:9
**average** 50:12 141:18

**avoid** 42:16 96:21
**aware** 6:11 38:24 57:8 61:15 69:9 88:10,11,17 91:20 94:1 95:19 96:7,15 97:9 100:8,11 103:22 110:12 114:10,22 144:7
**awful** 110:18
**awkward** 103:16

**b**

**b** 3:11 23:6 35:6 97:3,3 145:13
**back** 12:13 14:17,19 19:23 33:9,13 35:14 37:9,11 51:22 53:7 54:10 59:3 68:15,16 76:2 78:14 83:18 87:13 93:3 98:12,14 107:4,22 108:13,24 109:4 111:18 120:6 147:10
**background** 4:13 26:23 60:8,9 79:16 98:4
**backing** 50:23
**backwards** 120:4
**bags** 21:18
**balance** 32:21 98:21 127:2
**ballpark** 104:13
**baltimore** 83:15
**bar** 107:9
**barricades** 53:1
**barrier** 48:13 108:16 109:2
**barriers** 35:12 95:11
**bars** 143:24 144:3
**based** 38:22 62:8 63:6 115:2 124:3,3 136:5 137:2 144:7 146:7

**basis** 74:14,20 86:10 87:11 93:7,8 113:7 139:15
**bathroom** 139:20
**beckman** 2:7
**bed** 32:16 81:7 82:10
**began** 8:5
**beginning** 24:2 135:16
**begun** 53:22
**beings** 11:4
**believe** 6:18 13:24 36:22 38:7,10 41:8 44:19 66:7 67:5,19 69:20 70:17 85:22 90:18,22 91:18 93:21 94:6 95:6 96:1 99:8 100:6 102:22 103:3 115:4 124:13 128:14 129:9 138:12 142:14 143:12 144:18 145:6,10 146:6
**believed** 44:22
**bend** 1:3 2:5 129:19 146:16
**best** 26:7 46:23 91:16
**better** 45:6 75:4 102:12 111:19 128:17
**beyond** 40:16 45:3 50:4 51:21 141:21
**big** 94:19 109:11
**bill** 24:18 25:1
**billed** 122:15
**billings** 122:12
**binder** 60:2
**binding** 73:19,21
**bird's** 29:24
**birth** 6:12
**bit** 12:14

**bkslegal.com** 2:9
**block** 141:14
**blocks** 27:18 95:10
**blood** 50:9
**bls** 61:23
**blue** 145:12,15
**bodies** 70:12 84:21
**body** 64:1 70:13,16 71:15,22 72:2 73:18 84:23 102:15
**boils** 93:11
**bolt** 116:12 133:13
**bolts** 129:17
**book** 138:8 141:16 145:16 146:23
**books** 36:5
**borrow** 139:17
**bottom** 19:18 50:7
**bought** 9:2 142:23
**boulevard** 2:4
**box** 17:23
**boxside** 34:15
**bracket** 36:7
**brand** 118:14
**break** 37:3,7 62:16 98:8
**breathing** 141:7
**bring** 66:24 68:23 69:1,7 117:24 142:1 142:2
**broaden** 61:18
**brought** 21:12 101:16 104:24 143:2
**buckle** 23:17 28:8 30:3 40:24 42:10 58:6 59:21 60:1,3 64:6 128:2
**build** 76:23 78:18 79:3 81:9 82:2 106:19 107:1 144:6
**builders** 36:3 130:15,18,20 131:1 131:20,22 132:5,8 132:11

**building** 53:8,8 72:11 82:8 101:23 116:3 118:21
**buildings** 105:1,13 115:21
**builds** 83:24
**built** 83:17 102:11 113:20
**bullard** 129:5,22
**bunch** 48:12
**bundle** 22:20,21
**bundles** 30:12
**bungee** 112:20
**bungees** 24:15
**business** 8:13,17 9:4 9:8,10,12 11:24 12:1 33:23 38:19 39:16 71:23 89:4 101:5 115:10 138:5 140:23
**businesses** 11:16

**c**

**c** 11:9 97:4 113:24 113:24 148:1,1
**c.a.** 1:6
**cab** 110:11
**cable** 105:4,14 107:4 107:14 144:1
**cables** 144:4
**calculate** 125:5
**calculation** 62:24 144:14
**calculations** 62:9 63:10 113:16
**call** 30:24 31:1,23 31:24 37:17 38:5,10 47:20,20,22,23
**called** 47:22 65:21
**calls** 44:11 65:7 142:17
**cans** 105:15
**capability** 118:15
**capable** 99:22

**capably** 40:7
**capacity** 86:8
**capital** 20:19
**capture** 6:6
**care** 38:19 55:21 68:1 93:22 138:4 140:20 142:6
**careful** 129:16
**carefully** 115:3
**carry** 117:8
**cars** 107:19
**case** 5:17 12:12 13:20 14:17,22 15:16,21,23 21:15 21:16,22,23 22:3 38:20 43:23 51:19 52:1,2,12,17,20 59:6 64:23 65:2,3 66:20 68:3 69:8,12 70:14 72:12 78:17 82:19 83:7 93:13 101:17 106:6,6 107:8 115:15 116:5 121:12,21 122:24 123:7 124:14 132:12 136:6 138:17 140:4 142:8 143:20 145:23 146:7,15
**cases** 39:2 57:9,12 66:22 107:13 120:21,23 121:4,20 124:14 137:3
**castle** 148:3
**catch** 87:14 136:16
**category** 49:18
**catwalk** 78:16,18 79:3 81:10,12 82:2 83:17,24 84:3,4,5 108:7 120:5,6
**catwalks** 78:13 83:20,21 108:5 120:2
**caught** 136:17

cause 92:8
caused 100:21
cautious 99:24
ceiling 64:4 107:9
cell 36:11
centered 23:8
central 35:13 108:3
centrally 32:22
certain 15:10 48:16
  64:12 102:8 103:11
  118:20 139:5
  141:20
certainly 27:13 35:3
  55:9 67:5,12 75:14
  78:8 81:5 91:4
  92:19 96:12 101:5
  101:19 102:11
  103:2 114:13
certification 148:23
certify 148:6
cetera 137:16
chained 116:19
chaining 116:15
chains 110:11
chance 34:18,24
  35:5 75:4
change 9:8,10 22:10
changed 52:24
  105:11
changes 28:4
changing 145:9
check 23:22 24:1,7
  59:9 68:10
checked 27:20 43:10
  116:17,17
chemical 119:20
chemicals 7:4,5,6,12
chemist 7:17
cherry 15:11,15,24
cherrypicked 139:3
chicago 14:24
chicken 111:17
chip 129:7
choice 30:12,13

choose 77:3
chose 70:14 83:14
chosen 72:3 75:3
  83:13 91:9 119:21
  128:24
chris 15:9 43:22
christopher 14:21
chronic 100:1
circle 53:6
circumstances
  41:22 72:9 97:24
  118:20 127:3
citation 70:15 71:2
  74:14,20 75:4
  140:19
cite 72:6
cited 71:1 140:16
city 21:5 26:6 29:5
  39:15 58:20 83:1,10
  83:12 103:5 124:12
  143:14 146:16
claim 131:22
clarification 98:19
clarify 89:16 131:18
  131:24
classes 66:3,4
classify 49:4
clause 139:4
cleaning 21:17
clear 98:5
clermont 15:12
click 108:20
climb 24:10 40:20
  74:4
climbed 23:19 41:23
  51:16
climbing 22:16
  41:20 73:8 97:11
close 15:14 27:22
  28:5,6,15,18 41:2
  55:5 64:4 86:9
  95:12 98:3 117:1
  133:9 138:23
closed 23:16 25:8
  33:8

closer 133:10
club 12:4
coffee 119:13
coil 25:16,21 46:3
  109:7,14 111:17
coils 109:10,20
  116:14
colleague 14:24
  15:19
collector 101:9
com 108:20
combination 125:17
combined 119:11
come 38:20 41:1
  53:6 54:24 57:22
  62:23 72:10 86:13
  94:13 97:7 133:4
comes 12:23 14:5,12
  73:22 101:2 103:20
  113:9 127:7
coming 88:13
  111:18 129:17
  140:24 144:12
  146:4
commencing 1:15
commendable
  121:19
comment 55:15
commitment 139:1
common 51:11
  97:16,17,18 125:21
  141:6
comp 90:13
companies 10:3
  22:15 27:16 73:23
  106:12 117:6 120:1
  120:20 123:23
  136:6
company 1:21 8:5
  9:2 36:3 73:23
  106:12,13,19,24
  130:16,18 131:20
  132:6,9,16 139:17
  145:12,14,15

compared 88:21
comparison 63:6
compatibility
  118:11,13
compensation 90:7
  90:12 91:7 122:1
complete 45:4 57:12
  57:14 68:23
completed 57:18
complex 7:4 135:2
compliance 141:21
comply 69:15
  139:23 140:13
component 106:18
components 92:15
  92:16
computer 148:13
conceivable 61:23
concepts 66:23
  73:18 91:18
concerned 88:22
concerning 39:16
  123:20
concerns 101:13
concertina 113:24
  114:1
concluded 46:2
  49:12 147:12
conclusion 49:15,16
  57:22 58:5 134:14
  142:18
conclusions 50:13
concrete 27:18
  35:12 53:1 95:10,11
  139:5 141:14
condition 128:13
conditions 64:19
  98:6 100:2 138:1
conduct 87:3 91:10
  106:14 141:4
confident 42:12,21
  42:23
confirms 32:3,4,15
  32:21 33:11

conflict  81:8
confused  44:1
confusion  23:15
congestion  37:22
connecticut  20:22
connecting  101:5
104:24
connection  101:4
105:12
consciously  6:11
128:22
consensus  69:22
consequences  87:2
87:13,18,23 88:5,11
considerably  34:5
considered  99:19
122:23
consistency  26:10
27:1,2
consistent  63:1
consistently  64:9
consisting  20:5
construction  33:9
60:15,19,21,24 71:7
71:11 72:9 75:17
81:5 87:9 125:14,23
constructive  44:17
consultant  26:2
consulted  39:7 68:2
consulting  9:17,22
9:23 104:7 113:12
120:13
contact  12:7 41:1
138:23
contacted  113:11
115:13
contained  83:22
120:5
context  24:18 28:4
28:11,21 34:24 35:1
48:20 49:3,22 89:11
continue  40:17
115:12
continued  4:1
139:14

continuing  86:5
continuous  118:20
contract  89:24
130:15,15,21
131:19 132:19,20
contractor  88:18,21
89:9 90:10,19
131:21
contractors  90:17
112:5 116:2
contracts  90:13
contributed  99:20
contributing  100:14
controlling  35:21
69:12 91:24 96:19
113:5 116:8 118:2
139:11
controls  9:15,20,21
10:2,9,19 11:18
conveniently  40:6
58:7
conventional  109:14
conversation  20:10
23:2 28:20 30:6,17
30:20,21 31:11,18
35:8 36:9,16,18
38:9 41:18 43:11
45:9 46:19 47:7,9
47:14 48:21 49:3,23
50:6,19 53:14 54:24
56:24 57:3 135:3
conversations  19:11
28:22 46:11 58:18
convince  128:8,10
cooperated  97:21
copy  6:14 16:3
63:11 80:6 121:24
129:15 131:4
145:22 146:24
corbett  1:21
corporate  112:10
corporation  1:7
7:23,24 8:1,8,9,17
8:23 9:5 10:10

corporations  9:22
10:7,11,13 11:12,24
correct  6:21,22 7:16
8:7,10 9:13 11:5
14:16 18:4,17 20:7
26:18 42:6 60:22
61:7 64:18 66:12
70:1 72:14 77:23
81:2 83:3 84:4,6
90:21 103:6 106:8
107:11 116:10
122:10,17,20
123:10 137:17
140:18 143:5
correctly  42:3 54:13
55:4,20 148:11
corrects  23:10
cost  13:18 87:23,23
94:4,24 118:5
143:18,19,20
146:24
costs  88:11 125:13
council  63:18
counsel  148:16
count  104:12
counted  96:12
counting  119:23
country  12:4 62:3
73:10 105:15 113:4
115:14 123:21
county  148:3,5
couple  99:23
course  11:13 18:9
18:16 61:17 81:13
81:16 93:13 105:7
116:14 120:9 125:4
146:12
courses  66:13,16
court  1:1 20:18
57:10 116:7
covered  90:11
142:10
covers  70:19 120:11
cpe  1:13 3:3,16 5:4,9
148:7

crane  110:5 114:2
cranes  103:23
create  72:3 73:3,19
76:21 138:3
created  73:15
creates  108:11
131:10
creating  106:17
141:17
credibility  102:19
102:23
criteria  77:2
cross  79:10
csp  1:13 3:3,16 5:4,9
148:7
curb  29:7
currently  73:10
85:17
curriculum  3:15 5:3
6:14
curry  123:14
cut  45:14
cutting  92:4
cv  1:6 6:19,24 14:20
16:13 18:22

**d**

d  11:10 65:22 97:4
121:1
d'amore  1:16 148:4
148:22
daily  114:9
danger  86:7,11,20
87:5,6 137:21 139:9
dangerous  25:11
63:23,24 99:13
110:7
dangers  91:21
dare  48:22
data  61:16,21
date  6:12,17 42:20
74:23 98:17 99:16
100:2,5,8 122:13
dated  15:8 46:24

[day - dollars]                                                    Page 155

**day** 8:5 21:23 23:21
32:13,13 33:7,8,10
35:11 39:19 41:3
43:8 44:20 45:21,23
51:2 52:13 53:6
65:1,2,3 72:13 73:2
73:12 74:17 87:2
111:23 112:16
118:13 126:17,23
138:24 148:19
**days** 114:4
**dba** 11:19,20,23
**de** 1:22
**deal** 145:5
**dealing** 28:24 45:20
79:9 102:22 136:6
**death** 62:4 63:2,3,5
63:7,8
**deaths** 60:17,21
61:2,3,16,24 62:5,8
62:12,22
**december** 12:10
**decide** 76:24 103:1
**deck** 14:13 25:15
**decks** 13:14
**deem** 78:19
**defendant** 1:7 2:10
5:17 132:11
**defense** 120:15,19
121:4,11,22
**define** 67:13,16
**definitely** 63:24
73:21 74:9 78:18
142:20
**deflect** 130:7
**deflection** 129:17
**degree** 66:1
**delaware** 1:15 65:22
114:3 117:9 148:2
**delays** 124:22
**delegating** 85:2
**delivery** 46:7 111:21
**department** 138:19
**depending** 41:22
48:14 107:7 145:8

**depends** 110:4
113:15 116:23
**deployed** 113:23
**deponent** 148:9,11
**deponents** 93:5
**deposed** 123:16
**deposition** 1:12 3:3
3:18 5:6,18,19 6:5,7
18:10 19:8 22:1,5,6
45:2,16 95:18 99:23
102:21 120:22
121:15 122:8
123:16 124:21
130:14 143:18
145:24 147:12,15
148:7,14
**depositions** 18:14
18:19 22:3 57:10
93:4 123:18 136:21
**describe** 104:20
**described** 109:1
**describes** 43:12
**describing** 25:18
33:19,24 78:5,23
**description** 66:22
**design** 105:17 106:9
106:22 107:1
118:17,22
**designed** 12:24
13:12,15 15:13
104:22 113:20
118:17 143:4,9
**destroy** 120:10
**destroyed** 117:15
**detailed** 48:23
**details** 123:22
124:14
**determine** 113:16
**develop** 8:18,19
141:2
**developer** 12:16
14:7
**developing** 8:21
**device** 12:22 14:14
21:21 22:9 45:17

87:17 105:24
**devices** 12:19
104:20 110:13
112:1,17 114:24
**diagram** 17:24
58:22
**diagrams** 18:1
142:22 143:2
**diameter** 109:16
**difference** 67:13
**different** 24:9 26:10
48:20 49:13 57:20
64:3 89:21 109:7
111:12 116:16
126:17,17 131:13
135:8 143:2
**difficulty** 121:16
**diligent** 92:16
**direct** 86:18
**directed** 57:17
**direction** 19:7 35:15
119:15 144:2
**directions** 23:17
33:11 35:16 116:15
125:22
**directly** 128:23
139:12
**director** 123:15
**directs** 69:14
**disabilities** 85:7
**disagree** 79:6
**disagreeing** 82:1
**discomforts** 92:9
**discounting** 59:4
**discovery** 123:20
**discuss** 15:23
138:20
**discussed** 41:6 57:3
57:7 84:10 86:1
112:1 123:5,10
**discussing** 41:19
54:7 77:10 110:14
**discussion** 12:11
19:1,21 28:14 38:3
44:17,19 49:11

61:23 93:3 113:9
118:18 124:20
137:14 147:8
**discussions** 19:4
**dispatched** 36:4
132:16
**dispute** 75:14
**disruption** 126:4
**distance** 39:20 41:4
41:13 48:6 57:23
**distances** 40:15
**distinction** 89:8,12
89:23
**district** 1:1,2
**divided** 120:14
**division** 1:3 9:1
11:18
**dock** 25:8 50:23
54:10 82:7,8,18,19
82:20,21,23 83:2,9
84:4 86:16 94:3
108:6
**docks** 80:11 82:17
82:17 83:14,16
124:21,23
**doctor** 20:18 56:14
56:16 102:15
143:12 145:19
**doctors** 56:12
**document** 3:18 5:6
16:9 68:5,19 80:20
105:19 131:8,9,16
141:23
**documents** 3:13 5:1
124:5
**doing** 13:24 24:10
27:17,21 35:2 41:22
74:22 75:21 94:9
106:6 111:11
119:16,16 125:4
126:3 127:24
136:23
**dollars** 94:5 107:5
118:6

**dome** 115:20
**donut** 109:24 110:2
  110:6
**door** 139:17
**dot** 78:2,3 108:20
  138:19
**dozens** 83:11
**dr** 3:19 5:7 137:17
**draft** 141:1
**draw** 29:24
**drawn** 59:2
**drinks** 119:13
**drip** 23:9
**drive** 12:4 21:20
  50:8,23 54:10 83:18
  120:4,8,9
**driver** 13:11,23 30:5
  35:20 40:9 95:6,7
  95:19 96:11 97:2
  99:24 108:5 119:13
  142:1 145:4
**drivers** 13:13 21:4
  24:12 26:12 29:6
  32:11 36:5 50:5,15
  53:13 59:17 64:21
  64:21 72:1,1 74:11
  90:5 93:6 94:14
  119:8 120:3,8 136:9
  136:14,21 137:5
  139:23 140:10,11
  140:13 141:3
  144:19
**drives** 108:5
**driving** 90:10 99:4
  110:17
**drop** 128:1
**dropped** 23:19
  34:14
**dry** 65:1 92:8
**drywall** 54:6
**dsc** 9:20 10:9
**duly** 5:10 148:9
**dumb** 9:9
**duplicate** 21:7

**dupont** 7:18 8:5
**duties** 91:14 93:14
  93:14 130:23
**duty** 55:21 67:16,20
  67:23,24 70:5 71:2
  88:12 90:16 93:22
  131:10 139:4,13
**dynamic** 9:15,20,21
  10:2,9,18 11:18

**e**

**e** 3:11 4:7 9:3 11:10
  14:20 43:18,21
  44:18 65:22,22 97:4
  113:24 145:13
  148:1,1
**earlier** 44:2 109:1
**easier** 121:6
**easily** 140:8 144:5
**east** 2:4
**easy** 45:14
**ed** 12:11 15:1 56:3
**edge** 19:18 23:9,11
  23:21 32:20 45:12
  45:16,24 51:18
  81:10
**edges** 72:20
**edmond** 2:3
**education** 7:13
**effect** 7:4 74:1 122:4
**effective** 26:11
  78:19
**effects** 134:23
**efficient** 143:19
**efoley** 2:4
**eight** 23:6 41:24
  52:6 53:10 78:16
  109:16,17 112:11
  113:21
**eighty** 120:18
**either** 28:6 29:1,11
  31:15 53:24 57:4
  108:4 123:4 128:6
  128:18 136:10,22
  139:12

**elevated** 107:15
**eleven** 20:5
**elimination** 143:22
**ellis** 1:12 3:3,14,15
  3:17,20,20,22,24
  4:3,5,7,9,11,14,15
  4:19 5:2,3,4,7,8,9
  5:15,16 10:4,8,22
  11:17 13:10 17:5
  19:24 20:3,4 21:9
  31:7,10 37:5 43:17
  43:18,21 47:2,3
  58:15 79:17 96:3
  105:21 106:13
  137:18 148:7
**else's** 49:21
**emergency** 87:20
  138:1
**employed** 140:21
  142:5 143:13
**employee** 89:6,24
  90:4,5,6,8 91:2,6
**employees** 10:18,22
  11:1 62:3 71:17,18
  72:2 74:15 76:8
  91:4 92:12 112:24
  119:12
**employer** 35:21
  69:12 71:16,23
  72:23 86:18 87:24
  89:9 90:3,9,20,24
  91:2,24 92:14,23
  96:19 99:14 116:8
  118:2 119:22
  139:11,12
**employer's** 91:24
  92:11
**employers** 76:7
**encourage** 97:19
**endangering** 40:8
**ended** 8:20
**endorsement** 119:8
**enforce** 140:12
  142:3

**enforcement** 86:14
  139:6
**engaged** 134:12
**engineer** 106:9
**engineered** 144:19
**engineering** 7:14
  26:2 141:17
**engineers** 63:19
  79:21 84:15,19
  129:14 147:2
**england** 1:4 5:18
  13:21 18:2 19:2
  20:10,14 21:4 22:17
  23:2 24:20 25:18
  26:13 27:12 28:9
  30:16,20,23 31:12
  31:24 32:18 36:16
  36:19 37:13,21 38:3
  40:24 41:9 43:12,12
  44:6,13,19 45:15
  46:11 49:8,17 53:16
  53:18,23 55:10 57:4
  58:7 59:9,15,20
  60:23 64:23 67:2
  71:10,19 73:17
  74:11 75:14,20 87:4
  87:11 88:1,7,17
  90:17,19 93:7,12,16
  96:4,21 97:9,12
  98:16 99:4 110:17
  126:13 130:14
  131:21 132:7,16
  133:24 134:2,5,10
  135:1,6,22 136:9
  139:14 142:9
**england's** 43:23
  54:19 57:23 61:4
  69:20 73:12 74:18
  74:21 101:20
  102:18 122:24
  124:1,21 135:22
**entirety** 9:4
**entities** 11:24 69:15
**entitled** 3:18 5:6
  77:11 91:7

entry 139:24
environment 17:17
  145:8
equipment 80:12
  92:14 101:14,15
  103:24 118:11
  141:7 144:11
erection 130:10
ergonomically
  126:22
especially 21:17
  116:6 120:4 138:21
  139:4
esquire 2:3,8 15:11
essentially 16:13
  23:8 38:22 105:12
estimate 32:18 51:2
  117:16
estimates 32:13 33:7
et 137:16
evaluating 15:4
evening 66:3
evenly 32:22
event 115:22
evidence 72:12
  114:7,23
exactly 124:6
examination 3:5,7,8
examined 5:11
example 20:17 25:9
  54:6 77:1 90:7 92:8
  105:18 106:2,3
  107:17 119:18
  125:7
examples 22:11
  114:6
excellent 56:18
  102:23
exception 93:14
exclude 86:17
excluded 80:9
excludes 78:6
excuse 25:12 33:4
  133:4

executive 11:14
exempts 76:3
exercise 93:22 138:4
  140:20 142:6
exhibit 3:14,17,21
  3:22,24 4:3,5,8,9,10
  4:11,14,15,17 5:2,4
  5:8 6:14 16:2 19:24
  20:4,5 21:9,12 31:7
  31:10 37:1,5 38:7
  43:19,21 44:9 45:9
  47:3,6 57:9 58:15
  58:22 79:17,19
  80:20 105:21,24
  107:1,2,10 117:20
  120:21 121:21
  131:3,5 133:18
  137:8,13,15,17
  143:3,7,7 144:3
  145:21
exhibits 131:2 144:9
exist 8:24 70:13
  132:9
existed 61:11
existence 9:24 73:1
  104:24
existing 105:13
  144:6
exists 137:21
expanded 9:10
expect 60:3 97:14
  117:24 118:8 119:8
expected 94:2 96:16
  112:13
expecting 64:20
expenses 107:7
  119:23
expensive 107:16
experience 50:3,17
  136:6 137:2
experienced 115:5
expert 15:1 38:14,16
  39:2 44:15
expertise 13:17
  38:22

experts 87:15
explain 21:14 23:24
  28:1 59:1 138:12,15
explaining 45:8
explanation 48:23
  124:18
expose 74:5 93:8
exposed 24:17 92:16
  93:16 108:7 115:20
  142:11
exposure 75:11
  88:16 99:12 103:22
  108:14
expressed 82:15
  133:22
expressly 78:6,23
extending 144:1
extension 129:6
extent 22:24 80:19
  80:22
extenuating 72:9
exxon 119:11
eye 30:1 129:9 141:8

f

f 97:4 148:1
face 94:19 141:8
faced 87:9 93:13
facilities 105:17
  113:17 115:5
  139:20 141:23
  142:10,10
facility 28:7 83:10
  83:12
facing 109:24
fact 35:6 50:6,14
  87:19 90:5 105:11
  113:9 116:1 119:4
  126:5 136:12
  146:10
factor 100:14
fail 142:15
fair 6:2 31:22 46:10
  47:24 48:2 76:14

fairly 98:3
fall 10:3,4,8,22
  13:12 14:2 26:1,11
  39:2 42:4,20 45:23
  51:14 53:16 55:10
  62:13 64:17 66:21
  73:6,7,14 76:4,12
  76:21,22 77:2,18
  83:6 85:17 86:16,23
  87:1,12,16,18 88:2
  90:6,7 91:5 92:13
  93:16 97:6 98:22,22
  98:24 99:13,20
  100:14,21,22 101:3
  101:6,7,12 102:9
  103:22 104:16
  105:3 106:13
  108:19 109:2
  110:11,13 111:24
  112:4,13,16 113:4,5
  114:9,24 115:7,10
  115:13,20 123:21
  125:12 128:20,21
  130:13 134:3,23,23
  135:7,14 136:1,7
  137:4 138:5 140:2
  140:13 142:11,15
  143:3,8,13
fallen 99:6 127:9
  130:11
falling 13:13 62:1
  86:7,11,20 87:2,5,6
  87:15,19,20 88:3,8
  91:21 92:2,3 102:4
  105:10 115:15
  116:2 130:7,8,8
  137:21 139:9
  143:20
falls 60:13,19,22
  62:14 64:8 72:20
  90:18 102:6,8
  123:22 124:11
familiar 5:21 27:12
  27:14 41:21 66:23
  94:15

**far** 28:5,19 33:5
37:15 39:18 57:14
58:8 67:11 88:22
98:2 99:7 141:13
143:19 144:17,24
**faster** 144:20
**fatalities** 60:13,19
**father** 56:14
**fault** 116:7
**faxed** 80:7
**feasible** 40:11
143:15,18
**features** 141:2
**federal** 85:11,15,20
**fee** 90:9 106:24
107:12 122:8
**feed** 126:20 128:2
**feeding** 32:4,7 127:5
127:5
**feel** 126:6 127:22
**feeling** 95:8
**fees** 122:6
**feet** 23:7 27:23,23
28:1,11,12,13,18,18
28:20,21 30:7,8,10
32:16,17,17,20 33:8
33:16,23 34:2 35:13
35:13 39:19,21,24
40:4 41:8,10,24
48:7 52:4,5,7 53:9
53:10 58:4 74:5
75:15,16,17,21 76:5
78:16,17 99:12
109:16,17,17 116:3
125:18 127:9,17,18
127:23 128:7,10,18
128:20 129:9
141:18 142:11
145:3
**fell** 53:23 95:13
98:17 99:9 124:16
126:15 127:16
128:6,7 135:1
**felt** 127:4

**fence** 29:22 144:8
**fend** 92:2
**fifteen** 104:14
**fifty** 50:4
**figure** 112:8
**figured** 29:6
**file** 12:9 14:18,20
15:8 17:23 20:6
43:6,7 47:12 68:23
**filed** 5:17
**files** 44:16
**finally** 93:2
**find** 46:21 58:10
76:23 79:6 111:20
115:19 116:7 131:2
**fine** 28:13
**finger** 82:7,8,16,17
82:18,19,20,21,23
83:2,9,14,16 84:4
86:16 94:3 124:21
124:23
**finish** 81:22 115:17
**finished** 107:23
135:13 145:17
**finishing** 137:24
**firm** 9:17 12:8
122:19
**first** 5:10 7:21 8:5
12:7,11 15:18 16:4
19:18 22:20 30:4,16
52:24 53:2 128:5,22
145:15
**fit** 101:16
**fits** 56:17
**fitting** 119:19
**five** 17:6,8,11,19
36:1 65:24 68:12
109:17 118:20,21
120:20 127:9,17,18
128:7,10 145:9
**fixed** 108:4
**flashes** 135:3
**flat** 110:8
**flatbed** 12:24 13:24
14:2,4,10 16:17

50:24 62:1,13,14,15
62:21 81:7 84:5
94:8,14 99:5 104:2
110:19 111:8,9,22
112:16 116:9,13,20
116:22 127:18,23
128:6 139:8
**flatbeds** 37:23 50:8
50:22 51:1 61:18,19
63:2,5 111:2 129:5
129:23 136:10,15
136:22 137:16
138:12
**flip** 112:6
**floor** 137:21
**focus** 7:14 70:22
83:8
**focusing** 13:20
70:24
**foley** 2:2,3 3:8 12:11
15:1 16:3,5 17:2,6
18:13,21 25:3 29:11
31:1,11,24 36:14,16
37:17 38:4,10 39:3
47:9,20,23 49:19,24
52:16 56:4,8,10,16
56:21 63:11 68:10
77:6,16 79:11,18,23
80:2,15 81:21 84:7
89:11,17 90:2 95:22
96:6 98:18 100:15
100:20 103:12
122:1,13 123:13
131:7,14 133:8,11
136:3 137:1,7,11
142:21 143:1
146:19 147:6,10
**foley's** 12:7 16:7,10
18:20 56:2 122:19
**foleyandsmall.com**
2:4
**follow** 23:8 28:22
64:12 70:14 81:16
86:15 91:17,17
103:15 106:15

108:19 119:7
**followed** 72:23
91:19 106:9
**following** 72:7
**follows** 5:11
**foot** 23:6 25:15,16
33:1,6 53:11 59:6
75:18 108:7
**forces** 141:14
**foregoing** 148:6
**foresee** 146:9
**foreseeable** 136:8
136:14
**forever** 145:8
**forgive** 12:13
**forgot** 25:4
**forklift** 24:16 33:14
33:17 35:9 50:23
51:4,8,12 54:10
98:4 110:7 114:2
**forklifts** 33:12 34:7
**form** 48:13 63:21,22
75:10 89:18 136:18
**formerly** 15:18
**forms** 43:2,3 125:12
**formulate** 71:16
140:7
**formulated** 139:16
**formulation** 15:5
**forth** 14:19 35:14
137:18
**found** 65:5 86:6
88:24 95:5 131:4
**four** 16:23 18:1 23:9
25:15 27:22 28:1,11
28:13,18,20 30:7,7
30:10 32:16,16,17
32:17,17 39:19,23
40:4 41:10 48:7
52:4,6 53:8,11 59:6
74:5 75:14,16,18,21
78:17 99:12 109:16
127:17,18 128:7,9
128:18,20 142:11

[fours - hardhats]                                                              Page 159

**fours**  48:12 109:1
**free**  64:22
**frequently**  35:7
**friend**  15:18 56:21
**front**  16:9 22:23
  33:8,13 54:23 55:1
  55:5 59:3 72:10
**frozen**  127:19
**fulfilled**  139:1
**full**  32:19
**further**  40:18 147:6

**g**

**g**  97:4
**gadoury**  14:21 15:1
  15:2,9 43:11,22
  44:9,13,18
**gadoury's**  44:3
**gaf**  1:7 21:4 22:9
  23:4 26:4 32:14
  33:14,20,24 34:7,23
  35:10,22,24 36:5
  46:4 51:8,11 52:13
  53:12 54:7 55:12,13
  58:20 69:12 71:14
  71:15,21 72:6 73:15
  73:20,21 74:14,20
  83:1,7,12,13,15
  88:22 89:6 90:4,15
  92:14 93:9,15,18,19
  103:5,8,10,19
  123:20 124:12
  130:21 132:9 136:8
  137:4 138:3 140:2
  140:16,20 142:5,15
  143:13,15 146:3,9
  146:22
**gaf's**  132:3
**gain**  101:21
**gap**  32:5 59:10,12
**gaps**  30:12 108:13
**garbage**  21:17,19
  117:19
**garland**  15:11

**gate**  23:16 33:8,9
  74:2
**gathered**  125:19
**gathering**  15:6
**geared**  8:22
**general**  33:21 61:19
  70:5,13 71:2 74:6
  75:16,16,19 104:19
  128:19 130:12
  139:4 141:4
**generally**  34:22
  50:11 74:7 75:17
  116:9,24
**genes**  56:15
**geneva**  27:9 85:1
**gentleman**  124:16
**georgia**  29:23
**getting**  6:9 7:13 14:1
  14:15,24 25:10
  26:11,16 29:6 40:12
  41:11 48:15 133:9
**give**  22:1 48:4 50:21
  60:12 112:14
  141:17
**given**  8:3 57:10 83:9
  109:8 112:16
  113:17 120:22
  132:2 148:15
**gives**  25:8 35:8
  75:13
**giving**  31:21 131:11
**glad**  6:1
**gloria**  1:16 148:4,22
**gloves**  73:6 92:6
**go**  23:22 25:6 26:3
  29:21 31:14 32:10
  36:2 39:11,22 41:17
  42:8 46:6,23 47:12
  49:11 50:18 51:22
  53:3,5,7 71:5 74:4
  77:2 82:9,17,17
  83:17,19 87:13,19
  95:8,16 107:3,24
  108:24 109:8
  113:21 114:20

118:13 131:5
  133:14 139:16,20
  141:5,5,14,15,17,20
**goes**  35:16 42:15
  82:2 102:14 135:17
  145:4 146:15
**going**  22:12,13
  23:17 27:19 29:23
  31:20 33:10 35:15
  39:12 40:18,21 43:1
  45:8 47:12 50:9
  64:17 93:3 96:4
  97:2 98:4 102:7,13
  107:16 110:6
  111:17,18 112:18
  113:13,14,15,17
  118:1,3,12 119:4
  120:4 125:22 126:7
  127:16 133:7
  146:17
**good**  59:9 110:10
  111:19 115:2,7
  130:9 131:6 132:10
**goods**  48:17 114:20
  117:10
**google**  13:4
**gotten**  134:10
  136:17
**govern**  65:10
**government**  69:24
  84:24 85:2,11,13,20
  117:3
**governmental**  84:21
  85:2
**great**  82:21
**greater**  101:23
**greatest**  87:8
**ground**  23:11 40:6
  40:12 41:10,24
  42:13 45:17 46:1
  51:14 52:6 64:14,16
  75:15 97:10,15,19
  116:3 128:23
  129:18 140:14
  141:13

**group**  20:4
**growing**  117:5
**guard**  27:20
**guess**  16:13 50:9
  56:1,17 98:3 126:18
  134:22
**guessing**  127:22
**guidance**  76:12 79:5
  84:3 138:9
**guide**  74:12
**guided**  38:18
**guy**  133:21,24
  134:15,17,20 135:6
**guy's**  23:18
**guys**  107:18

**h**

**h**  3:11
**half**  52:7 113:2,2,3,8
  115:4,6,13 117:1,16
  120:7 146:16
**hammond**  2:10
**hand**  50:14 92:6,7
  114:2,5 120:3
  148:18
**handed**  74:1
**handing**  105:19
**handling**  110:5
**hands**  92:8
**handwriting**  56:19
**handwritten**  20:6
  54:12
**hanging**  21:18 145:3
**hangs**  125:10
**happen**  118:1
**happened**  41:2 48:1
  98:23
**happening**  33:19
  135:3
**happens**  110:2
**hardhat**  91:20,23
  129:1,3,4,16,20
  130:1,11 139:22
**hardhats**  73:5 105:7
  129:8,21 130:6

139:22 146:2,5,10
**harm's** 7:11
**harness** 25:17 93:1
  117:22 118:1,2,3,4
  118:5 119:1,4
  120:11,12
**harnesses** 92:18
  118:24 119:20,20
  140:3
**harsh** 56:13
**haul** 111:17
**hauling** 130:15
  131:19
**hazard** 35:17 60:7,8
  60:9 65:5 73:7
  75:13 76:22 77:1
  86:6 87:8 88:14
  92:4,6,10 93:12,13
  109:2 142:11,13
**hazardous** 61:8
**hazards** 64:22,23
  67:21 73:7 93:9,16
  113:5 139:19
**head** 91:22 92:3
  128:22 130:8 141:8
**headache** 133:13
**headroom** 40:16,21
  40:23
**hear** 95:13
**heard** 51:14 53:15
  55:10 132:23
  134:23 135:7,14,24
**heavier** 101:3,24
  102:7
**height** 8:21 21:2
  32:15 45:19 52:5,7
  62:21 64:11 74:3,5
  75:13 76:5 78:16
  92:10 99:12 114:21
  128:21 129:9
**heightened** 35:17
**heights** 78:13
**help** 34:10 58:10
**helpful** 34:9 113:5

**helping** 13:12
**higher** 34:4 45:12
  45:20
**highly** 7:4
**highway** 81:14
  110:17
**hilton** 1:14
**hint** 114:14
**hired** 39:1 88:24
**history** 93:4
**hit** 23:18 51:14
  101:22 102:9,10
  129:18
**hohman** 2:9
**hold** 12:19 32:20
  87:16 107:8 116:16
**holder** 12:17,18
**holders** 13:16
**holding** 17:17 33:6
  126:21 127:1 144:4
**hole** 109:24 110:2,6
**home** 12:5 68:21
  87:20
**homewood** 1:14
**hook** 118:12 125:11
**hooks** 145:4
**hopefully** 5:22 6:6
  109:22
**hoping** 57:16
**horizon** 104:22
**horizontal** 110:3
**hospital** 23:20
**host** 84:17 87:24
  92:11,14,23 99:14
  119:21
**hour** 20:15 51:3
  146:16
**hours** 15:10 23:23
  24:9 36:1
**huge** 109:12
**hum** 13:6 36:20 65:6
  121:14
**human** 11:3
**hundreds** 73:23

**hung** 40:19
**hurt** 73:13 88:2
**hurtful** 64:1
**hurting** 88:8
**hvac** 61:14

**i**

**icc** 33:1
**ice** 36:8,8
**icy** 64:19
**idea** 46:16 55:23
  82:21 106:4 117:12
  130:9
**identification** 5:2,5
  5:8 20:1 21:10 31:8
  37:6 43:19 47:4
  58:16 79:17 105:22
**identified** 145:20
**identify** 79:18
**ii** 129:5,8,22
**imagine** 127:19
**impact** 55:10 95:13
**impacts** 128:22
**implicit** 58:18
**important** 45:12
  70:21
**impression** 18:2
  30:2 44:2 46:12
  110:18 122:18
**impressions** 128:5
**improve** 15:13
**improvise** 64:8
**inability** 40:24
**inch** 23:6 32:18
  51:21 120:7
**inches** 23:9,10 42:1
  51:20,20 57:21 58:3
  59:24
**incident** 73:2 102:1
  114:17 115:5 130:2
**include** 61:4,6 62:19
  62:20 73:16 141:2
**included** 70:20
**includes** 145:22

**including** 34:15,21
  40:9 86:2 87:15
**inclusive** 20:12
**incorporate** 141:3
**incorporated**
  141:10
**incorrect** 32:19
**independent** 64:13
  64:21 72:1 88:18,21
  89:9,24 90:10,16,19
  93:6 111:16 112:5
  113:22 116:2
  117:24 118:8
  140:23
**index** 3:1 4:1
**indiana** 1:3 2:5,10
  25:9,19 34:11 38:12
  38:15,18 39:4,8,10
  39:15 65:9 67:3,14
  67:17 68:3,3,20
  69:2 74:17 85:13,15
  85:21 89:10 90:1,8
  90:11,17 91:8 132:4
  132:18
**indicate** 7:22 127:8
**indicated** 12:16
  124:7 148:9
**indicates** 9:14 18:23
  19:1
**indicating** 58:13
  80:21 121:12
**individual** 59:4
**industrial** 137:19
**industries** 63:1
  113:13,14
**industry** 50:3 60:15
  60:19,24 61:2 62:6
  63:8,8,9 70:6,13
  71:7 74:6 75:16,17
  75:19 87:10 114:12
  128:19
**informal** 104:23
**information** 15:6
  16:14 18:12,20 23:1
  30:16 31:17 36:13

37:20,21 44:7 48:3
50:20 57:6 122:22
**initial** 111:21
**injured** 13:12,13
74:18 87:12 94:1
**injuries** 62:24 63:7
63:8 87:7 102:7,14
**injury** 15:19 116:6
143:22,22
**input** 29:12,18 44:3
44:10
**inside** 125:9
**installation** 144:11
**installations** 106:10
**installed** 22:9 106:5
117:21
**instance** 52:17,18
71:14
**institute** 84:17,22
85:4
**instructed** 105:6
**instructions** 129:22
**insufficient** 59:14
**insurance** 117:6
**intellect** 66:10
**intended** 69:1
101:17 105:8
**intending** 44:23
45:6 53:3
**intention** 42:20 66:1
**intentions** 45:3
**interested** 71:24
148:17
**interesting** 58:9
105:2
**internally** 145:1
**international** 27:8
84:24
**internet** 111:19
**interpret** 34:20
**interpretation** 28:12
80:17
**interrupt** 25:6 29:8
33:18

**interruption** 124:24
**interview** 19:6
**intuitive** 86:13
**invest** 94:15
**investigate** 39:4
54:18
**investigating** 142:8
**investigation** 136:5
137:3
**investment** 114:16
**invitee** 67:3,5,10,12
67:14,18 93:18
139:14
**invitees** 38:19 39:16
65:8 67:20 69:13
71:18 73:4 74:17
93:6 113:1 138:5
139:14 140:7,23
**invoke** 75:15
**involve** 108:9
**involved** 14:23
29:15 40:15 66:21
105:16 124:11
125:8 134:22
136:24 140:11
**involving** 14:1 62:20
63:2 72:9
**iso** 26:20,24 27:4,8
27:10,11,15
**issue** 64:8 65:10
82:16 102:24 145:6
**issues** 40:21 129:19
136:7
**item** 60:7,12 86:6,6
**items** 39:16 141:10
141:16

**j**

**j** 1:12 2:8 3:3,15,19
4:19 5:3,7,9 20:19
148:7
**james** 121:21
**jefferson** 2:4
**jersey** 15:12 103:10
103:19

**job** 50:22 139:19
**john** 5:15
**joined** 8:5
**joist** 107:9
**journey** 24:3
**judge** 46:23
**jump** 134:14
**june** 30:21 31:12
36:23 37:14 41:18
45:10 46:24 47:7
48:4 50:21 99:10
**jury** 102:24

**k**

**keen** 101:9
**keep** 39:12 64:20,22
94:10 108:15
112:24 119:23
120:5 121:10
**keeping** 117:4
**keeps** 57:19
**kelly** 2:7
**kentucky** 105:16
113:21
**kevin** 55:17,18,20
55:21,23 56:5
**kevin's** 55:24
**killed** 61:11 62:2
75:3 116:4
**kin** 148:16
**kind** 22:8 58:18
70:14 75:21 76:22
83:6,14 110:13
111:13 112:1
136:23 139:22
141:19 145:7
**kinds** 102:8 111:12
131:11
**kit** 48:8,11,12 49:6
**kits** 50:15,24
**knew** 97:24
**know** 5:17,19,24
13:2 17:14 20:5
22:15,18 24:11
25:15 26:19,20,22

29:10 30:5,7 35:4
40:22 44:14,14,16
54:16,23 55:3,9,15
55:19 57:14,15 67:4
67:8,10,11 69:4
76:21 85:14 88:13
97:23 99:16 100:1,3
100:4,6,7 101:13
103:13 104:2 107:3
111:1 112:9 124:10
124:14,15 128:13
128:16 131:12
132:10,21,22 134:9
134:9 135:14,15,16
135:18 144:23
145:20
**knowing** 140:2
**knowledge** 70:16
71:15,22 72:2 96:13
146:3
**known** 13:3 97:1
139:9
**knows** 50:7,15

**l**

**l** 9:3,3 23:7 145:13
**l's** 144:2
**labor** 106:15 138:19
**ladder** 12:23 13:4
13:10,18,21 14:9,13
94:11,23
**lading** 24:18 25:1
**laid** 110:8
**land** 67:17
**landlord** 55:21
67:16
**landowner** 72:23
**lanes** 113:21,22
**language** 38:18
**lanyards** 92:18
140:3
**large** 21:18 140:9
**largest** 105:15
**late** 12:10

[law - mark]

Page 162

law 5:10 38:4,12,15
38:17,23 39:4,8,10
39:15 65:7,9,13,15
65:16,20,22 66:1,2
66:13,18,22 67:3,14
68:4,20 69:3 72:24
73:22 74:17 85:6,7
85:9,11,12 89:10
90:1,17,18 123:24
130:6 132:3,18
laws 66:23 112:23
117:9
lawyers 87:15
layer 52:14 53:11
leading 101:15
leads 27:2
leaf 19:17
leave 34:12
leaves 108:14
leaving 39:14 42:13
140:14
left 47:11 115:20
145:7
legal 39:7 66:11
142:17
legally 73:20,21
legible 56:19
legs 55:11
length 32:19
lengths 74:5
lesions 92:9
letter 15:8,10
letterhead 16:10
level 26:6 27:2 41:10
121:15
liability 38:12,15
39:5 66:17 68:4
69:3
licensee 67:3,14
lifeline 104:22
lifted 33:15 34:7
lifts 139:6
light 7:4
liked 91:13

likelihood 41:19
101:11 102:4
limitation 29:22
line 54:17,21,22
56:1 120:8
lines 21:1
list 18:10,15 22:3
57:9,18,19 114:15
120:21
listed 121:20
litigation 9:23 11:17
106:7 120:13
littering 117:9
little 12:14 44:1
107:7 121:10
125:12 126:10
live 109:8
llc 10:5,8,23
llcs 11:13
load 22:16 23:8,12
23:14,22,23 24:2,5
24:19,20 25:2,10
29:23 30:11 34:15
34:21,21 35:1,4,7
36:1 40:8,12 41:20
41:23 42:13,16,20
43:8 45:12,23 46:5
46:6 48:15,16 51:9
51:16,19,24 52:12
53:22 60:2 62:14
73:8 93:14 101:17
110:5,7 111:18,18
114:1 116:16,20
126:19 129:23
loaded 24:15 32:23
33:2 34:6 59:5
109:18,19,21
111:24 114:9 124:2
loading 12:20 14:10
26:5 33:11,12 34:23
43:13 46:3,4 72:18
74:22 75:9,10,11,24
76:17 77:4,14 78:6
78:24 80:10 81:20
81:23 82:13 86:1,3

104:17,22 105:8,17
112:15 114:24
119:16 124:11
137:15 138:11
139:10
loads 33:15,23 34:1
34:3,13 45:19,20
54:5,7 59:18 61:23
104:2,4 111:20
116:9,22 136:22
lobbing 59:5
locate 30:19,19
36:21
located 8:18
location 112:12,12
113:6 123:15
125:11 144:11,11
144:13
locations 25:22
72:21 83:12 97:5
126:17 144:12
locked 95:7
logic 116:6
long 20:13 21:20
23:7 38:8 50:10
64:16 94:10 108:7
133:7 145:1,3,7
longer 50:16
look 25:4 37:18 38:2
41:16 43:6 56:10
60:6 61:15 68:8
76:2 90:12 92:11,12
96:10 102:21
103:21 107:4
127:12 132:12
133:4 137:7 140:5
looked 6:19 17:5
68:2 78:4
looking 7:20 15:8
43:10 93:6 106:16
107:13 121:11
125:16 131:16
looks 7:17,20 18:7
20:10 25:12,21
34:17 36:10 37:14

44:11 45:11 54:11
54:12 55:4 133:18
lost 23:19 98:21
lot 23:15 64:20 75:5
89:12 96:14 99:4
110:18 138:10
lots 23:16 53:1
128:4
low 61:22,22 63:2
64:4
lower 34:5 45:19
lowered 109:6
lubricants 119:17
lucky 102:9

**m**

m 1:16 9:3 148:4,22
machine 148:12
magazine 129:13
mail 14:20 44:18
mails 4:7 43:18,21
main 14:13 23:16
112:19
maintenance 107:18
120:2,3 125:14
majority 115:7
man 48:8,21,23 49:4
49:10,18
man's 50:22
management 93:10
103:22
manchester 6:20
manufacturer 94:22
114:4
manufacturers
101:15,22 110:12
manufacturing 9:3
9:9 27:10
march 12:12 20:11
23:2 30:17
marine 80:11
mark 21:8 31:4
43:17 47:2 54:12
58:14 79:11,15
105:20 121:6

**[mark - normally]** Page 163

142:22
**marked** 3:22,24 4:3
  4:5,7,9,11,14,15
  19:24 20:4 21:9
  31:7,10 37:1,5 38:7
  43:18 47:3 58:15
  79:17 105:21 133:3
  133:17 137:13
  145:20,21
**market** 1:21 94:14
**master's** 125:5
**material** 110:5
  127:4
**materials** 1:7 4:13
  18:12,20 25:5 79:16
**matter** 7:3 44:3,10
  83:5 88:15 117:2
  121:18 126:6
**matters** 85:16
**maximum** 52:7,7
  101:17
**mean** 7:2 17:6 20:21
  21:3 22:14 25:14
  26:8 43:14 47:13
  54:15 55:1,7 58:1
  67:8 86:22 88:20
  98:20 109:23 111:5
  115:20 124:24
  134:8,24
**meaning** 24:4 42:10
  49:17 51:4 52:13,22
  52:23 53:11 134:17
  135:7
**meanings** 48:7
**means** 16:12 34:17
  36:2 47:11 81:13
  113:4 119:5
**meant** 87:16 129:16
**measured** 27:5
**measures** 26:11
  96:17 112:10
**mechanically** 108:6
**median** 50:4
**medical** 100:1,12

**medication** 100:4
**meet** 76:24
**meeting** 138:24
**member** 11:14
  147:1
**membership** 85:3
**memory** 23:1,19
  26:9 31:15 36:22
  37:19 41:21
**men** 101:21
**mention** 86:3
  129:15
**mentioned** 26:21
  27:15 56:21 141:12
  143:11,24
**merchandise** 111:13
**merely** 47:11
**message** 113:1
**met** 5:16 138:20
**metal** 59:21 115:21
  128:2
**method** 143:3,8
  144:3
**methods** 143:17
  145:2,10
**michigan** 21:5 26:6
  29:5 39:14,15 58:19
  83:1,10,12 85:16
  103:4 123:15
  124:11 143:14
  146:16
**middle** 31:24
**midwest** 108:2
**miles** 23:22 24:2,5
  34:13 116:18
**military** 26:23
**million** 87:19 111:4
  111:4,5,5,22
**millions** 116:22
**mills** 35:24
**mind** 9:9 12:23 14:5
  14:12 36:24 47:2
  49:21 51:22 71:4
  103:20 109:10
  126:11

**mindful** 73:6
**mine** 14:24 15:19
  56:21
**minimum** 41:13
**minute** 41:16
**minutes** 29:24 36:1
  51:3 68:12 133:14
  135:15,19 145:5
**mistake** 17:9 18:18
**mixture** 37:23
**mixtures** 7:5
**mobil** 119:10
**modest** 13:9
**moment** 31:3 47:19
  55:24 110:15
  135:23 136:13
**months** 139:15
**motorized** 80:12
**move** 24:15 30:3
  39:20 50:10 54:12
  95:4,16 96:4,11
  111:12 132:24
**moveable** 108:4
**moved** 36:7 95:9
  97:21 110:18
**moving** 35:18 54:22
  98:4
**mt** 55:12,14,16
**multi** 139:12
**mum** 13:6 36:20
  65:6 121:14

**n**

**n** 1:21 11:9,10 65:22
  113:24,24
**name** 5:13,16 8:1,9
  13:9 19:19 20:23
  47:10,11 65:20
  132:22 145:14,15
**named** 56:4
**names** 9:8 11:8
**national** 63:18
  84:16,22 85:3
**nationwide** 51:12
  73:24 74:8

**naturally** 128:21
**near** 108:15
**necessary** 41:24
  141:8,24
**neck** 129:7,18,19
**need** 48:6,8 68:10
  117:4 123:23
  125:14
**needed** 9:10 41:10
  100:22 141:19
**needs** 48:15 76:13
  125:6
**negligent** 142:14
**neither** 15:7 97:24
  148:15
**net** 108:21 145:2
**nets** 143:11,11
**netting** 125:10,10
  144:22,24
**never** 9:9 50:16
  58:19 73:15 88:9
  93:3 99:6 101:10
  103:3,4
**new** 15:12 31:17,21
  37:20 53:8 103:10
  103:19 145:12
  148:3
**newark** 114:3
**newburgh** 25:9,19
  34:11
**nice** 23:21 125:12
**nigel** 1:12 3:3,15,19
  4:19 5:3,7,9,15
  136:4 148:7
**night** 68:6
**nine** 50:4
**noise** 98:3
**non** 120:11
**nonmedical** 123:17
**noon** 68:11
**normal** 81:13 93:14
  137:24 139:10
**normally** 64:5,15
  107:15

**north** 103:10
**northeast** 108:3
**northern** 1:2
**nos** 4:17
**notably** 83:15
**notary** 1:17
**note** 35:21 54:2
  101:23
**notes** 3:22 4:3,5,9,17
  19:13,15,24 20:9
  26:19 30:20 31:7,11
  37:5,13,19 41:14
  43:10 45:9 46:9,19
  47:3,6 100:10
  133:18
**notice** 1:13 14:18
  123:23 148:8
**noticed** 55:12
  133:20,21,24 134:2
  134:20 135:5,11
**notified** 91:22
**notify** 86:17
**november** 15:9
**number** 13:2 32:12
  36:12 47:21 62:23
  63:7 96:24 110:22
  111:2 121:13 129:6
  130:10 144:12
**numbers** 114:8
**nuts** 129:17
**nye** 2:8 3:7 5:12,16
  17:4,8,10 19:20,23
  20:2,20 21:8,11
  31:3,9 36:24 37:11
  37:12 43:16,20 47:1
  47:5 49:22 50:1
  52:21 56:3,9,13,18
  56:23 58:14,17
  68:12,15,22 77:10
  77:12,20 79:13,20
  80:1,4,8 81:15 82:5
  84:8,9 89:14,22
  90:14 96:1,2,9 98:9
  98:14,15 99:1,3
  100:18,24 102:2

103:13,14 105:20
105:23 131:11
132:1 133:10,16
136:2,18 137:10
142:17,24 146:21
147:5

**o**

**o** 9:3 11:9 20:19
  113:24
**o'clock** 133:11
**object** 49:19 59:5
  80:16 89:17,18
  95:22 100:16
  102:10 131:7,14
  136:18
**objection** 77:16
  80:21,23 81:21 90:2
  96:6 142:17
**objects** 130:7
  137:21
**obligations** 91:13
**obliged** 91:12
**obscure** 31:5
**observations** 136:21
**observed** 99:15
**observer** 108:15
**obstruction** 144:7
**obvious** 65:12
**obviously** 12:6
  66:21 102:6 116:23
  126:4 127:18
**occasion** 52:10
  61:16
**occasionally** 85:6
**occasions** 34:21
  46:13
**occupational** 60:16
  61:3
**occupations** 61:6,13
**occupier** 67:17
**occur** 72:20
**occurs** 6:3,4 139:9
**offered** 123:12
  124:18

**office** 16:7,11 18:9
  18:13,20 68:19
  87:21
**official** 148:18
**offord** 121:21
**oh** 9:7 107:24
**oil** 119:17
**oils** 92:8
**okay** 9:7 11:20 16:8
  25:6 27:23 28:12,20
  38:9 46:10,16 56:8
  56:9 61:19 67:6
  72:15 83:1 115:18
  127:14 131:4
  133:11 135:9
**old** 27:16,16 48:8,21
  48:23 49:1,2,4,10
  49:18 50:8,15 99:16
**older** 49:8,12 50:11
**once** 61:11 76:24
  101:22 111:21
**ones** 85:10 108:9
**open** 17:17 127:23
**opening** 29:4 126:20
  127:6
**openings** 137:22
**operation** 27:2 46:4
  62:20 78:20 125:1
  126:5 139:10
  144:17
**operations** 27:5,8
  33:21 79:4 134:13
**operator** 23:4 33:15
  33:17 63:4 64:11
  91:8 111:16 118:8
**operators** 35:9 51:4
  51:8,9,12 62:2
  71:19
**opinion** 22:8 26:14
  39:19,23 40:1,2,3
  59:9,12 67:2 82:6
  90:15 98:16 99:9,11
  132:6,14 136:7,13
  137:4 138:2 140:20
  142:4 146:9

**opinions** 15:6 38:11
  122:23 131:12
  132:2 145:22,24
**opposed** 41:20
  97:10
**oral** 1:12
**order** 101:21 140:22
**organization** 84:17
  85:1 94:22
**organizations** 84:20
**oriented** 121:10
**original** 4:17
**orthopedic** 102:17
**osha** 18:24 69:11,18
  69:19 70:10,14,22
  71:2,6 72:6 74:14
  74:20 75:1 85:16
  90:23 91:1,3,9,13
  91:14,18 132:4,17
  137:13 138:13,17
  138:20 139:3,12
  140:6,16,19,21
  141:6 142:4
**outcome** 148:17
**outdoor** 144:5
**outdoors** 125:9
**outside** 24:17 26:6
  33:11 144:8
**overall** 64:1 72:19
**overhead** 25:17
  103:23 117:21
  141:24 144:7
**overlap** 11:1
**overseas** 8:18
**oversight** 119:21
**owes** 55:21
**owned** 89:2
**owner** 8:13,15,16
  10:12,16 23:4 62:2
  63:4,4 64:20 67:17
  67:20 70:15 71:19
  88:13 91:8 116:1
  118:18
**owners** 10:11

| p |
| --- |

**p** 11:9 121:1
**p.e.** 1:13 3:3,16 5:4
  5:9 148:7
**p.m.** 68:17 98:11,13
  147:13
**packed** 59:6
**packet** 3:13 5:1
**packing** 25:5
**page** 3:5 16:9 50:7
  60:6 65:4,4 69:10
  69:10 86:5 138:12
  138:18
**pages** 16:4,8,18 20:6
**pallet** 32:21 52:3
  59:7
**pallets** 23:5 32:15
  32:17,22 34:4 42:5
  43:13 45:13 52:3,4
  52:14 53:11 104:5
  124:2,8 126:14
**panel** 37:23 139:9
**paper** 140:10
**papers** 14:20
**paperwork** 24:24
  25:2 27:19,20 35:23
  43:2,4,8
**paralysis** 129:19
**paramedics** 127:8
**pardon** 78:3
**parent** 10:3,4
**park** 33:6 53:3
**parked** 27:22 41:2
  55:1 64:4
**parkway** 1:14
**part** 9:1 15:17,18
  16:8,13,14,19 33:3
  38:2,3,9 47:13
  48:18 54:19 71:2
  76:2 81:3 108:11
  129:6 135:12
  142:14 144:8
**particular** 13:20
  21:16 29:14 35:14

72:12 73:14 78:10
  83:13 84:18 106:6,8
  142:12
**particularly** 16:16
  141:2
**parts** 9:23 102:14
**party** 148:16
**passing** 14:19
**patent** 12:17,18 13:2
  13:16
**patented** 14:14
**patents** 12:19 14:3
**paying** 90:9
**pays** 90:3
**pennsylvania** 108:4
**people** 11:21 50:8
  55:2 62:1 87:14,15
  87:19 108:10,15
  113:11 114:21
  118:3,19,21,23
  130:11 138:22
  140:10 141:22
**percent** 42:14 60:18
  61:3 117:17 120:16
  120:18
**percentage** 37:24
  112:4,16
**percentages** 114:8
  114:23
**period** 7:5 101:20
  135:15,16,17
**person** 19:9 40:9
  49:13 61:10,24
  92:16 94:3 96:16
  101:7,8,12,13,13,18
  102:6,21 115:2
  143:20 146:7
**personal** 15:19
  141:7
**personally** 38:14
**persons** 137:20,21
**ph.d.** 1:13 3:3,16 5:4
  5:9 6:20,23 7:9
  148:7

**phoenix** 104:21
**phone** 19:10 31:23
  31:24 32:1 36:11
  47:21
**phonetic** 145:13
**photochemical** 7:1
**photograph** 29:13
**photographed**
  29:13,19
**photographs** 16:19
  16:24 17:11,19,20
  29:9
**photos** 29:7
**physically** 50:10
  58:1
**physician** 102:17
**pick** 121:3
**picked** 85:6
**picking** 8:20 121:17
**picks** 24:19
**pickups** 23:4
**picture** 98:5 109:9
**pictures** 29:1 101:16
  128:5 144:8
**piece** 64:6 108:12
  128:1 140:9
**pieces** 116:13
**pipes** 106:17
**pits** 103:24
**pivot** 40:18
**place** 12:1 19:21
  48:14 52:10 58:9
  67:24 72:24 73:13
  76:23 77:1 90:16
  95:8,9,10 96:23
  111:24 115:8 119:6
  125:12 147:8 148:9
**places** 112:15
  137:20
**plaintiff** 1:5 2:5
  19:6 102:22 120:14
  120:17,18,24
**plan** 146:17
**planning** 123:7
  129:23

**plant** 21:5 22:9
  23:16 25:19 26:4,6
  26:10,10 27:4 29:4
  32:2 34:13,16,23
  35:5,6,10 36:2 38:1
  51:11 55:14 58:20
  67:7 73:4,16 83:1,7
  83:16 86:17 91:21
  93:15 103:5,10,19
  103:21 104:21
  105:11 108:3 110:4
  112:9 114:13,16
  119:8 124:12
  125:21,24 129:2,21
  130:4 139:24 140:4
  141:6
**plants** 25:7,8,16,20
  25:24 27:9 32:12
  73:10 74:7 83:15
  103:8 104:8,11,15
  104:17 108:3 112:4
  115:11,12 128:19
**plastic** 21:18
**platform** 137:22
**played** 15:5
**please** 5:13,24 6:9
  19:3,15 21:8 23:1
  23:24 25:6 28:1
  31:4 37:20 46:21
  54:4,9 58:14 59:1
  105:20
**plus** 52:5,6 111:22
**plywood** 48:13
  109:1
**point** 22:12 40:19
  46:7 64:10 78:10,12
  92:18 95:23 97:2,3
  97:3,3 98:7,19
  111:13 115:1 119:5
**pointed** 56:1
**points** 35:9 48:20
  78:11 141:18
**policies** 72:1 73:3
  74:10 75:20 138:3

policy  64:10 140:12
popular  48:16
portion  44:21
portions  46:8
position  32:19 59:2
  82:12 110:7 139:11
possibility  99:19
  125:2 128:14
possible  14:5 19:5
  40:5,11 126:9 142:2
  144:4
possibly  63:12 92:11
post  107:8 108:9
  141:13
posts  107:15,20
pound  51:5 101:12
  101:12,13
pounds  30:7 51:7
  100:13 101:7,8,18
  101:18,21,22 102:3
  102:12,13 109:13
  118:18
powerpoint  63:22
practice  51:11 59:23
  91:16 110:4 125:21
  129:2
practices  97:5
precaution  130:5
prefer  120:1
preference  51:6
premarked  3:13,16
  3:20 5:1,4,7
premises  38:4,12,15
  38:23 39:4,15 65:7
  66:17 68:4,20 69:2
  73:22 74:12,17
  88:13 90:18 139:13
  140:24 146:11
preparation  21:20
prepare  22:6 57:17
  69:5 70:15
prepared  16:3,5,8
  18:2,9 21:1 69:2
  106:7

preparing  44:20
  45:1 81:14 82:18
  84:3
presence  98:1
present  138:24
  140:10
presentation  147:14
presentations  63:18
presently  87:8 108:2
president  7:22 8:11
  9:15 11:11
presidents  11:14
presumably  24:7
  99:5 135:6
presume  16:7 26:19
presumption  67:19
pretty  42:11 70:19
  117:3
prevent  96:3
prevented  142:7
  143:14
prevention  96:17
previous  35:15
  41:21 79:3 114:13
  114:17 123:22
  124:11
previously  23:4
  54:22 101:20
  126:16 127:1,4
price  107:6
primarily  25:20
print  56:19 140:9
printed  79:20 80:4
prior  7:14 134:3
  146:17
private  84:20
probably  5:23 12:10
  13:4 17:15 22:18
  27:14 36:14 65:24
  72:8 83:11 102:13
  102:16 107:19
  109:4 114:20
  115:12 125:13
  144:18

problem  94:18
  116:2 117:13
problems  119:19,20
  129:18
procedure  5:21
proceedings  68:6
process  6:4 14:23
  15:3 27:10,11 40:5
  53:5 75:11,12,13
  136:12
processes  7:1
produce  117:8,19
producer  105:15
producing  7:3
product  81:5,24
  116:24 117:2
  118:10 119:7
production  13:7
  27:1,3 126:5
productivity  27:3
products  8:18,19,22
  9:19 76:20 111:13
professional  1:16
  16:16 129:10,13
  148:5,22
program  119:10
  125:5
prohibit  22:15
prohibition  22:13
project  126:1
propelled  80:12
proper  10:20 100:23
property  67:20,22
  87:3 88:14 138:5
  143:14 146:4
proportion  111:23
  116:23
protect  86:8 105:10
protected  114:21
  115:22
protecting  137:20
protection  23:21
  26:1,11 45:12 65:8
  69:13 76:5,12,21
  77:2,18 78:12,19

83:6,13 85:17
  86:16 87:17 92:6,14
  92:24 93:1,5,8,18
  96:18 97:6,7 98:23
  99:13 100:22
  104:16 105:3,10
  110:13 112:1,5,13
  112:17 113:4 114:9
  114:15,24 115:8,10
  115:23 123:21
  128:20 130:13
  136:7 137:5 138:5
  140:2,13,23 141:8,8
  141:9,9,24 142:12
  142:15 143:3,8,13
  144:16,19 145:7
protections  143:21
  143:23
protective  112:9
  141:7
protectors  45:16
  46:1 51:18
provide  16:13 44:7
  63:10 67:24 69:12
  76:12 77:2 83:13
  90:16 92:23,24 93:8
  93:18 94:3,3 96:18
  97:6 106:14 109:2
  110:13 118:2,8
  138:4 139:6,13
  140:22 141:24
  142:2,15
provided  3:19 5:7
  13:16 17:1 18:12,20
  18:23 38:11 93:17
  93:20 94:6 99:13
  104:23 106:11
  123:23 124:6
  129:21,22 142:13
  143:16
provides  76:12
  84:23 117:22
providing  48:16
  71:24 81:4,6,11,24
  82:9 93:5 140:6

[providing - record]

142:12
**provision**  118:10
141:23
**ps**  148:23
**public**  1:17
**published**  63:16,17
63:20 129:10,13
**pull**  24:14 33:13
78:18 112:21 114:2
117:15
**pulled**  27:17 35:20
53:2,3 72:2 83:16
**pulling**  24:7 46:5
78:12
**purchased**  45:17
**pure**  100:16,18,20
**purpose**  81:3,4,10
81:12,24
**purposes**  49:10
79:10
**pursuant**  1:13 148:8
**push**  114:5 125:7
**pushed**  108:6 117:5
**put**  16:6,10,12,15,17
31:16 33:16 45:16
45:24 46:22 50:2
51:4,9,18 70:8
108:16 112:8
113:10,19 114:4,14
114:18,19 115:24
119:6 125:23
130:22 145:7
**putting**  108:9 109:1
141:11

**q**

**qualification**  102:17
**quantified**  136:1
**quantify**  64:2
110:21
**quantitative**  114:23
**quarter**  23:10
**quasi**  85:1
**query**  24:14

**question**  5:24 6:5
9:9 10:21 14:11
24:11 29:16 31:20
36:6 39:19 40:22,23
48:19 53:19 54:12
57:15 67:4 68:19
74:19 75:22 77:13
79:10 82:16 83:8
85:14 88:9 89:13,18
89:19 91:1,11 95:24
97:13,13,23 100:16
100:23 101:1,2
102:6,16 103:16
112:3,6 115:4
131:15,15,19,24
136:19
**questions**  19:7 48:1
48:10 133:3 136:4
137:12 138:10
140:15 147:6
**quick**  37:2 56:11
98:7
**quickest**  145:6
**quickly**  126:8
**quite**  61:23
**quote**  15:10,14 55:5
55:5 79:1 86:7,9

**r**

**r**  9:3 11:10 23:6,7
65:22 113:24 148:1
**radius**  35:18
**rail**  23:6 32:5 33:1
41:20 42:2,5 51:21
105:17 107:5,7,14
107:19,20 108:10
108:13,22 125:11
126:14 127:6 128:3
128:9 144:4
**railing**  78:13 81:11
87:16 108:22 125:8
**railroad**  80:11
107:17,19
**rails**  107:15 120:5,7

**rain**  117:4
**ramps**  137:22
**ran**  51:15
**randall**  2:8 5:16
17:3
**randy**  49:20 56:11
77:7 79:12,18 80:18
84:7 89:11 95:23
98:18 100:15
103:12 133:9 137:8
**rate**  105:6
**rating**  108:12
**ravenswood**  34:11
34:12
**reach**  126:21
**reached**  32:1
**read**  6:4 20:16 23:7
24:17 46:8 54:4,9
54:11 55:4 57:20
76:2 78:4,8 80:9
91:8 99:23 128:4
131:6 133:19,20
137:9 138:8 146:8
146:22
**reading**  6:6 26:9
54:13 55:20 147:14
**real**  56:10
**realization**  112:23
**realize**  88:2
**really**  30:3 35:10
43:14 46:3 70:12
76:20 86:24 94:20
126:13
**rear**  59:3
**reason**  35:7 42:16
45:11 61:22 73:9
95:3,5 96:8 97:20
103:21 115:23
121:16 127:15
128:23
**reasonable**  38:18
68:1 71:16 93:22
97:8 105:6 118:8
138:4 140:20 142:6

**reasonably**  42:21,23
66:23 93:17 99:22
143:21
**reasons**  35:8 102:20
136:15,17
**recall**  16:1 17:15,16
17:22 30:15 41:7
42:4 43:5,6 93:5
104:1,6 124:17,19
126:13
**recalled**  126:16
**recalling**  29:2
**receive**  102:13
**received**  102:20
**receiving**  112:12,19
112:19
**recognition**  101:21
**recognizance**  91:23
**recognize**  67:21
70:6 121:23 131:21
139:19,20
**recognized**  64:8
84:23 93:9 116:1
**recollection**  22:24
47:17,19 103:18
127:10
**recollects**  53:2
**recommend**  44:3
94:14,23 129:24
130:3
**recommendary**  85:5
**recommendation**
94:16 129:11
**recommended**  71:1
94:12,21 123:12,22
129:4,9,15 130:7
**recommending**  15:3
**reconstructed**  59:8
72:11
**record**  5:14 19:11
19:20,21,23 37:9,11
68:13,15,16 76:3
80:15 98:10,12,14
147:7,8 148:14

[recorded - roughly]                                                      Page 168

**recorded** 148:12
**recordings** 17:20
**records** 18:6 100:12
  101:10 107:4
**reduction** 143:21
**refer** 18:24 20:3
  22:17 31:19 34:19
  60:15,16 69:17
  76:10,10 140:22
**reference** 7:21 65:7
  70:9 76:19 77:4,14
  77:17,22 138:14
**referenced** 142:16
**referencing** 138:18
**referred** 77:24 79:7
  85:8 145:24
**referring** 28:15
  43:16 58:23 66:10
  85:10,16 98:22
  106:12 107:10
  133:17 138:16
**refers** 30:8 35:5
  137:23
**refinery** 119:14
**reflected** 123:4
**refreshes** 22:24
**regard** 28:10 29:16
  34:23 42:9 50:14
  58:5 61:16 72:7,15
  74:21 76:9 91:24
  108:1 122:23
  125:24 132:7 140:3
**regarded** 59:23
**regarding** 35:11
  39:8 43:22 93:5
  122:1
**regards** 101:11
**registered** 1:16
  148:4,22
**regular** 129:16,20
**regulation** 69:24
  84:10,13
**regulations** 69:15
  69:17,20 74:7 91:10
  140:6 142:5

**relate** 43:11 77:8
  80:22 131:23
**related** 7:21 27:3
  54:21
**relates** 27:1 35:6
  36:7 68:3,6,20 69:8
  75:9,24 76:17,20
**relating** 21:1 28:6
  29:5 43:8 131:19
**relationship** 130:24
  138:20
**relative** 78:12
**relevant** 12:20
  14:10
**reliable** 114:10
**reliant** 57:13
**rely** 125:17
**remark** 22:17
**remediate** 88:15
**remedies** 66:7,9,19
**remember** 36:15
  54:1 56:6 103:9,16
  124:6 126:18,23
  128:17,18 145:14
**remodeling** 27:19
**remote** 123:15
**remove** 112:20
**removed** 48:14
  119:6
**report** 16:3,4,15,23
  17:7 18:15,23,24
  19:1 22:4,7 29:10
  46:16 57:20 60:6
  63:5 65:4 76:10
  77:11 79:8 86:5
  121:24 123:3,4
  124:1 127:8,12
  138:14 143:18
  145:19,21,22
**reported** 62:7,10
  63:1,17
**reporter** 1:17 20:18
  148:5,22
**reporting** 1:21
  61:24 62:4

**reports** 128:4
**represent** 5:17
  44:13 61:2 120:20
  120:24
**representation**
  84:24
**representatives**
  136:8
**represented** 124:7
**request** 18:5 51:10
**requested** 146:18
**require** 71:14
**required** 24:22,23
  71:20 73:14 93:15
  130:4,6
**requirement** 24:1
  76:4 91:20 117:9,17
**requirements** 92:1
  117:7 130:22
  137:19
**requires** 69:11
  112:11
**research** 7:17,22,24
  8:8,23 56:1,5 63:12
**responsibilities**
  90:23 131:12 132:3
**responsibility**
  130:19 132:7,17
**responsible** 93:12
  112:24 139:11
**rest** 16:6,10
**restate** 6:1,10 89:20
  99:2
**result** 139:3,13
**resulting** 62:12
**resumé** 7:20 12:14
  14:7 65:18
**retained** 4:18
**returned** 34:15
**returns** 30:6
**review** 17:13
**reynolds** 34:11
**rick** 36:10 46:17
  47:7 48:3 50:20
  53:22 57:1,4,23

59:15 134:6,24
**right** 7:13 14:6 17:8
  17:18,19 18:15
  26:18 28:6 32:10
  35:12 37:15 43:6,15
  46:14 48:5 52:19
  56:3 71:8 73:1 75:6
  84:12 86:17 89:3,7
  95:12 100:11 102:9
  103:20 104:9,10
  111:15 115:8
  120:19 121:14
  122:3,14 127:1,14
  128:18 130:6,20
  133:15,21 134:1
  140:18
**rise** 75:13
**risk** 35:17 67:19
  87:12 88:8 117:23
  119:1
**risks** 118:23
**river** 119:14
**rnye** 2:9
**road** 24:11,12 65:14
  109:3 111:2,23
  126:8 144:21
**roadside** 106:17
**rocky** 1:14
**role** 15:5 131:1
**roles** 11:11 140:12
**roll** 21:19 30:9
  52:14
**rolled** 30:8,9,11
**roller** 30:9
**rollers** 125:8
**roof** 103:23 114:19
  115:21
**roofers** 61:13
**roofing** 105:1
**room** 42:12 87:20
**rope** 25:17
**rough** 62:9
**roughly** 107:12
  146:16

[rows - signature]                                    Page 169

**rows** 105:5
**rtc** 9:2
**rub** 23:6 32:5 41:19
  42:1,5 51:21 108:10
  108:12 125:11
  126:14 127:6 128:9
**rubber** 120:7
**rule** 36:5 74:6 75:19
  128:19 129:24
  130:12
**rules** 32:11 35:22
  53:12 64:12 71:7,17
  71:24 72:3 73:15,18
  73:19,22,24 74:1,10
  74:16 75:16 86:13
  86:15,18 92:11,12
  92:13 93:17,20,21
  138:21 139:12,15
  139:18,18,23 140:2
  140:6,11 141:4,6,9
  146:4,6
**run** 1:14 118:20

**s**

**s** 3:11 9:3,3 11:9
  20:19
**safe** 25:7 67:24
  78:15 90:16 112:24
  139:13,21 140:6
**safely** 109:22
**safer** 97:9,14 126:6
  144:17
**safest** 109:24
**safety** 7:8,14,21 8:5
  8:21 9:8 10:4,8,22
  12:16 14:7 16:16
  56:20 63:18,19 72:3
  73:9 74:12 79:21
  84:15,18 86:12,13
  93:23 94:22 95:3
  97:5 106:13 108:20
  114:16 123:14
  129:10,13,14
  130:19 132:7
  137:19 139:23

**141:23 143:11**
  147:2
**salary** 90:4
**satisfactory** 59:10
**saw** 17:21 25:19
  44:18 51:15 55:11
  68:6 122:14 135:21
**saying** 6:5 42:11
  50:7 51:6 60:18,20
  62:5 71:20 72:5
  82:1,2,22 85:12
  86:12,19 87:4,11
  88:1,4,4 93:19
  96:23,24 101:2
  113:3,7 121:20
**says** 7:1 14:7 25:3
  27:16,17 28:11,18
  29:5 34:9 42:24
  50:14 53:24 55:20
  78:5 79:2 80:20,21
  82:11
**scenarios** 64:3
**schilli** 36:11
**school** 65:13,15,17
  65:20,22 66:2
**scientific** 9:15,20,21
  10:2,9,18 11:18
**scope** 78:5,5,10,23
  81:18 83:24 84:10
  85:23 137:18,23
**screen** 115:24
**screens** 114:18
**se** 88:4
**seal** 148:18
**second** 16:22 145:14
**section** 69:11 71:6
  72:16,21 108:7
**sections** 138:13,13
  138:16
**secure** 24:8
**security** 35:23,23
  51:15 53:8 74:2
**see** 9:9 16:18 19:15
  25:5 30:5 42:24
  43:7 47:9 55:9,17

**68:9 84:7 92:12,17**
  108:21,22,22,23
  109:5,8 121:2,3,7,9
  123:17 126:4
  132:22 135:4
**seeing** 124:6
**seek** 92:17
**seen** 24:12 25:1 29:2
  43:3 53:18 58:3
  72:19 73:24 76:1
  101:10 103:18
  104:2,4,4 123:3,16
  130:14 132:8,21
  139:18 144:24
**self** 80:12 83:22
**sellstrom** 9:2,5
**semester** 65:16
**semi** 128:22
**semis** 28:15
**sense** 16:14 56:20
  97:16,17,18 109:15
  112:14 130:9 140:1
**sent** 18:2 24:16
**sentence** 23:13
  30:11 81:3,23 86:19
  115:17 137:24
**separate** 10:7
**separation** 27:23
**series** 27:10
**serious** 140:8
**serve** 74:20
**service** 18:6
**services** 9:19 15:3,4
  27:5 44:4 122:2
  123:13
**sessions** 15:13
**set** 4:7 43:18,21 71:1
  71:7,24 72:3,22
  73:3,18 74:10,11,16
  75:19 86:13 116:12
  138:3 139:15,18
**sets** 137:18
**settled** 21:23 93:3
**seven** 16:9 18:1 32:3
  34:13 124:8,8

**seventy** 118:6
**severe** 87:9
**share** 11:24
**shelter** 93:17
**shifting** 116:18
**shingle** 110:12
**shingles** 23:5 24:14
  30:9 32:16 33:3
  34:14 36:7 45:13,13
  45:14 46:5 48:6
  59:6,18 93:15 104:5
  126:15 127:20
  128:11
**ship** 112:4 117:3
**shipped** 114:20
**shipper** 106:17
**shippers** 113:3,12
**shipping** 37:24
  112:12,18,19,22
  113:6 125:1
**shoe** 141:9
**short** 102:3
**shorthand** 148:12
**show** 79:22 143:2
**showing** 21:16
**shown** 107:1,6
  144:3
**shows** 59:4,7
**shufflers** 35:23
**side** 12:9 21:18
  27:18,19 33:3 40:7
  40:8,16,19 48:8,11
  48:12,16 49:6 50:15
  50:24 60:2 108:8,13
  108:16 110:6,6
  112:6 118:21
  121:18 124:8,9
  127:23 128:3,9
  140:9
**sided** 25:8 108:6
  120:5
**sides** 108:14 145:3,5
**sideways** 39:20,22
**signature** 147:11

**significant** 116:7,7
**signing** 147:14
**signs** 29:5 106:17
**similar** 33:3 38:19
  105:14
**similarly** 139:19
**simple** 7:6 99:1
  125:9 145:1
**simplest** 125:13
  145:10
**simply** 14:1 31:20
  72:22 74:16 84:2
  95:10 125:11 145:4
**single** 52:14 53:11
  87:21 112:9
**sit** 124:19 126:1
**site** 71:17 74:18 90:5
  96:16 118:11
  141:22 144:11,23
  146:17
**situation** 50:14 75:2
**situations** 137:20
**six** 25:16 32:3 34:13
  48:7 65:24 75:17
  76:5
**sixty** 62:8
**size** 73:10 125:18,19
**sketch** 3:24 4:11,15
  21:9,15 30:1 35:15
  35:15,19 41:14,16
  58:9,13,15,22
  104:23 105:18,21
**sketches** 107:14
**skilled** 42:9
**sky** 127:19
**skylight** 114:18
  115:13,16,23
**skylights** 115:20,20
  115:21 116:3
**slipped** 98:20
**slippery** 42:2 64:19
**slot** 108:10
**slotted** 48:13 108:11
  108:12

**small** 2:2 51:6
**smith** 2:7
**social** 35:10
**society** 63:19 79:21
  84:14,18 87:23
  147:2
**softeners** 23:21
**softer** 102:10
**soja** 20:17,19,22
  21:15,22
**sold** 8:19 9:4,12
**sole** 8:15,16 10:16
  62:3 91:2
**solution** 20:24 21:3
  21:6 88:15
**solutions** 10:4,9,23
  106:13 108:20
**solvents** 92:7
**somebody** 58:3
  71:23 144:14
**sorry** 20:18 25:6
  29:21 39:15 42:8
  67:17 107:24
**sort** 9:19 12:22
  29:16 112:14 115:8
  117:1 125:6 141:14
  141:14
**sound** 134:5
**sounds** 23:14 66:16
**source** 80:18 84:2
  114:7,11 115:9
**sources** 57:6 122:22
**south** 1:3 2:5 35:24
  146:15
**space** 12:6 33:2,6
  48:17 125:8,15
**speak** 44:6 77:7,9
**speaking** 39:3 50:11
  62:12 91:15 95:2
  116:9,24
**speaks** 80:24 131:8
  131:16
**special** 40:15 96:13
**specially** 12:24

**specialty** 141:10
**specific** 41:21 69:17
  69:19 72:17 73:13
  80:16,23 85:24
  106:3 112:10 114:6
  129:6
**specifically** 25:8
  34:22 41:8 59:14
  75:8,23 76:17 78:9
  86:4 104:4 130:1
  136:13 137:15
  138:11
**spectrum** 36:4
**speculate** 49:20
  100:23
**speculation** 100:17
  100:18,20
**speculative** 49:24
  100:16
**speed** 144:15
**spent** 20:13 125:7
**spoke** 106:11
**spoken** 46:13,17
  53:20
**spotting** 121:14
**stable** 116:17
**stacking** 52:3
**stages** 15:11
**stair** 87:16 130:10
**stairs** 87:20,21
**standard** 24:6 27:4
  27:6,7,9 59:23 70:6
  73:14 76:11,16 77:6
  77:8,24 78:10,11,18
  78:22 79:2,23 80:3
  80:7,10,17,23,24
  81:9,17,19 82:3,8,9
  82:12,18 83:17,19
  83:20 84:6,11,12,18
  85:7,17 137:18
  141:12
**standards** 18:24
  27:8 69:22 70:9,10
  70:12,13,20 71:1
  72:20,22 76:9,23

  77:19 84:16,22,23
  84:24 85:3,5,5,8,18
  85:24 86:3 91:18
  129:8 137:13
  138:17 140:21
  141:16 142:5
**standing** 127:5,19
**stands** 79:3
**start** 12:17
**started** 8:2,20 47:1
**starting** 141:1
**state** 5:13 38:15,23
  65:12 76:3 85:13,15
  112:23 117:8,18
  128:16 132:3 148:2
  148:6
**stated** 6:24
**statement** 42:24
  60:22 69:11 76:14
  81:2 82:10 86:10
  95:18 133:23
**statements** 140:8
**states** 1:1 38:20,24
  77:8 78:9,23 85:18
  137:18
**station** 74:3 94:4
**stationary** 138:22
**stations** 114:19
  125:24
**statistical** 114:11,22
**statistics** 60:12
  61:12,16 63:7 101:9
  101:10,11 111:1
  114:8
**status** 85:2
**statute** 68:3 90:8,12
  91:8
**statutes** 39:7
**stay** 48:14 138:23
**staying** 7:11
**steel** 23:17 28:8
  35:24 109:8 111:17
  145:12,13,15
**stepladder** 33:1
  94:7,17,18,19,21,21

**stepping**  84:5 94:21
**sticky**  19:16
**stipulate**  79:1
**stolen**  94:10 119:6
**stones**  117:8
**stop**  16:22 23:22
  24:4,6
**storage**  26:6
**stories**  130:10
**straight**  39:22 120:4
  120:8
**strap**  23:3 24:14
  28:8 30:4 32:5,21
  40:7,11,18,24 41:10
  42:12 53:3 58:7
  59:20,21,24 60:4
  97:10,14 116:14
  126:21 136:17
**strapped**  28:16,17
  42:16 104:3,5
  116:10,11,19
**strapping**  16:20
  24:16 26:5 27:22
  35:11 40:6,13 45:4
  45:13 53:22,24 61:9
  61:10,17,20 62:16
  62:19 63:23 64:1,5
  64:14 74:21,21
  75:12 76:18 77:14
  78:15 81:13 99:5
  104:22 113:18
  125:20 133:19
  134:6,8,12,15,15,19
  135:5,10,13,21
  136:10,16
**straps**  22:20 23:12
  23:13 24:2,8 42:15
  59:17 127:2
**strategy**  15:12
**street**  1:21 29:1
**strictly**  91:15
**structural**  102:14
**structure**  78:14
  94:19 117:5 120:6
  120:10 144:6

**structures**  141:11
**stuff**  75:5 110:18
**subheading**  60:7,10
  65:5 86:6
**subject**  7:3 115:3
**subsequently**  24:8
  30:1
**substitute**  130:13
**success**  130:10
**successfully**  30:4
  130:12
**sufficient**  40:23
  103:15
**suites**  1:14
**summary**  19:7
  39:10 44:19 68:20
  69:2 79:24 80:1
**sun**  105:10
**supervision**  148:13
**support**  9:23 11:17
  70:6 107:15 129:6
**suppose**  13:2 123:8
**supposed**  112:15
**sure**  12:15 16:12
  26:21 28:21 30:10
  41:6 65:19 91:2
  98:5,9 100:7 103:9
  103:17 107:3 109:4
  113:2 127:16
  131:21 133:6
  144:10,15
**surface**  13:1 62:14
  64:24
**survived**  130:12
**surviving**  19:6
**suspect**  88:10
**suspension**  129:7
**sworn**  5:10 148:9
**system**  25:9 49:13
  76:21,23 77:2,3
  86:16 104:22 105:4
  105:12 106:3 107:5
  107:5,20,20 108:12
  108:24 118:2,3
  119:2,4 125:10

**systems**  76:20
  101:23 104:16
  105:14 106:5,20
  107:1,7,8,14,14
  108:1,10,11,18,21
  108:22,22,23
  117:20,21 118:4,16
  119:24 123:21
  141:13 144:4

**t**

**t**  3:11 9:3 11:9
  113:24 143:24
  144:3 148:1,1
**table**  12:9 39:9
  68:20
**tail**  44:8
**take**  7:8 11:12 17:24
  19:13 37:2 48:17,17
  50:16 61:19 66:4
  68:12 88:15 93:14
  96:16 98:7 101:19
  113:17 121:9
  125:11 127:11
  128:5 134:24
  141:15
**taken**  1:13 5:19
  16:20 29:7 37:7
  59:2 66:14 75:18
  114:14 119:6 144:8
  148:8
**takes**  51:2,3 114:4
  125:15 135:15
  145:4
**talk**  33:15 39:20
  40:10 50:18 55:13
  70:3 95:21 112:18
  115:3 128:12
**talked**  25:15 28:4
  35:18 37:22 46:2,4
  46:5,10 85:23
  116:15 117:21
  122:24 126:10
  128:14 143:17

**talking**  8:4 11:3
  20:14 33:21 34:10
  37:13 51:11 52:2,11
  56:6 71:3 74:15,16
  75:4,12 101:24
  109:14 135:8,19
**talks**  36:3 38:3
  42:14 50:24
**tall**  33:16,24 34:3
  52:4 53:10 127:17
**taller**  54:5
**tank**  119:17
**tankers**  119:17
**tarp**  21:19 23:12,13
  23:18 24:14,15
  30:11 33:15,16
  42:15,16,20 44:20
  44:23 46:5 51:5,5
  53:4 93:15 105:9
  112:21,21 113:23
  117:10,15 127:4
  128:8 135:18,18
**tarped**  24:19,21
  116:23 134:21,21
  135:7,13
**tarping**  16:17,21
  24:16 26:5 27:22
  33:14 35:3 54:1
  62:17,19 63:23,24
  64:9 73:8 74:3
  75:12 77:1,15 78:15
  81:12 94:4 99:5
  104:23 113:18
  114:19 117:1,18
  125:20,23 134:11
  134:23 135:1,24
  136:10,13,16,23
**tarps**  30:6,9 34:6
  42:15 51:6,9 117:4
**tearing**  42:16
**technical**  13:17
**technically**  67:5,9
**techniques**  116:16
  125:4

telephone 19:9 20:10 46:11
tell 6:9 19:3 20:13 23:1 28:9 34:6 37:20 41:4,18 42:19 47:17 75:8 88:7 103:3 121:5,8 148:10
telling 33:4 51:8 52:9
temporary 138:1
ten 20:5 49:8 112:11 127:23 140:8 144:13
tend 128:5
tendency 101:6
tennessee 34:12 108:2
tens 85:4 94:4
term 81:19 97:17
terms 35:5 66:20 82:7 104:19 106:11 110:22 112:22 125:13 136:1
tested 130:1
testified 5:11 146:22
testify 21:21 45:15
testifying 110:17 123:8
testimony 3:19 5:7 15:14 18:10 45:24 57:10 120:22 121:17 124:18 140:4 148:11,15
testing 27:4 146:7
texarkana 34:16
texas 14:21
thank 14:16 56:9 131:6 146:20 147:5
thanks 56:11
thereof 106:18 148:17
thick 60:1
thicknesses 109:7

thin 48:12
thing 24:18 31:14 43:15 46:2 67:11 70:4 71:3 102:9 105:2 111:11 112:19 133:12 135:2 137:8 138:6
things 16:2 25:19 57:20,21 66:17 80:10,13 91:21 95:2 96:13,14,21,24 98:4 109:18 114:5 125:6 130:8
think 6:24 9:22 10:8 13:23 17:7 18:21 19:4 21:23 25:3 26:21 28:24 29:22 35:6,19 38:4,14 40:4 44:14 45:19,21 46:10 47:8,21 49:19 53:21 54:1,20 59:15 70:21 73:21 74:24 75:22 77:6,11 81:1 85:15,15 87:14 89:12,12,17 91:6,10 91:15 94:2 95:1,15 95:23 97:6,7,12,13 97:18,20 99:22 100:23 101:4 102:3 102:5,8 110:10 112:5,20,22 116:5 118:7 121:24 122:21 123:10,14 124:5,17 125:9,15 125:18,19,23 127:15 129:10,16 130:5,22 131:7,14 132:11 136:20 142:24 143:24 145:1 146:19
thinking 27:18 49:12 130:20
thinks 42:6
third 23:3 36:18 60:21

thought 14:11 20:24 41:9 44:5 49:15,17 95:6 99:1 100:10 107:4 126:22 132:24 145:2
thousand 107:5
thousands 66:21 85:4 94:4 112:15 115:11
thread 136:16
three 10:20 11:3,23 19:4 22:20 23:10,10 35:11 42:1 46:11 51:21 59:24 66:5 91:4 108:3 109:5 114:4 115:6 120:5,9 145:9
threw 30:4
throughput 105:5 113:16 124:24
throughs 115:13
throw 23:12,13,18 30:8 59:10,17 132:22
throwing 23:17 42:9 59:20
thrown 59:8,22 60:4 67:6
tidy 16:2
tie 33:14 51:3 127:24
tight 24:2
time 6:6 7:5 8:10 10:17 14:2 19:22 23:14,15 28:14 29:2 34:8,9 35:1 37:21 40:3 42:4,14 49:2 51:2 53:23 70:4 71:4 72:11 85:16 86:2,4 91:3 99:11 99:15,15 101:19,24 109:9 118:13 123:6 123:11 125:7 127:5 128:22 129:4 132:10,15 133:5

134:7,21 135:1,10 135:12,14,16,17,21 135:23,24 136:1 139:24 141:13 147:9 148:8
times 5:19 8:16 28:3 28:4 29:4 32:2 41:22 67:6 97:3 99:23 126:17
title 9:11
today 25:5 101:16 105:18 112:2 122:14 123:5 124:19 133:7
told 24:4,20 41:9 51:23 53:15 100:12 124:4 126:12 135:20
tolerance 101:24
top 24:12 34:21 35:4 35:7 40:8 42:1,4,7 42:15 51:16 52:4,15 52:19 53:9 59:5 64:7 92:3 103:23 114:15 115:24 126:14,19 127:3,19 128:10 129:17 133:18 135:22 136:22 141:15
toss 40:24 58:6
tossing 28:7 40:7 64:6
total 122:15
touches 40:17
track 35:13 111:20
tractor 27:21
traded 15:11
trading 7:22,24 8:8 8:23
traffic 23:16 33:10 54:19,20
trailer 23:5,6,9 30:2 30:8 32:19,22 40:13 41:11 43:13,14 44:21 51:1,19 52:8

[trailer - unloaded]                                                    Page 173

53:9 62:15,21 64:7 81:7 89:2 108:8 116:20 124:2 127:24 128:3 133:19,21 134:2,8 134:11,19,20 135:5 135:6,10,11,12,21 135:24

**trailers**  16:17 24:13 25:9 26:5 27:21 32:14 48:7 76:4 104:3 110:19 111:9 111:9 113:19 134:6

**train**  141:11

**trained**  99:14 105:4 142:9

**trainer**  97:19

**training**  106:15 119:10

**transcribed**  148:13

**transcription**  148:14

**transport**  36:4

**transportation**  36:4 36:11 130:16,18,21 131:1,20,22 132:6,9 132:11

**transporting**  25:21 48:5

**trapped**  30:2 32:4 54:19 95:10

**traveling**  35:5 117:11

**treat**  64:10

**treatise**  141:17

**trial**  3:18 5:6 15:12 21:24 120:22 121:15 123:8,17 146:15,17

**trick**  111:19

**tried**  104:12

**trigger**  76:5

**triggers**  114:18

**trip**  24:7

**triple**  129:7

**truck**  13:11,13,23 14:10 16:16 21:1,16 21:19 23:18 24:7,10 26:5 28:8 29:6 30:2 32:11 33:2,4 40:7 40:17,20,20 41:1,2 41:5,5 42:10 43:13 43:14 44:20,21 48:7 48:15 50:5 51:1 52:8,11,13,18 53:2 53:8 54:3,12,19,22 54:22,23 55:1 57:23 57:24 59:3,4,5,13 59:17 61:9,10 62:1 62:13,15 64:7,10,11 69:21 72:10,13 73:8 73:12 74:4,22,22 76:17 78:14 81:10 81:14 82:10 83:18 84:5 89:2 90:11 92:19,20,20 93:6 95:4,17 96:5,11 97:10,11,21 99:5,23 108:8 120:3 127:17 127:17 134:15 135:1,22 136:9 137:5 145:3

**trucker**  63:2 108:17 117:24 134:13

**truckers**  12:24 27:21 34:2 64:13,13 86:8,11,21 94:9 105:3,9 113:22 140:24 146:4,6,10

**trucking**  16:16,18 48:5 50:3,9 62:6 86:3 108:20 138:21 139:7

**truckloads**  110:23

**trucks**  12:20 14:4 24:13 27:24 28:6 30:3 32:12,14 33:7 35:12,14,18 37:22 37:23 39:18,21 48:7

**triple**  51:2 61:17 64:4 72:18 75:9,10,24 77:5,14,15,15 78:6 78:24 79:4 80:11 81:19,20,23 82:13 86:1 95:9 98:4 104:17,18,19 105:5 109:3,6,9 111:6,8 111:10,22 112:13 112:16 113:18,21 114:8,24 117:7,14 119:17 124:11 125:21 137:16 138:21,22 139:5,6,8 139:9,10 144:12

**true**  6:16 8:4 9:16 14:16 45:18,20 57:2 58:21 61:1 69:16 70:2 71:12 73:15 76:6 85:22 99:8 103:7 145:21 148:14

**truth**  83:5 148:10,10 148:11

**try**  19:6 22:22

**trying**  16:13 19:5 34:20 49:16 54:18 126:13 131:2

**turn**  102:12

**turning**  35:18 51:1

**twisted**  34:22

**two**  9:23 11:23,24 22:20 23:6,7,23 24:8 25:9 27:23 28:4,12,13,18,20 30:4 33:1,6,12,13 39:21,21 41:8 44:11 48:8,10,12 52:4 58:3 59:24 63:4,15 69:17 70:9,10,21 91:4 101:22 104:24 105:13 108:3,6,14 109:1,5 113:22 115:6 118:19 120:9 121:15 133:11

145:5

**type**  46:3 61:4 87:7 90:4 102:21 108:1 113:23 116:24 129:5,8,22 130:1 138:4

**types**  48:17 78:13 108:18 117:14 125:22 128:4

**typical**  63:7 125:24 141:5

**typically**  26:4 34:14 50:22 71:9 120:7,16

**u**

**u**  11:10 23:6 145:13

**u.s.**  8:20 85:2 117:2

**unable**  63:5

**unacceptable**  92:5

**unaware**  88:7

**unclear**  5:24 6:9 126:11

**undergo**  27:5

**underneath**  36:8,8

**underreported**  63:3

**understand**  24:18 28:23 36:6 42:3 43:15 51:23 72:5 86:23,24 87:2,22 88:14 93:19 140:11

**understanding**  45:2 69:14 71:6 76:11 89:23 92:23 104:16

**understood**  41:12 88:5 93:24 140:9

**unfortunately**  83:5 117:13

**united**  1:1

**universally**  116:10 116:11

**university**  6:20 125:5

**unload**  22:13

**unloaded**  111:24,24

**unloading** 12:20
72:18 75:9,10,24
76:17 77:4,14 78:6
78:24 80:11 81:20
81:23 82:13 86:1,4
104:18 107:19
137:16 138:12
**unnecessarily** 74:4
**unnecessary** 5:23
**unrealistic** 118:7
**unreported** 62:8,10
62:11,22
**unrolled** 33:17
**untarping** 46:6
**updating** 101:10
**upside** 144:2
**usage** 125:24
**use** 37:24 48:8 49:6
50:15 70:5 71:16
74:3 84:2 86:15
94:16 97:17 105:12
106:4 109:3 114:24
117:16 118:3,4
120:1 129:4,23,24
142:3
**useful** 13:21,23
**usually** 22:6 23:12
51:16 90:3 114:18
120:19

**v**

**v** 1:6
**value** 15:14
**variable** 58:11
**varied** 34:5
**varies** 114:12
**variety** 97:4
**various** 15:11
136:15
**vegetable** 117:18
**vehicle** 32:4 82:3
94:8
**vehicles** 76:4 139:5
139:7

**verify** 118:12
**veritext** 1:21
**vernon** 55:12,14,16
**version** 66:10
**versus** 102:12
120:14
**vertical** 106:17
145:2
**vertically** 125:10
126:20
**vicinity** 95:19
**video** 17:19 29:2
102:20 105:4
119:10
**videotape** 17:16
29:17
**view** 29:1 48:20
64:11 78:12
**violation** 75:1 86:18
**violations** 140:17
**virginia** 34:12
**visit** 67:24 74:18
115:12 146:17
**visited** 104:8 115:11
**visiting** 103:21
105:9
**visitors** 73:16
**visits** 33:22
**vitae** 3:15 5:3 6:15

**w**

**w** 2:3 65:22
**wait** 29:24 115:17
**waive** 147:11
**waived** 147:15
**walk** 23:11 32:20
39:22 41:23 42:1,2
81:4,12,24 83:21
94:20 126:14
**walked** 51:16 55:5,8
95:20
**walking** 41:19 81:6
103:23 127:2 128:8
139:21

**wall** 64:5 137:22
**want** 12:13 19:16
20:3 22:2 31:5
40:19 72:15 76:20
79:1,3,7,11 82:2
96:20 113:2 121:3,4
123:17 126:4,8
127:12 131:18
133:12,13 134:14
**wanted** 42:17
**wants** 76:13
**watched** 59:17
**way** 7:11 24:9 31:16
33:9,14 42:11 48:16
50:2,16,24 53:5,6
58:1 70:8 71:9
82:15 94:9 102:5
109:4,24 112:3
128:18 133:21
**ways** 59:7 126:2,24
**we've** 58:19 73:24
106:5 145:20,20
**wear** 73:5,6 91:23
92:1 105:6 119:5,7
129:2 139:22 146:4
**wearing** 129:1 130:3
146:10
**web** 16:17 32:4
**webbing** 59:24 60:1
64:6 126:20 127:6
128:1
**website** 63:22 79:21
79:24 80:5,18
108:19,20 113:10
**week** 34:13,14
115:12
**weeks** 120:11
**weigh** 109:12
**weighed** 100:13
**weight** 48:18 100:8
100:13,19 101:5,20
101:21 102:3
118:15 126:7
**weights** 101:24

**welcome** 144:19
**went** 35:14 51:15
55:10
**west** 34:11
**whatsoever** 76:22
**wheel** 32:24
**wheeled** 139:7
**whichever** 121:8
**whip** 117:11
**wide** 23:6,9,11
51:20,20 59:7,24
**widener** 65:16,21
**williams** 36:11
46:17 47:7 48:3
49:1,4,17 50:21
51:23 52:9,22,23
53:14,15,22 55:13
57:1,4,23 59:15
95:4,12,16,20 96:4
96:8 97:20 133:22
133:23 134:6,18,19
134:24 135:4,5,7,11
135:13,20,20
**willing** 113:15
**wilmington** 1:15,22
**wire** 25:10
**wires** 25:16
**wise** 37:24 71:22
**witness** 4:19 19:6,8
20:19 37:4 52:19
56:7,14,20 68:18
77:17 80:6 81:1,22
89:20 90:3 96:7
127:21 131:18
133:12 136:20
142:19 148:15,18
**woke** 23:19
**wondering** 143:12
**wood** 116:13
**word** 22:10,12 45:7
55:17 87:13 97:17
127:11
**words** 23:7 24:17
26:15,17 48:9 53:9
89:21 117:23

**[work - zealand]**

**work**  8:4,21 11:21
21:2 25:7 35:22
40:5 50:16 60:21
61:5 64:11,20 75:21
81:5 87:3 88:24
90:4,16 104:7
106:14 107:18
119:12 120:13,14
122:18 123:7 126:2
127:24 133:14
136:23,23 139:12
141:22 144:20,22
146:13
**worked**  107:18
**worker**  7:7 117:23
126:6
**worker's**  90:7,11,13
91:7
**workers**  83:14
139:4,20
**working**  50:24 54:2
60:23 66:24 71:10
98:6 107:8 114:21
117:17 118:21
119:24 138:20,22
145:13
**workplace**  137:19
139:13 140:7 141:4
**workstations**
144:14
**worse**  35:24 56:11
87:8
**write**  20:23 27:14
140:12
**writing**  23:8 26:14
56:11 66:7,8,9,11
135:4
**written**  31:6 36:10
63:21 78:22
**wrong**  52:24 103:4
127:15
**wrote**  25:12 34:18
48:24 55:12 58:3

| x |
|---|
| **x**  3:11 |

| y |
|---|

**y**  11:10
**yard**  16:20 107:17
**yeah**  15:4 112:7
**year**  46:24 50:15
62:8 87:21 101:22
110:23 120:16
**years**  8:3 15:20
24:12 32:3 48:6,24
49:2,8 50:8 63:15
65:24 71:24 73:1,3
73:11 99:4 101:4,14
112:11 115:6,14
117:16 119:15
120:9 125:15 139:1
139:15 145:9
**yellow**  19:16
**yesterday**  73:2
**young**  50:22

| z |
|---|

**z15**  86:3
**z359**  77:19
**z359.1**  77:13
**z359.1.**  69:23 76:10
**zealand**  145:12